PRESENT:  All the Justices

PETER VLAMING

v.  Record No. 211061

WEST POINT SCHOOL BOARD, ET AL.

OPINION BY
JUSTICE D. ARTHUR KELSEY
DECEMBER 14, 2023

FROM THE CIRCUIT COURT OF KING WILLIAM COUNTY
Jeffrey W. Shaw, Judge

The West Point School Board terminated the employment of Peter Vlaming, a high school French teacher.  Vlaming claims that he lost his job not because of something he had said — but because of what his conscience would not allow him to say.  In class, Vlaming referred to a transgender student by the student's preferred name and avoided the use of third-person pronouns when referring to the student.  Vlaming claims that the School Board ordered him to use government-mandated pronouns *in addition to* using the student's preferred name.  The School Board fired Vlaming for refusing to do so.

Vlaming sued the West Point School Board, the principal and the assistant principal of the high school, and the superintendent (collectively, the "School Board"), alleging constitutional, statutory, and breach-of-contract claims.  Examining only the allegations in Vlaming's complaint, the circuit court dismissed Vlaming's claims, finding that they failed to state legally viable causes of action.  Disagreeing with the circuit court, we reverse and remand for further proceedings.

I.

Without hearing any evidence, the circuit court ended this case at its earliest stage by sustaining the School Board's demurrer and granting the School Board's plea in bar.  Given this procedural posture, we accept on appeal the facts alleged in Vlaming's complaint as true and draw any reasonable inferences from those facts in his favor.  *See, e.g.*, *Eubank v. Thomas*, 300

Va. 201, 206 (2021); *Plofchan v. Plofchan*, 299 Va. 534, 547-48 (2021). We apply the same presumption of correctness to allegations challenged by a plea in bar when, as here, the plea seeks to duplicate the function of a demurrer and when no disputed facts are resolved following an evidentiary hearing. *See California Condo. Ass'n v. Peterson*, 301 Va. 14, 20-21 (2022); *Our Lady of Peace, Inc. v. Morgan*, 297 Va. 832, 847 n.4 (2019).

So viewed, Vlaming's complaint alleges the following facts. Vlaming taught French at West Point High School for six years. Consistently giving Vlaming positive evaluations, the School Board granted him "continuing contract status." *See* J.A. at 5, 42. Near the end of the 2017-18 school year, Vlaming learned that a biologically female student (referred to in this litigation as "John Doe") intended to transition to a male identity. *Id.* at 6-7. Previously a student in Vlaming's Exploratory French and French I classes, Doe planned to enroll in Vlaming's French II class for Fall 2018.

At the beginning of the school year, Vlaming ordinarily asked each student to pick a French name that the student preferred to use for that class and any subsequent French classes. Prior to the beginning of the 2018-19 school year, Vlaming "became aware that [Doe] desired to be called by a more culturally masculine name instead of [Doe's] culturally female names (both [Doe's] given and French names)." *Id.* at 7. Seeking "[t]o avoid drawing unwanted attention" to Doe, Vlaming asked the entire French II class to "pick new French names for the semester" despite having already chosen a French name in French I "so that [Doe] would not be the only one changing names." *Id.*

Toward the middle of the fall semester, Vlaming alleges, he also became aware that Doe wanted to be referred to by masculine pronouns. For Vlaming, this request asked him to violate his conscience. He holds religious and philosophical convictions that reject the idea that "gender

2

identity, rather than biological reality, fundamentally shapes and defines who we truly are as humans" and instead accept as a verity that "sex is fixed in each person, and that it cannot be changed, regardless of our feelings or desires." *Id.* at 2-3. In the "ongoing public debate regarding gender dysphoria," Vlaming alleges that he cannot in good conscience "use pronouns that express an objectively untrue ideological message." *Id.* at 2. "Mr. Vlaming's conscience and religious practice," the complaint states, "prohibits him from intentionally lying, and he sincerely believes that referring to a female as a male by using an objectively male pronoun is telling a lie." *Id.* at 11.

Seeking to respect Doe's preferences while remaining true to his conscience, Vlaming used Doe's "new preferred names (both French and English)," *id.* at 7, and avoided using third-person pronouns when referring to Doe. To limit the risk of Doe feeling singled out, Vlaming "also rarely, if ever, used third person pronouns to refer to any students during class or while the student being referred to was present." *Id.* "In class discussion," the complaint explains, "if Mr. Vlaming refers to a student, or their work, it is rare that he uses a pronoun. Rather he would say, for example, 'What do you think about John's answer?' or, 'Was John's answer correct?'" *Id.*

On October 22, 2018, Vlaming met with Doe and explained that "he was trying to honor [Doe's] wishes" by using Doe's preferred name and "would not use the female pronoun" to refer to Doe when the two of them were present. *Id.* at 8. "During the meeting," the complaint alleges, Doe "did not take issue with, or mention at all, Mr. Vlaming's practice of not using pronouns in class. The meeting ended on a good note, and the student seemed to be satisfied and comfortable with the situation." *Id.* Later that day, Vlaming called Doe's parent. The parent told Vlaming that Doe "had thought the meeting had gone well." *Id.* When Vlaming explained

3

his reasons for avoiding the use of pronouns, the parent told Vlaming that he "should leave his principles and beliefs out of this and refer to [Doe] as a male." *Id.* at 9.

On October 23 and 24, Vlaming met with Assistant Principal Suzanne Aunspach to discuss Vlaming's treatment of Doe. Aunspach told Vlaming "that he should be aware of the law." *Id.* at 10. Aunspach gave Vlaming two documents prepared by the National Center for Transgender Equality. *See id.* at 46-49. One of these documents asserted that transgender students have the legal "right to be addressed by the names and pronouns that they use" and the legal "right to use the restrooms and locker rooms that match their gender identity." *Id.* at 46. With respect to students "whose genders aren't entirely male or female, sometimes called non-binary or genderqueer students," the document stated that "these student[s] should determine which locker rooms and restrooms, pronouns, and dress code standards are most appropriate for them in accordance with their gender identity." *Id.* at 47.

During his conversations with Aunspach, Vlaming again explained that "using male pronouns to refer to a female was against his religious beliefs." *Id.* at 10. Vlaming believes "both as a matter of human anatomy and religious conviction that sex is biologically fixed in each person and cannot be changed regardless of a person's feelings or desires." *Id.* "Saying 'he,' 'him,' or 'his' objectively expresses the message that a person is, or the speaker believes [the person] to be, male." *Id.* Vlaming explained that his "conscience and religious practice prohibited him from intentionally lying" by "referring to a female as a male." *Id.* at 11. Aunspach's response was direct: Vlaming's "personal religious beliefs end at the school door" to the extent that they conflict with School Board policy. *Id.* Under School Board policy, Aunspach said, Vlaming's "non-use of pronouns was not enough," and he "should use male pronouns or his job could be at risk." *Id.* at 10.

4

A week later, Vlaming met with Principal Jonathan Hochman. Vlaming explained that he did not wish to offend Doe but that his religious beliefs prohibited him from using masculine pronouns to refer to Doe. Like Aunspach, Hochman told Vlaming that he was required to use masculine pronouns to refer to Doe "in any and every context" and that Vlaming's failure to do so could lead to the termination of his employment. *Id.* at 11. In another meeting with Vlaming, Hochman and Aunspach together repeated that he was required to use masculine pronouns to refer to Doe and would be reprimanded for not doing so in the past.

Shortly after this last meeting, Vlaming returned to his French class. Under his supervision, the students participated that day in a paired classroom exercise involving the use of virtual-reality goggles. At one point, Doe was wearing the goggles and walking through the classroom while receiving instructions from a second student. Concerned that Doe was about to walk into a wall, Vlaming exclaimed to the second student: "Don't let her hit the wall!" *Id.* at 12. Vlaming immediately "put his hand to his mouth" and finished supervising the activity. *Id.* When class concluded, Vlaming apologized to Doe, explaining that "this is difficult" and that his remark was a spontaneous reaction to the risk that Doe was about to walk into a classroom wall and get hurt. *Id.* Dissatisfied with this explanation, Doe withdrew from Vlaming's class later that day.

Vlaming immediately reported the incident to Hochman. Hochman explained that Vlaming should have expressly apologized to Doe for not using a masculine pronoun. Hochman told Vlaming: "You know what you do to d[e]fuse a situation like that? You say, 'I'm sorry, I meant to say *him*.'" *Id.* (emphasis in original). Later that day, Hochman recommended to Superintendent Laura Abel that Vlaming be placed on administrative leave.

5

The following day, Abel suspended Vlaming pending an official investigation of his actions. Five days later, Hochman issued a reprimand and final warning letter to Vlaming. The letter explained that Vlaming's refusal to use masculine pronouns to refer to Doe had violated the School Board's policy "prohibiting harassment or retaliation against students and others on the basis of gender identity." *Id.* at 14. Abel met the same day with Vlaming to discuss the terms of the final warning letter. During this conversation, Vlaming said that he would continue to use Doe's preferred name but could not use masculine pronouns to refer to Doe because his religious beliefs and conscience prohibited him from doing so.

Abel subsequently gave Vlaming a written directive ordering him to use masculine pronouns to refer to Doe. Vlaming's noncompliance, the directive warned, would result in the termination of his employment. Having already committed to using Doe's preferred name and avoiding the use of third-person pronouns, Vlaming again said that he could not in good conscience use masculine pronouns when referring to Doe. Abel then recommended Vlaming's termination to the School Board.

At the conclusion of a subsequent public hearing, the School Board voted to terminate Vlaming's employment. The School Board fired Vlaming, the complaint alleges, because he had refused to use masculine pronouns to refer to Doe and had refused to comply with directives from school administrators to do so. *See id.* at 16, 68-69. Vlaming's refusals, the School Board stated, had violated School Board Policies AC and GBA/JFHA, which prohibited discrimination and harassment based on gender identity.

Vlaming later filed a complaint in the circuit court against the School Board, Abel, Hochman, and Aunspach. The complaint asserted free-exercise, free-speech, due-process, and breach-of-contract claims resulting from Vlaming's termination. Vlaming based his claims

6

entirely on provisions of the Constitution of Virginia, Virginia statutes, and other Virginia law. The School Board defendants filed a joint demurrer to each of the claims in Vlaming's complaint and a plea in bar to Vlaming's free-speech claims. The School Board did not present any evidence to support the plea in bar.

The circuit court granted the School Board's plea in bar and sustained the School Board's demurrer. The circuit court sustained the School Board's demurrer to Vlaming's breach-of-contract claim to the extent that it applied to Abel, Hochman, and Aunspach, but partially overruled it to the extent that it applied to the School Board. As to the School Board, the circuit court sustained the demurrer to that portion of the claim alleging that the School Board had terminated Vlaming's employment based upon unlawful grounds, and it overruled the demurrer to the extent that the breach-of-contract claim asserted procedural challenges against the School Board.[1] Vlaming nonsuited this surviving portion of his breach-of-contract claim against the School Board.

## II.

"On appeal, we review a circuit court's judgment sustaining a demurrer de novo." *Eubank*, 300 Va. at 206. Likewise, the "standard of review on appeal when considering a plea in bar is 'functionally de novo' when the appellate court must consider solely the pleadings to resolve the issue presented." *Plofchan*, 299 Va. at 547 (quoting *Massenburg v. City of Petersburg*, 298 Va. 212, 216 (2019)). In this scenario, "we consider as true the facts alleged in the [complaint] and the reasonable factual inferences that can be drawn from the facts alleged."

---

[1] On appeal, Vlaming only challenges the dismissal of the breach-of-contract claim to the extent that it applies to the School Board's decision to terminate his employment contract based upon allegedly unlawful grounds. Vlaming has not challenged on appeal the dismissal of the breach-of-contract claim as to Abel, Hochman, and Aunspach.

7

*Eubank*, 300 Va. at 206; *see also Plofchan*, 299 Va. at 547-48. "We do not evaluate the merits of the allegations, but only whether the factual allegations sufficiently plead a cause of action." *Eubank*, 300 Va. at 206. Whether these factual allegations and inferences, when assumed to be true, constitute a "viable cause of action" is a question of law. *See Terry v. Irish Fleet, Inc.*, 296 Va. 129, 139 (2018).

A.

Because Vlaming predicates his free-exercise claim exclusively on Article I, Section 16 of the Constitution of Virginia, we limit our analysis and holding to its specific text and historical context. "Just as it remains the duty of the United States Supreme Court to interpret the text of the Constitution of the United States, our duty as the highest court in Virginia is to reach our own conclusion with respect to the meaning of Virginia's foundational charter of government." *Palmer v. Atlantic Coast Pipeline, LLC*, 293 Va. 573, 586 (2017) (McCullough, J., concurring).

> As Virginia's Supreme Court, we must uphold the Constitution of Virginia and the individual rights it protects. If, upon a careful inquiry, some of the clauses of our Declaration of Rights are found to offer more protection than the protections found in the Constitution of the United States, . . . we [must] do our duty and honor the original public meaning of those provisions.

*Id.* at 587. As we recently emphasized, "[e]ven when principles of federal and state constitutional law share common ground, there is 'no good reason not to look first to Virginia's Constitution for the safeguards of the fundamental rights of Virginians.'" *McKeithen v. City of Richmond*, 302 Va. ___, ___ n.7, 893 S.E.2d 369, 378 n.7 (2023) (citation omitted). Our colleagues in the federal courts are of one mind with us on this view: "[S]tate courts are absolutely free to interpret state constitutional provisions to accord greater protection" than

8

federal-court interpretations of "similar provisions of the United States Constitution." *Arizona v. Evans*, 514 U.S. 1, 8 (1995).

We begin our analysis with the observation that the "constitutional guarantees of religious freedom have no deeper roots than in Virginia, where they originated, and nowhere have they been more scrupulously observed." *Reid v. Gholson*, 229 Va. 179, 187 (1985) (footnote omitted). "No State has more jealously guarded and preserved the questions of religious belief and religious worship as questions between each individual man and his Maker than Virginia." *Jones v. Commonwealth*, 185 Va. 335, 343 (1946).

Given Virginia's historic role in the protection of religious liberties, the provisions in the Constitution of Virginia have "a vitality independent of the Federal Constitution." 1 A.E. Dick Howard, Commentaries on the Constitution of Virginia 303 (1974) [hereinafter Howard, Commentaries]. Article I, Section 16 of the Constitution of Virginia states:

> That religion or the duty which we owe to our Creator, and the manner of discharging it, can be directed only by reason and conviction, not by force or violence; and, therefore, all men are equally entitled to the free exercise of religion, according to the dictates of conscience; and that it is the mutual duty of all to practice Christian forbearance, love, and charity towards each other. No man shall be compelled to frequent or support any religious worship, place, or ministry whatsoever, nor shall be enforced, restrained, molested, or burthened in his body or goods, nor shall otherwise suffer on account of his religious opinions or belief; but all men shall be free to profess and by argument to maintain their opinions in matters of religion, and the same shall in nowise diminish, enlarge, or affect their civil capacities. And the General Assembly shall not prescribe any religious test whatever, or confer any peculiar privileges or advantages on any sect or denomination, or pass any law requiring or authorizing any religious society, or the people of any district within this Commonwealth, to levy on themselves or others, any tax for the erection or repair of any house of public worship, or for the support of any church or ministry; but it shall be left free to every person to select his religious instructor, and to make for his support such private contract as he shall please.

9

This fulsome language stands in stark contrast to the single clause in the First Amendment addressing religious liberty: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. To some Virginians of the founding generation, this contrast was worrisome — enough so that Virginia delayed ratification of the First Amendment for a year and a half "partly on the argument that the provision for religious freedom was too weak." 1 Howard, Commentaries, *supra*, at 293. Whether that fear was justified we cannot say.

What we can say is that Article I, Section 16 of the Constitution of Virginia plainly declares that "all men are equally entitled to the free exercise of religion, according to the dictates of conscience." Among other things, this means that "[n]o man . . . shall be enforced, restrained, molested, or burthened in his body or goods, nor shall otherwise suffer on account of his religious opinions or belief" and that "all men shall be free to profess and by argument to maintain their opinions in matters of religion, and the same shall in nowise diminish, enlarge, or affect their civil capacities." Va. Const. art. I, § 16.

The first sentence of Article I, Section 16 has been in the Constitution of Virginia since 1776. "The remaining two sentences in this section draw heavily on Thomas Jefferson's 1786 Statute for Religious Freedom and first appeared in the 1830 Constitution in the Legislature Article, where they remained until they were moved to the bill of rights in the 1971 Constitutional revision." John Dinan, The Virginia State Constitution 83 (2d ed. 2014). This addition to the Constitution of Virginia "gave that legislative enactment, theretofore generally treated as of constitutional consequence, explicit constitutional status." Brent Tarter, Constitutional History of Virginia 96 (2023).

Because of the marked textual differences between the religion clauses of the First Amendment of the United States Constitution and the free-exercise provisions of the Constitution of Virginia, interpretations of the former inform but do not necessarily govern the construction of the latter. This observation requires us to examine the informative influence of *Employment Division v. Smith*, in which the United States Supreme Court held that a neutral law of general applicability does not violate the Free Exercise Clause of the First Amendment even when the law incidentally burdens religious views, speech, or practices. *See* 494 U.S. 872, 878-79 (1990). Four justices in *Smith* — Justices Brennan, Marshall, Blackmun, and O'Connor — strongly disagreed with its reasoning: "In my view, today's holding dramatically departs from well-settled First Amendment jurisprudence . . . and is incompatible with our Nation's fundamental commitment to individual religious liberty." *Id.* at 891 (O'Connor, J., concurring in the judgment). Many others outside the judiciary, including the American Civil Liberties Union, expressed even stronger views in the aftermath of *Smith*.[2]

Though *Smith* has been interpreted broadly by some lower courts and narrowly by others,[3] the consensus view of *Smith* appears to be that the government has no obligation to

---

[2] At a congressional hearing addressing *Smith* and Congress's bipartisan response to it, the then-president of the American Civil Liberties Union expressed the view of many:

> My colleague . . . I think used very dramatic, but not overly dramatic language when he described the Supreme Court's decision in *Smith* as the *Dred Scott* of first amendment law. I would like to play out that analogy and say, by the same reasoning, that would make this act, the Religious Freedom Restoration Act, the civil rights act of first amendment law. It is that important, and I am very, very honored to have a chance to support it.

*The Religious Freedom Restoration Act: Hearing on S. 2969 Before the S. Comm. on the Judiciary*, 102d Cong. 171 (1992) (statement of Nadine Strossen, President, American Civil Liberties Union).

[3] In recent years, the United States Supreme Court has sought to ameliorate the

11

accommodate sincerely held religious beliefs if it is enforcing a law or policy that passes the neutrality and general-applicability tests. *See Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421-22 (2022); Lund, *supra* note 3, at 847-48. Never expressly overruled, *Smith* continues to be controversial, and calls for its reconsideration have not subsided in the 33 years following its issuance. *See, e.g.*, *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1888 (2021) (Alito, J., concurring) ("We should reconsider *Smith* without further delay. . . . It swept aside decades of established precedent, and it has not aged well."); *id.* at 1882 (Barrett, J., concurring) ("In my view, the textual and structural arguments against *Smith* are more compelling."); *id.* at 1931 (Gorsuch, J., concurring) ("*Smith* committed a constitutional error."); *City of Boerne v. Flores*, 521 U.S. 507, 556-57 (1997) (O'Connor, J., dissenting) ("I remain of the view that *Smith* was wrongly decided . . . ."); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 559 (1993) (Souter, J., concurring in part and concurring in the judgment) ("I have doubts about whether the *Smith* rule merits adherence. I write separately . . . to express my view that, in a case presenting the issue, the Court should re-examine the rule *Smith* declared.").[4]

_____

inflexibility of the *Smith* doctrine, but even the attempt at doing so, some critics say, has "warp[ed] the doctrinal fabric of free exercise." Christopher C. Lund, *Second-Best Free Exercise*, 91 Fordham L. Rev. 843, 845 (2022).

[4] Many legal scholars question the historicity of *Smith*'s reasoning. *See generally* John Witte, Jr. & Joel A. Nichols, Religion and the American Constitutional Experiment 138 (3d ed. 2011); Marc O. DeGirolami, *Free Exercise by Moonlight*, 53 San Diego L. Rev. 105, 106 (2016); W. Cole Durham, Jr. & Alexander Dushku, *Traditionalism, Secularism, and the Transformative Dimension of Religious Institutions*, 1993 BYU L. Rev. 421, 448; Kent Greenawalt, *Religion and the Rehnquist Court*, 99 Nw. U. L. Rev. 145, 154 (2004); Douglas Laycock, *The Remnants of Free Exercise*, 1990 Sup. Ct. Rev. 1, 1; Douglas Laycock, *The Supreme Court's Assault on Free Exercise, and the Amicus Brief That Was Never Filed*, 8 J.L. & Religion 99, 102-07 (1990) [hereinafter Laycock, *Amicus Brief*]; Lund, *supra* note 3, at 875-76; Michael W. McConnell, *Free Exercise Revisionism and the* Smith *Decision*, 57 U. Chi. L. Rev. 1109, 1116-19 (1990); Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1419-1513 (1990) [hereinafter McConnell, *Origins*].

Despite these significant reservations, the School Board argues that we should fold *Smith*'s reasoning into our interpretation of Article I, Section 16 of the Constitution of Virginia. One of our colleagues agrees with the School Board.[5] *See post* at 94 ("[W]hen a law is neutral as to religion, Article I, Section 16 is not violated."); *see also post* at 80-81, 86-88, 92-94, 97-98, 106-09. We do not. In our opinion, the federal *Smith* doctrine is not and never has been the law in Virginia, and its shelf life in the federal courts remains uncertain.[6]

Our reasoning instead begins with a review of the drafting history of the first sentence of Article I, Section 16. This provision "appeared in the 1776 Constitution and has been unchanged since that time." Dinan, *supra*, at 81. When a constitutional provision has remained unchanged throughout Virginia constitutional history, we apply the original meaning of the provision when first adopted. *See Howell v. McAuliffe*, 292 Va. 320, 345-47 (2016).[7]

---

[5] Justice Mann issues a separate opinion concurring in part and dissenting in part. Chief Justice Goodwyn and Justice Powell join only as to Parts II, III, and IV of Justice Mann's separate opinion. For the sake of simplicity, we will refer to Justice Mann's separate opinion as "the dissent." Justice Powell and Chief Justice Goodwyn also issue a separate opinion that concurs in the result that we reach on the free-exercise issue but disagrees with our analysis of the limiting principle applicable to Article I, Section 16 of the Constitution of Virginia.

[6] Citing *Tran v. Gwinn*, 262 Va. 572 (2001), the School Board argues that we have already adopted *Smith* as the governing standard under Article I, Section 16 of the Constitution of Virginia. *See* Appellees' Br. at 13. Our opinion in *Tran*, however, rejected the plaintiff's claim that a zoning ordinance "violated his First Amendment rights of religion" because the ordinance did not "satisfy the *Smith* test." *Tran*, 262 Va. at 577, 580. We did not once mention Article I, Section 16 of the Constitution of Virginia in our opinion in *Tran*. "For stare decisis to apply, 'the court must have decided the issue for which the precedent is claimed; it cannot merely have discussed it in dictum, ignored it, or assumed the point without ruling on it.'" *Jones v. Commonwealth*, 293 Va. 29, 50 (2017) (quoting Bryan A. Garner et al., The Law of Judicial Precedent 6 (2016)).

[7] The dissent claims that in *Howell* we consulted legal history only after making "an express finding that the constitutional provision cited as authority by the Governor was ambiguous before turning to the legislative history of Article I, Section 7 of the Constitution of Virginia." *Post* at 85 note 4. Had we not made such a finding, the dissent implies, the historical meaning of a constitutional text would not have been considered. The dissent's factual premise and legal conclusion are both incorrect. The ambiguity observation in *Howell* only pertained to

13

During the debate preceding the adoption of the 1776 Constitution of Virginia, George Mason proposed the following provision to protect religious liberty:

> That religion, or the duty which we owe to our CREATOR, and the manner of discharging it, can be (directed) only by reason and conviction, not by force or violence; and therefore, that *all men should enjoy the fullest toleration in the exercise of religion, according to the dictates of conscience, unpunished and unrestrained by the magistrate, unless, under colour of religion, any man disturb the peace, the happiness, or safety of society.* And that it is the mutual duty of all to practice Christian forbearance, love, and charity towards each other.

George Mason, Committee Draft of the Virginia Declaration of Rights, *in* 1 The Papers of George Mason 282, 284-85 (Robert A. Rutland ed., 1970) (emphasis added). Seeking more robust protection for religious freedom, James Madison recommended the adoption of a broader provision:

> That religion, or the duty which we owe to our CREATOR, and the manner of discharging it, can be directed only by reason and conviction, not by force or violence; and therefore, that *all men are equally entitled to enjoy the free exercise of religion, according to the dictates of conscience, unpunished and unrestrained by the magistrate, [u]nless the preservation of equal liberty and the existence of the State are manifestly endangered;* [a]nd that it is the

---

Article V, Section 12, which governs gubernatorial clemency powers. *See Howell*, 292 Va. at 343. Our extensive review of legal history, however, pertained to our interpretation of Article 1, Section 7, the anti-suspension provision that "has been repeated, without alteration, in all subsequent versions of the Constitution of Virginia." *Id.* at 345.

In another attempt to weaken the precedential weight of *Howell*, the dissent claims that *Howell* "directly contradicts" our earlier opinion in *Elliott v. Ashby*, 104 Va. 716, 718 (1905). *Post* at 85 note 4. In that case, we stated that, on the issue then before the Court, we had "a judgment of this court, which has remained *unquestioned* as the law of this state for more than a quarter of a century, construing a provision of the Constitution and a statute passed in pursuance thereof, and the construction placed upon them has not only been *unchallenged*, but must be taken as having been approved by the adoption of the identical language in the Code and the Constitution." *Elliott*, 104 Va. at 718 (emphasis added). *Howell* did not overlook or overrule any "unquestioned" or "unchallenged" prior decisions that were later folded into a reenacted statutory or constitutional provision. Nor do we in the present case. The dissent's contention to the contrary is unsupportable.

14

mutual duty of all to practice Christian forbearance, love, and charity towards each other.

James Madison, Madison's Amendments to the Declaration of Rights, *in* 1 The Papers of James Madison 174, 174-75 (William T. Hutchinson & William M.E. Rachal eds., 1962) [hereinafter Madison's Amendments] (emphasis added) (footnotes omitted).

Mason and Madison both held strong views of religious liberty. Their only disagreement appears to have been about the scope of the limiting principle applicable to that liberty interest. While Mason believed that the Commonwealth could limit religious liberty if doing so was necessary to protect "the peace, the happiness, or safety of society," Mason, *supra*, at 284-85, Madison believed that the Commonwealth could only interfere with religious practices "if the preservation of equal liberty, and the existence of the State [would] be manifestly endangered," Madison's Amendments, *supra*, at 174-75.

As Justice Sandra Day O'Connor, a strong critic of *Smith*, pointed out: "Although Madison endorsed a more limited state interest exception than did Mason, [their] debate would have been irrelevant if either had thought the right to free exercise did not include a right to be exempt from certain generally applicable laws." *Flores*, 521 U.S. at 556-57 (O'Connor, J., dissenting); *see also* McConnell, *Origins*, *supra* note 4, at 1463 (noting that "the dispute between Madison and Mason would not have mattered if the proviso were of no legal significance, and the proviso would have been of no legal significance if the 'full and free exercise of religion' did not include the right of exemption from generally applicable laws that conflict with religious conscience").

In June 1776, the Fifth Virginia Convention at Williamsburg adopted a "Declaration of Rights" and incorporated it into the first Constitution of Virginia. The Declaration asserted that individuals "have certain inherent rights, of which, when they enter into a state of society, they

cannot, by any compact, deprive or divest their posterity." Va. Declaration of Rights art. I (1776). One such inherent right was the "free exercise of religion" compelled only by the "dictates of conscience." *Id.* at art. XVI.

Conspicuously absent in the Declaration of Rights, however, was any express resolution of Mason and Madison's debate over the proper limiting principle. There must be one, of course. No matter its source, no legal right is absolute in all circumstances and at all times, no matter the effect on others. As Justice Holmes observed:

> All rights tend to declare themselves absolute to their logical extreme. Yet all in fact are limited by the neighborhood of principles of policy which are other than those on which the particular right is founded, and which become strong enough to hold their own when a certain point is reached.

*Hudson Cnty. Water Co. v. McCarter*, 209 U.S. 349, 355 (1908); *see also* 1 William Blackstone, Commentaries *125 (stating that "every man, when he enters into society, gives up a part of his natural liberty, as the price of so valuable a purchase; and, in consideration of receiving the advantages of mutual commerce, obliges himself to conform to those laws, which the community has thought proper to establish").

We believe that the best inference to draw from this textual omission of a limiting principle, as Justice O'Connor observed, is that "the Virginia Legislature intended the scope of its free exercise provision to strike some middle ground between Mason's narrower and Madison's broader notions of the right to religious freedom." *Flores*, 521 U.S. at 557 (O'Connor, J., dissenting); *see also* McConnell, *Origins*, *supra* note 4, at 1463 ("It is fair to assume . . . that the state's interest must fall somewhere between . . . Mason's broad formulation . . . [and] Madison's more limited formulation."). Virginia's search for this "middle ground," *Flores*, 521 U.S. at 557 (O'Connor, J., dissenting), did not end with the adoption of the

16

1776 Constitution of Virginia. Following robust debate, the Virginia General Assembly enacted Thomas Jefferson's Act for Religious Freedom in 1786. *See* Code § 57-1; 1 Howard, Commentaries, *supra*, at 291-92. Interpreting the limits of religious liberty, the Act for Religious Freedom provided that civil government could interfere with an individual's sincerely held religious principles only when these "principles break out into overt acts against peace and good order." Code § 57-1. As we later elaborated:

> It is well to remember, too, that the act for religious freedom holds this language: "That to suffer the civil magistrate to intrude his powers into the field of opinion, and to restrain the profession or propagation of principles on supposition of their ill-tendency, is a dangerous fallacy, which at once destroys all religious liberty . . . ; that it is time enough for the rightful purposes of civil government, for its officers to interfere, when principles break out into overt acts against peace and good order."

*Protestant Episcopal Educ. Soc'y v. Churchman*, 80 Va. 718, 776 (1885).

This famous statute set the baseline for two centuries of thought on the relationship between religion and government in a free society. Jefferson's Act for Religious Freedom has been viewed as "the most decisive element in an epochal shift in the Western world's approach to relations between civil and religious spheres of life after fourteen centuries." Martin E. Marty, *The Virginia Statute Two Hundred Years Later*, *in* The Virginia Statute for Religious Freedom: Its Evolution and Consequences in American History 1, 1 (Merrill D. Peterson & Robert C. Vaughan eds., 1988). The Act arose out of "[t]he struggle which took place in Virginia in its last days as a colony and its early days as a state," and "it influenced the American theories of Church-State separation and religious freedom more than any other historical factor." 1 Anson Phelps Stokes, Church and State in the United States 366 (1950).

As recently as 2016, the Virginia General Assembly reaffirmed the modern salience of Jefferson's restatement of Virginia's traditional view of religious liberty: "The General

17

Assembly does hereby declare again that the rights asserted in [the Act for Religious Freedom] are the natural and unalienable rights of mankind and this declaration is the policy of the Commonwealth of Virginia." Code § 57-2. This understanding of religious liberty as a "natural and unalienable" right explains the rationale behind Jefferson's limiting principle in the Act for Religious Freedom. Drawing upon Lockean principles of social-contract theory, Jefferson reasoned that "our rulers can have no authority over such natural rights, only as we have submitted to them." Thomas Jefferson, Notes on Virginia, *in* 8 The Works of Thomas Jefferson 249, 399-400 (H.A. Washington ed., 1884).

Because "[t]he rights of conscience we never submitted," Jefferson stated, "[t]he legitimate powers of government extend to such acts only as are injurious to others." *Id.* at 400. Explaining what he meant by "injurious" acts, Jefferson gave an example: "[I]t does me no injury for my neighbor to say there are twenty gods, or no God. It neither picks my pocket nor breaks my leg." *Id.* In the Act for Religious Freedom, Jefferson restated this common-sense limitation in legal terms: The government could only curtail the free exercise of religion when it resulted in "overt acts against peace and good order," Code § 57-1. The manifest intent of the Act was to "put teeth into the constitutional guarantee of rights of conscience" protected by the Constitution of Virginia. 1 Howard, Commentaries, *supra*, at 292.

Considering the drafting history of the Constitution of Virginia — its specific text and historical context — along with the 1786 Act for Religious Freedom and its reaffirmation in 2016, we hold that in the Commonwealth of Virginia, the constitutional right to free exercise of religion is among the "natural and unalienable rights of mankind," Code § 57-2, and that "overt acts against peace and good order," Code § 57-1, correctly defines the limiting principle for this

18

right and establishes the duty of government to accommodate religious liberties that do not transgress these limits. As James Madison presciently observed:

> [T]here is one State at least, Virginia, where religious liberty is placed on its true foundation and is defined in its full latitude. The general principle is contained in her declaration of rights, prefixed to her Constitution: but it is unfolded and defined, in its precise extent, in the act of the Legislature, usually named the Religious Bill, which was passed into a law in the year 1786.

James Madison, Monopolies. Perpetuities. Corporations. Ecclesiastical Endowments., *in Madison's "Detached Memoranda," 3* Wm. & Mary Q. 551, 554 (Elizabeth Fleet ed., 1946) [hereinafter Madison's Memoranda].[8]

The limiting principle — overt acts against peace and good order — does not encompass all behaviors that may conceivably be regulated by all government laws, edicts, and policies, but rather only a distinct subcategory of unlawful behavior. *See generally* John A. Ragosta, Wellspring of Liberty 155-60 (2010); Michael W. McConnell, *Freedom from Persecution or Protection of the Rights of Conscience?: A Critique of Justice Scalia's Historical Arguments in* City of Boerne v. Flores, 39 Wm. & Mary L. Rev. 819, 834-37 (1998); Branton J. Nestor, *The Original Meaning and Significance of Early State Provisos to the Free Exercise of Religion*, 42 Harv. J.L. & Pub. Pol'y 971, 977-99 (2019).

---

[8] Justice Powell's opinion argues that we have judicially amended Article I, Section 16 to include the peace-and-good-order limitation expressly stated in Jefferson's 1786 Act for Religious Freedom. *See post* at 74-75. That argument, however, is not with us but with James Madison. As noted above, Madison explained that the "general principle" of the *constitutional* right to free exercise of religion was "*unfolded and defined, in its precise extent*" by Jefferson's famous Act. Madison's Memoranda, *supra*, at 554 (emphasis added). We are confident that Madison understood the difference between interpreting a constitutional provision and rewriting it. And no Virginia court has ever suggested that he misstated the original meaning of religious-liberty provisions of the Constitution of Virginia. We thus make no apologies for honoring Madison's views on this subject.

Instead, "peace and safety" constitutional provisions "identify a narrower subcategory of the general laws" in an effort to ensure that "the free exercise provisions would exempt religiously motivated conduct from these laws up to the point that such conduct breached public peace or safety." McConnell, *Origins*, *supra* note 4, at 1462. Under this proviso, any duty to accommodate an individual's religious liberty could not undermine "the government's right to protect public peace and safety." *Id.* at 1464. "There is no free exercise right," to mention just a couple of obvious examples, "to kidnap another person for the purpose of proselytizing, or to trespass on private property . . . to protest immoral activity." *Id.*

Prior to *Smith*, the prevailing federal doctrine recognized that claims for religious exemptions from neutral laws could be rejected when "[t]he conduct or actions [in question] have *invariably posed some substantial threat to public safety, peace or order*." *Sherbert v. Verner*, 374 U.S. 398, 403 (1963) (emphasis added). Protecting the public from such a threat can constitute a "compelling state interest," the United States Supreme Court held prior to *Smith*, only in situations involving "the gravest abuses, endangering paramount interest[s]." *Id.* at 406 (citation omitted). These must be "interests of the highest order," and any government coercion must be "narrowly tailored to achieve those interests." *Fulton*, 141 S. Ct. at 1881 (citation omitted). While not endorsing or rejecting the application of this standard in specific federal cases, we believe that *Sherbert* correctly framed the nature of the limiting principle. It captured well the historical view that "strict scrutiny" policed the government's claim that such a threat existed in the first place and that, even if it did, the threat could not be defused and the contest

20

sidelined by "less restrictive means."  *See id.* at 1893 (Alito, J., concurring in judgment) (applying *Sherbert* and its progeny).[9]

And this should not surprise us.  The state constitutional provisions and statutes that historically protected the free exercise of religion unless it endangered the public peace, safety, or order have been considered "precursor[s] to the compelling-interest test and impl[y] that the free exercise of religion was understood to include an exemption from generally applicable laws."  Michael W. McConnell, *Should Congress Pass Legislation Restoring the Broader Interpretation of Free Exercise of Religion?*, 15 Harv. J.L. & Pub. Pol'y 181, 181-82, 185-86 (1992) (noting that the United States Supreme Court had "expounded" upon the "peace and safety" provisos in many early state constitutions by putting them "in more modern terms by stating that a burden on the free exercise of religion is constitutional only if there is a compelling government interest that justifies that burden"); *see also* Laycock, *Amicus Brief*, *supra* note 4, at 102-03 (noting that exceptions were necessary to free-exercise clauses through "peace and safety" limits for state constitutional provisions and the parallel "compelling interest" test for the federal constitutional provision because "primacy of conscience was the starting presumption").  After *Sherbert* and before the demise of the peace-and-good-order limiting principle in *Smith*, the United States Supreme Court continued to link the principle to *Sherbert*'s compelling-state-

---

[9] Both legal scholars, *see* Stephanie H. Barclay, *The Historical Origins of Judicial Religious Exemptions*, 96 Notre Dame L. Rev. 55, 113-16 (2020), and three Supreme Court Justices, *see Fulton*, 141 S. Ct. at 1909 (Alito, J., concurring in the judgment), view the reasoning in *Commonwealth v. Cronin*, 2 Va. Cir. 488, 499-505 (1855), as an early Virginia example of the free-exercise methodology that was later folded into the *Sherbert* standard.  The author of *Cronin*, Judge John A. Meredith, was a distinguished judge of the Richmond Circuit Court, a former Virginia State Senator, and a Delegate to the Virginia Constitutional Convention of 1850.  *See Miscellany*, 6 Va. L.J. 250, 250-51 (1882).

21

interest test. *See, e.g.*, *McDaniel v. Paty*, 435 U.S. 618, 631 n.2 (1978) (Brennan, J., concurring); *Wisconsin v. Yoder*, 406 U.S. 205, 219-21, 229-30 (1972).[10]

We need not catalogue, for our resolution of this appeal, the subset of "overt acts" that would forfeit an individual's constitutional right to free exercise of religion and relieve the government from any constitutional duty of accommodation. Nor is it necessary to speculate on putative compelling state interests in other contexts. This case comes before us from the dismissal of a complaint (on demurrer and in part on a plea in bar) without any consideration of evidence. Our standard of review requires us to assume as true each of Vlaming's factual allegations and any reasonable inferences from those allegations. Those allegations claim that the School Board fired Vlaming because he had refused to affirmatively use a masculine pronoun to refer to Doe, a biologically female student. Had he done so, Vlaming claims, he would have violated his sincerely held religious beliefs. The accommodation that he asked for was straightforward: To honor his religious convictions, he would use Doe's preferred name (both in

---

[10] We agree with our concurring colleagues' observation that the peace-and-good-order limiting principle does not literally appear in the text of Article I, Section 16. *Post* at 74. But we disagree with their argument that the textual omission of this historical principle renders it irrelevant to the task of determining the presence of (using *Sherbert*'s modern turn of phrase) a compelling state interest. After all, there is no textual limitation of any kind — whether written in historical or modern verbiage — in Article I, Section 16. But that cannot mean, as Holmes cautioned, that the mere declaration of a legal right renders it invariably absolute in any and all contexts no matter the circumstances. *Supra* at 16.

The concurrence's textual-omission argument thus proves too much. If it were true, the right to free exercise would be limitless. Neither our concurring colleagues nor we believe that. In the clearest of terms, they accept *Sherbert*'s "compelling state interest" formulation of the limiting principle even though not a word of it appears in the text of either the First Amendment to the United States Constitution or Article I, Section 16 of the Constitution of Virginia. We do too. But for us the modern formulation of the principle must be understood in its historical context. That is exactly what *Sherbert* was saying, two sentences before applying the "compelling state interest" test, when it recognized that binding federal precedent interpreting the First Amendment "invariably" refused to recognize the right to free exercise of religion when it "posed some substantial threat to public safety, peace or order." *Sherbert*, 374 U.S. at 403.

22

English and in French) and would avoid using any third-person pronouns to refer to Doe. The School Board, according to Vlaming, rejected this accommodation and compelled him to use government-approved pronouns instead of using only Doe's preferred name.

The issue here is not whether the School Board's policies forbidding discrimination and harassment of students applied (as the School Board asserts) or did not apply (as Vlaming asserts) to the compelled-speech situation alleged in the complaint. The issue is whether Vlaming's sincerely held religious beliefs caused him to commit overt acts that "invariably posed some substantial threat to public safety, peace or order," *Sherbert*, 374 U.S. at 403, and if so, whether the government's compelling state interest in protecting the public from that threat, when examined under the rigors of strict scrutiny, could be satisfied by "less restrictive means," *Fulton*, 141 S. Ct. at 1893 (Alito, J., concurring in the judgment).[11]

When religious liberty merges with free-speech protections, as it does in this case, mere "objectionable" and "hurtful" religious speech or, as in this case, nonspeech, is not enough to meet this standard. *Id.* at 1924. "In an open, pluralistic, self-governing society, the expression of an idea cannot be suppressed simply because some find it offensive, insulting, or even wounding." *Id.* A lawful government "is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened

_____

[11] Justice Powell's opinion criticizes our analysis because we fail to distinguish between the semantic variation between the limiting principle expressed as "peace and good order" in Jefferson's Act and its restatement as "safety, peace or order" in *Sherbert. Post* at 77-78. As the historical record shows, however, such abstract locutions share the same essential meaning: "It is basic that no showing merely of a rational relationship to some colorable state interest would suffice; in this highly sensitive constitutional area, '[o]nly the gravest abuses, endangering paramount interest, give occasion for permissible limitation.'" *Sherbert*, 374 U.S. at 406 (citation omitted). Strictly construed, only state interests "of the highest order" fit this categorical limitation. *Fulton*, 141 S. Ct. at 1881 (citation omitted). Unlike our dissenting colleagues, we see this modern restatement of the limiting principle as wholly in sync with its conceptual antecedents.

23

either purpose may strike the government." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 579 (1995). "Government may neither compel affirmation of a repugnant belief," *Sherbert* correctly declared, "nor penalize or discriminate against individuals or groups because they hold religious views abhorrent to the authorities." 374 U.S. at 402.

The essential character of this jurisprudential view seeks to protect diversity of thought, diversity of speech, diversity of religion, and diversity of opinions. Our Constitutional Republic, framed upon principles of classical liberalism, cannot be true to itself if it curates between those who can and those who cannot participate in the public marketplace of ideas and retreat, when necessary, to the private sanctuary of conscience. Absent a truly compelling reason for doing so, no government committed to these principles can lawfully coerce its citizens into pledging verbal allegiance to ideological views that violate their sincerely held religious beliefs.

Applying these principles to the presumptively accurate factual allegations in the complaint and all reasonable inferences therefrom, we hold that Vlaming has alleged a legally viable claim under Article I, Section 16 of the Constitution of Virginia. The circuit court erred in dismissing this claim on demurrer on the ground that Vlaming's factual allegations, even if assumed to be true, were insufficient as a matter of law to state a free-exercise claim under Article I, Section 16 of the Constitution of Virginia.

B.

On nearly every aspect of the free-exercise issue, the dissent takes a different view. Using a thematic narrative, the dissent exclaims that our "dabble" in the "political" and "ideological issues of the day," *post* at 143, "tears at the very values that underpin Article I, Section 16" by "creating a hierarchy of legal protections for ideas and expression" based wholly on some unstated "epistemological source," *post* at 104. Opining that our dabble strategy crosses

24

"the threshold into a world of academic speculation," the dissent fears that we leave "our gates open, unguarded" against the "injustice" of religious people seeking to protect their religious liberties. *Post* at 81-82.

To close the gates to this parade of horribles, the dissent advocates that we adopt the federal *Smith* thesis and justifies it by relying on four sources: (1) the plain text of Article I, Section 16, (2) historical constitutional context, (3) our prior judicial precedent, and (4) the role of the 1971 Constitution. All of these sources allegedly reaffirm the view that the federal *Smith* standard is now and has been the law of Virginia since 1776.[12] We are unpersuaded.

1.

The "plain language" of Article I, Section 16, as the dissent reads it, adopts *Smith*'s "neutrality analysis," *post* at 81, which extinguishes any claim of religious liberty that collides with a neutral, secular law of general applicability. We fail to see how this could possibly be true. Article I, Section 16 includes 238 words and 8 independent clauses. *See* Va. Const. art. I, § 16. The second independent clause states that "all men are equally entitled to the free exercise of religion, according to the dictates of conscience." *Id.* Another independent clause states that "[n]o man . . . shall be enforced, restrained, molested, or burthened in his body or goods, nor shall otherwise suffer on account of his religious opinions or belief," and yet another declares

---

[12] Our dissenting colleague says that he is not "advocating for the *Smith* standard." *Post* at 93. Instead, Justice Mann believes he is merely advocating "for a *Virginia* standard which supports strict scrutiny of non-neutral laws." *Post* at 93 (emphasis added). But actually — that *is* the *Smith* standard. "*Smith* held that laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause *so long as* they are neutral and generally applicable." *Fulton*, 141 S. Ct. at 1876 (emphasis added). "Failing either the neutrality or general applicability test [as formulated by *Smith*] is sufficient to trigger strict scrutiny." *Kennedy*, 142 S. Ct. at 2422. Justice Mann then goes on to reject criticism of *Smith* on the ground that such criticism "does not make *Smith* 'bad law' or any less instructive." *Post* at 93 note 9. We can offer only one response to this observation: Whether it is being advocated or merely admired, the *Smith* standard is not and has never been Virginia law.

25

that "all men shall be free to profess and by argument to maintain their opinions in matters of religion." *Id.*

Passing over these unqualified textual commands, the dissent fixates on this independent clause — "and the same shall in nowise diminish, enlarge, or affect their civil capacities." *Id.* Tying that clause to the earlier "opinions in matters of religion" phrase, the dissent discovers its zeitgeist: The Constitution of Virginia only protects "a person's religious beliefs" and offers no protection for "religiously motivated activities." *Post* at 84. This argument stands on its own shoulders. No Virginia court has ever so held. Since 1776, the Constitution of Virginia has expressly protected "the *free exercise of religion*, according to the *dictates of* conscience," and has declared that no Virginia government can enforce, restrain, molest, burden or "otherwise suffer" anyone because of their religious views. Va. Const. art. I, § 16 (emphases added). That is quite plainly worded. The Civil Capacities Clause doubles down on the earlier provisions by specifically protecting the "civil capacities" of religious people.[13]

We understand, as everyone does, that some limiting principle on this textually unqualified right must be recognized. With equal certitude, however, we know that the

---

[13] Employing a unique "grammatical analysis," the dissent contends that the "rule of the last antecedent" supports the dissent's interpretation. *Post* at 83-84. It is a valuable rule, to be sure, but it has no applicability here. The independent clauses in Article I, Section 16 present an array of protections (e.g., "free exercise of religion, according to the dictates of conscience"; "shall [not] otherwise suffer on account of his religious opinions or belief"; and "free to profess and by argument to maintain their opinions in matters of religion"), and none of these phrases can be contextually limited by "the same shall in nowise diminish, enlarge, or affect their civil capacities." No Virginia court has held otherwise. Under settled principles, the last-antecedent rule plays no role when "the sense of the passage requires a different construction." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 146 (2012) (quoting *Sim's Lessee v. Irvine*, 3 U.S. (3 Dall.) 425, 444 n.* (1799)); *see also* Henry Campbell Black, Handbook on the Construction and Interpretation of the Laws § 73, at 224 (2d ed. 1911); 2A Norman J. Singer & Shambie Singer, Sutherland's Statutes and Statutory Construction § 47:33, at 501 (7th ed. 2014).

26

limitation cannot simply be to "keep your religion to yourself." It would be alarming indeed to think that in the Commonwealth of Virginia, a religious person needs a constitutional right merely to hold a silent belief or opinion that does not change a thing he does or does not do. Nor should the limiting principle be that no right to free exercise of religion exists at all in the face of a secular law that is generally applicable and neutral. Endorsed by *Smith* and advocated by the dissent, that rubric extinguishes the right to free exercise for anyone within the reach of such a law. It is an eliminating, not limiting, principle. We reject it.

Before discerning the scope of any limiting principle, however, we first recognize that the right to "exercise" one's religion, if it means anything, includes the right to speak or not speak and to act or not act based upon one's religious sincerely held opinions or beliefs. The leading federal case, *Wisconsin v. Yoder*, summarily rejected the idea that "religious beliefs are absolutely free from the State's control but . . . 'actions,' even though religiously grounded, are outside the protection of the First Amendment." 406 U.S. at 219-20. The plain meaning of "free exercise," *Yoder* made clear, cannot be displaced by "the idea that religiously grounded conduct is *always* outside the protection of the Free Exercise Clause." *Id.* (emphasis added). In religion, as in many other areas of life, *Yoder* observed, "belief and action cannot be neatly confined in logic-tight compartments." *Id.* at 220.[14] Put another way, the First Amendment's free-exercise

---

[14] *See also Thomas v. Review Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 717-18 (1981) (explaining that "a burden upon religion exists" when "the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs"); *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940) (recognizing that the right to free exercise "embraces two concepts, — freedom to believe and freedom to act"); 2 St. George Tucker, Blackstone's Commentaries, Editor's App. Note G, at 4 (1803) ("Liberty of conscience in matters of religion consists in the absolute and unrestrained exercise of our religious opinions, *and duties*, in that mode which our own reason and conviction dictate . . . ." (emphasis added)); James Madison, Memorial and Remonstrance Against Religious Assessments, *in* 8 The Papers of James Madison 295, 299 (Robert A. Rutland

right "protects not only the right to harbor religious beliefs inwardly and secretly. It does perhaps its most important work by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through 'the performance of (or abstention from) physical acts.'" *Kennedy*, 142 S. Ct. at 2421 (citation omitted). We hold the same views about the free-exercise right recognized in Article I, Section 16 of the Constitution of Virginia.

We are also unpersuaded by any assertion that Article I, Section 16's protection of "religious opinions or belief" only forbids government from causing a religious person (to the extent that he holds opinions or has beliefs) to "suffer" diminished "civil capacities."[15] The Civil Capacities Clause enters the text with the conjunction "and," signaling an addition to, not a limitation of, the overarching principles. These principles guarantee that all individuals are "equally entitled to the free exercise of religion, according to the dictates of conscience," that none "shall otherwise suffer on account of his religious opinions or belief," and that "all men shall be free to profess and by argument to maintain their opinions in matters of religion," Va.

---

et al. eds., 1973) (insisting that "[i]t is the duty of every man to render to the Creator such homage and such only as he believes to be acceptable to him" and that religious liberties protect "[t]his duty"); McConnell, *Origins*, *supra* note 4, at 1460 ("In the biblical tradition, 'duties' to God included actions, perhaps all of life, and not just speech and opinion. So according to Virginia, the right of free exercise extended to all of a believer's duties to God and included a choice of means as well as ends."); *id.* at 1462 (noting that provisos limiting free exercise, such as the one in Jefferson's Act for Religious Freedom, to protect "peace and good order" confirm "that the free exercise right was not understood to be confined to beliefs" because "[b]eliefs without more do not have the capacity to disturb the public peace and safety"); *id.* at 1488-89 (contending that "the term 'free exercise' makes clear that the clause protects religiously motivated conduct as well as belief" because "[a]s defined by dictionaries at the time of the framing, the word 'exercise' strongly connoted action").

[15] The dissent asserts that Vlaming limited his "free-exercise cause of action based on his diminished civil capacity as a public-school teacher." *Post* at 84. We disagree. Vlaming's amended complaint, trial court briefs, appellate briefs, and oral argument before our Court make clear that he has invoked the entirety of Article I, Section 16 in support of his free-exercise claim. *See, e.g.*, J.A. at 31-32, 168-71; Appellant's Br. at 20-23, 35-36; Oral Argument Audio at 1:40 to 2:12, 42:15 to 42:48.

Const. art. I, § 16.[16]  This language parallels Jefferson's 1786 Act for Religious Freedom that

forbids the government from imposing "temporal punishment, or burthens, *or . . .* civil

incapacitations" on those expressing "religious opinions."  Code § 57-1 (emphasis added).[17]

Even if Article I, Section 16 only protected the "civil capacities" of religious people,

Vlaming's allegations of harm to his tenured public-teaching position, secured by a contract

enforceable by a suit at law, describe a legally cognizable diminishment of his "civil capacities."

*See* J.A. at 31, 168-69, 170.  The expression "civil capacities" has deep roots in legal history and

jurisprudential theory.[18]  Under most, if not all such definitions, civil capacities come wholly

from positive-law pronouncements, not natural-law precepts.  Positive law establishes "forms of

internal polity" that determine "the civil capacities and incapacities" of parties to the social

contract.  *See Polydore v. Prince*, 19 F. Cas. 950, 952 (D. Me. 1837) (No. 11, 257).  In this

context, "civil capacities" is an idiomatic phrase that refers to the bundle of positive-law rights

that enable individuals to participate fully in all lawful civil, political, and legal spheres of life.

---

[16] *See Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 236 (2011) (recognizing that "linking independent ideas is the job of a coordinating conjunction like 'and'"); Scalia & Garner, *supra* note 13, at 141 (citing *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241-42 (1989)) (noting that "the conjunction *and*" is "essentially equivalent to *together with*").

[17] Eight other state constitutions prohibit impairments of civil "capacities" or the creation of civil "incapacities" when directed against religious beliefs, opinions, or actions. *See, e.g.*, Ala. Const. art. I, §§ 3, 3.02; Colo. Const. art. II, § 4; Idaho Const. art. I, § 4; Ill. Const. art. I, § 3; Iowa Const. art. I, § 4; Ky. Const. § 5; R.I. Const. art. I, § 3; W. Va. Const. art. III, § 15.

[18] *See generally* Douglas G. Smith, *Citizenship and the Fourteenth Amendment*, 34 San Diego L. Rev. 681, 747-52 (1997) (describing the origin of the concept of civil capacities in Roman law, which granted "certain privileges of the civil law" to citizens, making "civil capacities inherent in citizenship"); 1 John Bouvier, A Law Dictionary (10th ed. 1860) (defining "in the law sense" the word "capacity" to include "the performance of *civil acts*" such as "to make a contract, and the like" (emphasis added)); 1 Timothy Cunningham, A New and Complete Law Dictionary 461 (1764) (defining "[c]apacity" in the legal sense to include the right "to sue and be sued").

In contrast, natural rights were historically understood as unalienable because they are inherent in what it means to be human. Such rights preexisted the social contract and were not created by civil government. The Founders keenly appreciated this distinction, particularly when discussing constitutional rights.[19] The right to religious liberty, as Jefferson's Act declared, was a "natural right" bestowed by the "Almighty God" and not by any assembly of mortal men. Code § 57-1. This ancient belief has fared well in Virginia over the last two centuries. As recently as 2016, the General Assembly reaffirmed its view that religious liberty is one of the "natural and unalienable rights of mankind and this declaration is the policy of the Commonwealth of Virginia." Code § 57-2.

A natural-law right (such as religious liberty) should be distinguished from a mere "civil capacity" recognized in the social contract of lesser man-made laws (such as the right to make and legally enforce a contract). We illustrated this point in *Perry*, a case in which we held that a trial court had violated a witness's religious liberty by "allowing [a] witness to be questioned [by a prosecutor] on his voir dire touching his religious opinions." *Perry v. Commonwealth*, 44 Va.

---

[19] *See, e.g.*, 1 Annals of Cong. 454 (Joseph Gales ed., 1834) (recording James Madison's description of the Bill of Rights in a speech to Congress as containing, inter alia, "positive rights" that "result from the nature of the compact" such as "[t]rial by jury [that] cannot be considered as a natural right, but a right resulting from a social compact which regulates the action of the community, but is as essential to secure the liberty of the people as any one of the pre-existent rights of nature"); Additional Letters from the Federal Farmer to the Republican (Dec. 25, 1787), *in* 2 The Complete Anti-Federalist 256, 261 (Herbert J. Storing ed., 1981) ("Of rights, some are natural and unalienable, of which even the people cannot deprive individuals: Some are constitutional or fundamental; these cannot be altered or abolished by the ordinary laws; but the people, by express acts, may alter or abolish them — These, such as the trial by jury, the benefits of the writ of habeas corpus, &c. individuals claim under the solemn compacts of the people, as constitutions, or at least under laws so strengthened by long usage as not to be repealable by the ordinary legislature — and some are common or mere legal rights, that is, such as individuals claim under laws which the ordinary legislature may alter or abolish at pleasure."); 2 James Kent, Commentaries on American Law 1 (1827) ("The rights of persons in private life are either absolute, being such as belong to individuals in a single unconnected state; or relative, being those which arise from the civil and domestic relations.").

(3 Gratt.) 632, 645 (1846). The right to testify, *Perry* explained, was not a natural-law right inherent in any religious practice or belief. The inability to testify because of proscribed opinions was a mere "civil incapacity" that comes "[f]rom the law" promulgated by the "civil institutions of the country." *Id.* at 643-44. Even so, it could not be said that depriving the witness of his man-made right to testify did not violate his natural-law right to religious liberty. To the contrary, we declared, "the Constitution says that religious opinions shall not lessen 'civil capacities.'" *Id.* at 644. *Perry* was making the point that the constitutional right to religious liberty in the Commonwealth of Virginia not only protects core attributes of religion (beliefs and practices) but also wholly non-religious civil capacities that are not derived from natural law.

Viewing Vlaming's allegations in their most favorable light, we hold that his "civil capacity" as a tenured public employee constituted a right that comes "[f]rom the law" adopted by the "civil institutions of the country," *id.*, and, as such, could not be diminished or affected by Vlaming's religious opinions or beliefs. Applying settled principles of law, Vlaming had an intangible property interest in his continued employment and a corresponding right not to be terminated without just cause.[20] His public teaching contract was not terminable at will, *see* J.A. at 5, 42, and statutory provisions protected his legal right not to be fired or suspended from his job without just cause.[21]

---

[20] *See Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 576-77 (1972) (recognizing that public employees in teaching positions held under tenure had intangible property interests in their continued employment); *Perry v. Sindermann*, 408 U.S. 593, 601 (1972) (same); 4 Eugene McQuillin, The Law of Municipal Corporations § 12:315, at 616-18 (3d ed. rev. 2019) ("A law creates a property interest in continued employment when it places restrictions on the grounds upon which an employee may be discharged.").

[21] *See* Code §§ 22.1-304(B) (providing that teachers "employed after completing the probationary period shall be entitled to continuing contracts during good behavior and competent service"), -307 (providing that "[t]eachers may be dismissed for incompetency, immorality, noncompliance with school laws and regulations, disability as shown by competent medical

We next turn to the dissent's view that legal history supports the contention that the religious-liberty clauses of the Constitution of Virginia were not intended to protect religious people from neutral, secular laws that indirectly infringe upon religious liberty. "Rather," the dissent opines, "the framers of Article I, Section 16 intended to combat the religious intolerance and establishment that pervaded Colonial Virginia." *Post* at 87. We reject this view because it tightly fuses the related, but nonetheless distinct, free-exercise protections and anti-establishment prohibitions of Article I, Section 16. The effect of this conflation is to view Vlaming's resistance to compelled speech as a form of "religious intolerance," *post* at 87, that should be categorically outside the protection of the conjoined free-exercise and anti-establishment provisions.

Implicit in this argument is a startling fallacy: Any government accommodation of a religious person's sincerely held views — particularly those that the government finds unorthodox — somehow establishes a religious beachhead on the shores of the secular state. That inference explains the first citation in the dissent on this topic, *Everson v. Board of Education of Ewing Township*, 330 U.S. 1 (1947), a United States Supreme Court case interpreting the Establishment Clause of the First Amendment to the United States Constitution. It serves as a good platform on which to stage our disagreement. The issue in *Everson*, but not before us, was whether the government had directly or indirectly supported a state religion in violation of the Establishment Clause. *See id.* at 7-8. The issue before us, but not in *Everson*, is whether the government's compelled-speech policy infringes upon the religious liberties of a Virginia citizen. And the governing law before us is not, as in *Everson*, the Establishment

---

evidence when in compliance with federal law, conviction of a felony or a crime of moral turpitude, or other good and just cause"), -315(A) (providing that teachers "may be suspended for good and just cause").

Clause of the First Amendment. The governing law is the Free Exercise Clause of the Constitution of Virginia and its later amendments. Mixing these provisions together skews their separate histories and purposes.

The First Amendment was ratified in 1791, and for the first time, the United States Constitution included an express right to "free exercise" of religion and a prohibition against a state-sponsored "establishment of religion." In contrast, the first sentence of Article I, Section 16 of the Constitution of Virginia initially appeared in 1776 and stated unequivocally that "all men are equally entitled to the free exercise of religion, according to the dictates of conscience." This individual right to free exercise was not conjoined with a prohibition on a state establishment of religion. The delegates to the 1776 convention voted down one of Madison's proposed amendments to the free-exercise provision precisely because it "would have disestablished the Anglican Church in Virginia and probably also barred state support of religious sects generally." A.E. Dick Howard, *"For the Common Benefit": Constitutional History in Virginia as a Casebook for the Modern Constitution-Maker*, 54 Va. L. Rev. 816, 825 (1968). The Commonwealth had an established religion both before and after the 1776 Constitutional Convention, and it remained largely intact for another decade until the passage of Jefferson's Act for Religious Freedom in 1786. *See* 12 William Waller Hening, The Statutes at Large 84-86 (1823); 1 Howard, Commentaries, *supra*, at 290-92; Robert Allen Rutland, The Birth of the Bill of Rights 1776-1791, at 83-88 (1955). In Virginia, even if not elsewhere, "the modern argument against religious exemptions, based on the establishment clause, is thus historically unsupportable." McConnell, *Origins*, *supra* note 4, at 1511-12.

This decade-long disconnect between Virginia's protection of an individual's "free exercise of religion, according to the dictates of conscience" and the later-adopted express

prohibition against the establishment of a state religion untangles any effort to bind these unique concepts into a single inseparable doctrine. The dissent's contrary view relies heavily on an amicus curiae brief filed on behalf of Professor Alan Taylor. *See post* at 88. A highly respected faculty member of the Department of History at the University of Virginia, Taylor has studied the "political process" accompanying the "uneasy compromises" made in the 18th-century struggles over church and state. *See* Amicus Br. for Professor Alan Taylor in Support of Appellees at 16 [hereinafter Taylor Amicus Br.].

Taylor's amicus brief advocates for a conflation theory that treats an individual's right to free exercise as a subsidiary notion completely encapsulated by the overarching maxim that government should not establish a state religion. Taylor's brief does not mention *Smith* by name. Even so, just like the dissent, the brief applies the federal *Smith* neutrality doctrine to the Constitution of Virginia and concludes that it "does not support a broad right to religious exemptions from civil laws that are neutral toward religion." Taylor Amicus Br., *supra*, at 17. As we earlier explained, we reject the federal *Smith* neutrality doctrine as inconsistent with the text and historical context of Article I, Section 16 of the Constitution of Virginia.

That said, it is not our place to question whether *Smith* correctly understood the economized text of the First Amendment. We ask only if *Smith* accurately marks off the doctrinal boundaries of Article I, Section 16 of the Constitution of Virginia. It does not. The text of Article I, Section 16 makes clear what Virginians mean by religious liberty:

- "[A]ll men are equally entitled to the free exercise of religion, according to the dictates of conscience . . . ."

- "No man . . . shall be enforced, restrained, molested, or burthened in his body or goods, nor shall otherwise suffer on account of his religious opinions or belief . . . ."

34

- "[A]ll men shall be free to profess and by argument to maintain their opinions in matters of religion . . . ."

- "[A]nd the same shall in nowise diminish, enlarge, or affect their civil capacities."

Given the clarity and resoluteness of these words, we hold that religious liberties in this Commonwealth do not vanish simply because a purely secular law says so — no matter its impartiality toward specific religions or its impassivity toward religion generally.

### 3.

We now come to the dissent's claim that we have jettisoned "[c]ontrolling [p]recedent" in Virginia that "vindicates" the dissent's "historical analysis." *Post* at 93. Justice Mann mentions several cases that we have allegedly overruled: *Perry v. Commonwealth*, 44 Va. (3 Gratt.) 632 (1846); *Remington v. Commonwealth*, 262 Va. 333 (2001); *Crook v. Commonwealth*, 147 Va. 593 (1927); *Pirkey Brothers v. Commonwealth*, 134 Va. 713 (1922); and *Rich v. Commonwealth*, 198 Va. 445 (1956). We have not overruled any of them, and none of them supports the adoption of the federal *Smith* standard as Virginia law.

*Perry* held that the trial court violated a witness's religious liberty by allowing a prosecutor to question the witness's "belief in rewards and punishments at the hands of the Deity." 44 Va. at 637. "It is justly supposed," *Perry* acknowledged, "that all who acknowledge an overruling and just God, whether they believe in a future state or no, believe that they incur a higher obligation, when they invoke Him to witness their vows, or the truth of what they declare, than by a simple promise or asseveration." *Id.* at 638. Despite recognizing the "great value" that we place "on the obligation of an oath," *Perry* held that the oath could not be lawfully honored by questioning a witness's religious faith. *Id.* at 638, 645. The reason why was clear: The Constitution of Virginia "declares, that all men shall be free to profess, and by argument to

35

maintain their religious opinions" and that the government can place "neither burdens nor civil incapacities" upon doing so. *Id.* at 641, 643. We do not understand how this holding supports the dissent's conclusion that "[f]or the first time, this Court held [in *Perry*] that, when a law is neutral as to religion, Article I, Section 16 is *not* violated." *Post* at 94 (emphasis added). That is not what *Perry* held.

The dissent also asserts that we have overruled *Remington*. In that case, a trial court in a capital-murder case granted a prosecutor's request to strike potential jurors from the venire because they "stated that they would not vote to impose the penalty of death" even if the accused were convicted of capital murder. 262 Va. at 346, 349. The venire members, however, never articulated any religious belief or opinion as a basis for their refusal to impose the death penalty. With a three-sentence holding, *Remington* ended the analysis there:

> Contrary to Remington's assertions, the record clearly indicates that [the jurors] *were not removed from the venire because of their religious beliefs*. Rather, [they] stated that they would not vote to impose the penalty of death. We hold that the circuit court did not err in removing [them] from the jury panel because their responses demonstrated that their *personal objections* to the death penalty would have substantially impaired or prevented them from performing their duties as jurors.

*Id.* at 349 (emphases added). There was no violation of the jurors' religious liberty because the factual "record clearly indicate[d]" that the jurors did not testify that their refusal to impose the death penalty was due to any religious beliefs or opinions. *Id.* Once again, this case has nothing to do with the debate presently before us.[22]

---

[22] The dissent restates the *Remington* holding in this way: "Because the record showed that the incapacity did not derive from the *religious beliefs as beliefs*, but rather from the fact that *the beliefs* manifested into an unwillingness to perform their duties as jurors, it did not violate the Constitution." *Post* at 95 (emphases added). On several levels as expounded upon above, we reject this unique interpretation.

Finally, the dissent calls our attention to *Rich*, *Crook*, and *Pirkey Brothers*. All involve Sunday-closing laws. *Rich* held that the Commonwealth had failed to prove that the defendant had violated a Sunday-closing law. 198 Va. at 450-52 (holding that "selling food and groceries" on a Sunday was covered by the statutory "necessity" exception). In passing, *Rich* cited *Crook*, which held that playing "professional baseball" was not covered by the statutory "necessity" exception, *Crook*, 147 Va. at 600.

Both *Rich* and *Crook* cite Judge Burks's opinion in *Pirkey Brothers*, which affirmed a factual finding that the "work done" (operating the historic Weyer's Cave) was not within the statutory "necessity" exception, *Pirkey Bros.*, 134 Va. at 730-31. As was the case in *Rich* and *Crook*, the "constitutional validity of the statute" was *not* "called in question" in *Pirkey Brothers*. *Id.* at 717. The case was before the Court merely to answer "the simple question whether the keeping open of these caverns and admission to them of visitors on Sunday constitute a violation of the statute commonly known as the 'Sunday Observance Law.'" *Id.* at 716.

Though the constitutional issue was not before the Court, much of Judge Burks's opinion in *Pirkey Brothers* addressed in broad terms how the role of religiously motivated laws (like Sunday-closing laws) can still have a secular purpose that do not offend established principles ensuring the proper separation of church and state. The dissent, however, reads this discussion to be Virginia's anticipatory rejection of anything like *Sherbert*'s "compelling state interest" standard and implicit endorsement of *Smith*'s later view that no religious liberties can ever be the basis for attacking a generally applicable and neutral secular law. We think this view reads far too much into these cases. None of the litigants in *Rich*, *Crook*, or *Pirkey Brothers* asserted that the challenged laws burdened their free exercise of religion. It is an exaggeration, at best, to

suggest that these cases necessarily establish settled precedent adopting either the *Smith* or *Sherbert* standards of religious liberty.

The Sunday-closing cases are nonetheless perplexing because they raise two related but distinct issues:  Can a state force employers to give workers one day a week of rest even if the day chosen has religious antecedents, and if so, can a state punish religious persons (by denying them unemployment benefits) if their religion celebrates a day of rest on some other day?  We agree with the answer in *Pirkey Brothers* to the first question and the answer in *Sherbert* to the second question.  What we do not agree with, however, is the assertion that the second question is irrelevant because the government can eliminate religious objections altogether simply by enacting a generally applicable, neutral statute.

4.

We must also address the dissent's complaint that we spend too much time detailing the history of the religious-liberty provisions, particularly the free-exercise provision of the 1776 Constitution of Virginia, because the real focus should be on the 1971 Constitution.  As the dissent reads our history, Virginians in 1971 adopted a new constitution that fully embraced the federal *Smith* standard for religious liberty and thereby announced their "utter rejection" of any other view being the "original understanding" of Article I, Section 16.  *Post* at 93.  Here again, we see things differently.

The crucial first sentence in Article I, Section 16 has been in the Constitution of Virginia since 1776.  It remains unaltered to this very day.  The next two sentences "drew heavily on Thomas Jefferson's 1786 Act for Religious Freedom and first appeared in the 1830 Constitution in the Legislature Article, where they remained until they were moved to the bill of rights in the 1971 Constitutional revision."  Dinan, *supra*, at 83.  The 1971 revision changed not a word of

these sentences, and the revisors expressly disavowed any intention to do so. As Professor Howard, the Executive Director of the Commission, has explained, "parts of [the Constitution of Virginia] have been simply carried forward," and "[i]n particular, George Mason's famous Declaration of Rights of 1776 appears almost word for word today as Article I of the present constitution." A.E. Dick Howard & William Antholis, *The Virginia Constitution of 1971: An Interview with A.E. Dick Howard*, 129 Va. Mag. Hist. & Biography 347, 348 (2021) [hereinafter Howard & Antholis, *Interview*]. The revisers "understood George Mason, Thomas Jefferson, [and] James Madison" and were "conversant with the Founders' ideas and drew on their very language." *Id.* at 358.

The Commission Chairman, Albertis Harrison, Jr., was a former Governor and Virginia Supreme Court Justice. He also made the continuity point clear at the time. Just before releasing the Commission's report, Justice Harrison emphasized that "little change has been made in the Virginia Bill of Rights since 1776 when Virginia undertook to draft a Declaration of Rights" and that he did not "think that anybody in our generation, and certainly none of us who constituted this Commission, felt that we were so bold as to feel that we could do a better job than those who had drafted the Bill of Rights." Audiotape: Remarks on Release of Commission on Constitutional Revision Report at 14:03 to 14:27 (Jan. 8, 1969) [hereinafter Remarks on Release] (on file with the Library of Virginia). "With reference to religious liberty," Justice Harrison continued, the 1971 Constitution contained the "classic . . . statements of religious liberty, one by Thomas Jefferson and the other by James Madison." *Id.* at 15:50 to 16:05.

The Commission's written report presented to the Governor and the General Assembly confirmed that "the Commission ha[d] made no effort to 'modernize' the language of the Bill of Rights, believing it would be unlikely to improve on the well-turned phrases of the original

39

framers."  The Constitution of Virginia: Report of the Commission on Constitutional Revision 85 (1969).  The report noted that "many of the sections" in the Bill of Rights "have not changed since 1776 — a testimonial to the insight which the original Framers had into the basic and recurring questions of political philosophy" and stating that the Commission "approached the Bill of Rights with special care" by recommending "few changes in the Bill of Rights as it now appears."  *Id.*; *see also id.* at 100 (noting that "[t]he first sentence of proposed section 16," originally "inserted in the Bill of Rights in 1776," was "preserved without change" and that the "remainder of the proposed section," which originally derived from Jefferson's Act, "is taken, again with no change whatever, from present section 58").

These observations track Justice Harrison's assurance that, despite substantial revisions to some provisions, "We were not commissioned by the Governor, and the General Assembly did not initiate this Commission with the idea of giving Virginia a new constitution, and we have not done that."  Remarks on Release, *supra*, at 11:52 to 12:04.  The dissent brushes aside this statement as "incorrect" and worthy of "no judicial weight."  *See post* at 82 note 2.  The dissent's assertion assumes that Justice Harrison did not know that the 1971 Constitution was "an amendment in the form of a substitute" and, in that technical sense, a "new" constitution under principles of "parliamentary practice."  Tarter, *supra*, at 281.[23]  We think that supposition highly

_____

[23] This technical point is accurate but also somewhat misleading.  The Act of Assembly approving the 1971 Constitution described it as the "revised Constitution," and the ballot questions submitted to the voters for ratification "of the proposed general amendment of the Constitution of Virginia" asked whether the Constitution of Virginia should "be generally amended and revised."  1970 Acts ch. 763, at 1595, 1623-24, 1626.

No one at the time thought the Commission on Constitutional Revision was attempting to scrap the "old" constitution and start from scratch on a wholly "new" one.  The use of this parliamentary maneuver was only meant to achieve the political goals of avoiding an "uncontrollable convention" and instead giving "full control" over the revisions to the "majority [party] in both houses of the assembly."  Tarter, *supra*, at 278.  For these reasons, the old/new

unlikely, but even so, it matters little to us. Justice Harrison was not contesting this parliamentary practice or debating semantic nuances. He was only pointing out the obvious: The religious-liberty clauses were wholly untouched by the 1971 Constitution, and no effort was made to undo the meaning attributed to them by the original Framers — which is our point as well.

Let's suppose we are wrong, and Virginians in 1971 dismissed as anachronistic the views of George Mason, Thomas Jefferson, and James Madison and instead looked solely to the contemporaneous understanding of religious liberty prevailing in 1971. Would that support the dissent's view? Not at all. In 1971, Justice Brennan's 1963 opinion in *Sherbert* represented the near-universal understanding of "free exercise" of religious liberties. Justice Scalia's 1990 opinion in *Smith* came nearly two decades later. And it did so over the objection of Justices Brennan, Marshall, Blackmun, and O'Connor who pointed out that *Smith* "dramatically departs from well-settled First Amendment jurisprudence" and "is incompatible with our Nation's fundamental commitment to individual religious liberty." *Smith*, 494 U.S. at 891 (O'Connor, J., concurring in the judgment).

The dissent never expressly adopts *Smith* by name, but as mentioned above, Part I of the dissent unequivocally endorses the federal *Smith* neutrality doctrine.[24] Because the School Board's policies are neutral and generally applicable, the dissent argues, "it *does not matter* whether [Vlaming] has a religious or secular objection to them." *Post* at 99 (emphasis added).[25]

---

distinction is an unhelpful intellectual exercise. *See, e.g.,* Howard & Antholis, *Interview*, *supra*, at 376 ("In Virginia, the proposed constitution, in technical legal terms, was an amendment to the previous constitution. It was in fact a wholesale replacement, a new constitution, but technically it was an amendment to the 1902 constitution.").

[24] *See supra* at 13.

[25] *See supra* note 12.

41

Like Justices Brennan, Marshall, Blackmun, and O'Connor, we think it does matter and that the does-not-matter proposition entered American constitutional jurisprudence for the first time in 1990 when *Smith* reformulated the federal free-exercise doctrine. That mistaken view of religious liberty was not the common understanding of Virginians nearly two decades earlier in 1971. Nor was it the view of the original Framers two centuries ago in 1776. And it is not our understanding today.

We take seriously the dissent's accusation that our efforts to unpack the early legal history of the Constitution of Virginia is little more than "academic speculation." *Post* at 82. We make no pretense of having omniscient certitude on this or any other legal issue. We are nonetheless duty bound to interpret and apply legal texts, such as the religious-liberty clauses of the Constitution of Virginia, to concrete cases, such as the present dispute. We cannot do so in this case, however, without recognizing that the legal concepts nested in the religious-liberty clauses have historical origins.[26] The Founders understood the essentiality of this interpretative task. Shortly after participating in the Federal Constitutional Convention, James Madison made a profound observation about legal texts:

---

[26] *See* Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union 59 (1868) ("But it must not be forgotten, in construing our constitutions, that in many particulars they are but the legitimate successors of the great charters of English liberty, whose provisions declaratory of the rights of the subject have acquired a well-understood meaning, which the people must be supposed to have had in view in adopting them. We cannot understand these provisions unless we understand their history . . . ."); *see id.* at 54 ("The meaning of the constitution is fixed when it is adopted, and it is not different at any subsequent time when a court has occasion to pass upon it."); A Discourse upon the Exposition & Understanding of Statutes with Sir Thomas Egerton's Additions 141 (Samuel E. Thorne ed., 1942) (arguing that statutes must be read in their historical context "for without knowledge of the ancient law they shall neither know the statute nor expound it well, but shall, as it were, follow their noses and grope at it in the dark" (altering archaic spelling in title and text)). *See generally* Scalia & Garner, *supra* note 13, at 78-92 (outlining the "Fixed-Meaning Canon," which states that "[w]ords must be given the meaning they had when the text was adopted").

> All new laws, though penned with the greatest technical skill and passed on the fullest and most mature deliberation, are considered as more or less obscure and equivocal . . . . The use of words is to express ideas. . . . But no language is so copious as to supply words and phrases for every complex idea, or so correct as not to include many equivocally denoting different ideas.

The Federalist No. 37, at 229 (James Madison) (Clinton Rossiter ed., 1961). Madison's antidote for such indeterminacy, however, was not to celebrate the elasticity of words using instrumentalist and policy-oriented interpretative models. Instead, he believed that interpreters should consult the popular meaning of legal words and phrases within the historical context in which they arose. To Madison, this was not just a question of linguistics but also of democratic legitimacy.[27] Not mincing his own words, he declared:

> I entirely concur in the propriety of resorting to the sense in which the Constitution was accepted and ratified by the nation. *In that sense alone it is the legitimate Constitution. . . .* If the meaning of the text be sought in the changeable meaning of the words composing it, it is evident that the shape and attributes of the government must partake of the changes to which the words and phrases of all living languages are constantly subject. What a metamorphosis would be produced in the code of law if all its ancient phraseology were to be taken in its modern sense!

Letter from James Madison to Henry Lee (June 25, 1824), *in* 3 Letters and Other Writings of James Madison 441, 442 (1867) (emphasis added). Reflecting on this view a couple of years

---

[27] *See* Memorandum by Nicholas P. Trist of Conversation with James Madison (Sept. 27, 1834), *in* 3 The Records of the Federal Convention of 1787, at 533, 534 (Max Farrand ed., 1911) (recording Madison's desire that the government "conform to the Constitution as understood by the Convention that produced and recommended it, and particularly by the State conventions that adopted it"); Letter from James Madison to Thomas Ritchie (Sept. 15, 1821), *in* 3 Letters and Other Writings of James Madison 228, 228 (1867) (stating that "the legitimate meaning" of the Constitution "must be derived from the text itself . . . in the sense attached to it by the people in the respective State Conventions, where it received all the authority which it possesses"); 5 Annals of Cong. 776 (1796) ("As the [Constitution] came from [the drafters] it was nothing more than the draft of a plan, nothing but a dead letter, until life and validity were breathed into it by the voice of the people, speaking through the several State Conventions.").

later, Madison restated his point with a rhetorical question: "In the exposition of laws, and even of Constitutions how many important errors may be produced by mere innovations in the use of words and phrases, if not controulable by a recurrence to the original and authentic meaning attached to them."[28]

Thomas Jefferson, Madison's mentor, agreed: "On every question of construction," Jefferson said, "[let us] carry ourselves back to the time when the Constitution was adopted, recollect the spirit manifested in the debates, and instead of trying what meaning may be squeezed out of the text, or invented against it, conform to the probable one in which it was passed." Letter from Thomas Jefferson to Judge William Johnson (June 12, 1823), *in* 15 The Writings of Thomas Jefferson 439, 449 (Andrew A. Lipscomb & Albert Ellery Bergh eds., memorial ed. 1904). Such views date back to the very origins of the Anglo-American common-law methods of textual interpretation. *See generally* 1 William Blackstone, Commentaries *59.

To answer the dissent's charge of "academic speculation," *post* at 82, we will concede the incontestable: The use of legal history to understand the original denotation and connotation of words used in legal texts may not deliver the exactitude of a mathematical equation. And it is a difficult task when interpreting low-resolution legal texts written in centuries past. But it is far preferrable than its more indeterminate alternative — modern judges engaging in an eisegesis, declaring what the text ought to mean, rather than an exegesis, determining what the historical text actually meant when the words became law.

---

[28] *See* Letter from James Madison to Sherman Converse (Mar. 10, 1826), *in* 3 Letters and Other Writings of James Madison 518, 519 (1865).

## C.

Vlaming also contends that the allegations of his complaint are sufficient to set forth a statutory free-exercise claim under the Virginia Religious Freedom Restoration Act ("VRFRA"), Code § 57-2.02, and that the circuit court erred in dismissing this claim on demurrer. We agree.

## 1.

First enacted in 2007, the General Assembly patterned the VRFRA to parallel, in varying degrees, similar statutes enacted by the United States Congress and numerous state legislative assemblies. The core provision of the VRFRA announces a general rule and a narrow exception. The general rule states that "[n]o government entity shall substantially burden a person's free exercise of religion even if the burden results from a rule of general applicability." Code § 57-2.02(B). The narrow exception adds that a violation of the general rule will only be excused if the government "demonstrates that application of the burden to the person is (i) essential to further a compelling governmental interest and (ii) the least restrictive means of furthering that compelling governmental interest." *Id.*

The VRFRA is quite specific about who must prove what. The claimant has the initial obligation to show that the government "substantially burden[ed]" the "free exercise of religion," *id.*, which includes any act that "inhibit[ed] or curtail[ed]" the "religiously motivated practice," Code § 57-2.02(A). If the claimant makes that prima facie showing, the government then has "the burdens of going forward with the evidence and of persuasion under the standard of clear and convincing evidence," *id.*, to show that the specific "application of the [government's] burden to the person is (i) essential to further a compelling governmental interest and (ii) the least restrictive means of furthering that compelling governmental interest," Code § 57-2.02(B).

45

The VRFRA differs from its federal counterpart, the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb-2000bb-4, in some respects. Unlike the VRFRA, the federal RFRA does not require the government to prove that its contested actions be "essential" to the furtherance of "a compelling governmental interest." *Compare* Code § 57-2.02(A)-(B), *with* 42 U.S.C. § 2000bb-1.[29] Nor does the federal RFRA require the government to prove the essentiality of its compelling interest by "clear and convincing evidence," *see* 42 U.S.C. § 2000bb-1, a heightened standard of evidentiary proof.[30]

In one important respect, however, the VRFRA closely parallels the federal RFRA. "'The least-restrictive-means standard is exceptionally demanding,' and it requires the government to 'show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party.'" *Holt v. Hobbs*, 574 U.S. 352, 364-65 (2015) (alterations omitted) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S.

---

[29] The VRFRA's requirement that the means be "essential," Code § 57-2.02(B), elevates this already demanding standard even further. *See, e.g.*, *Marianist Province of U.S. v. City of Kirkwood*, 944 F.3d 996, 1003-04 (8th Cir. 2019) (describing similar language in Missouri's RFRA as a "heightened" version of "the usual strict-scrutiny standard"); *Roles v. Townsend*, 64 P.3d 338, 340 (Idaho Ct. App. 2003) (analyzing whether Idaho's tobacco-free prison policy was not only in furtherance of a compelling interest but also, pursuant to Idaho's RFRA, "essential" to its interest in "maintain[ing] internal security and control[ling] the black market for tobacco").

[30] As an evidentiary standard of proof, "'clear and convincing evidence' has been defined as 'that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established.'" *Judicial Inquiry & Rev. Comm'n v. Pomrenke*, 294 Va. 401, 409 (2017) (citation omitted). The standard "is considerably higher than a 'mere preponderance' and has been fairly characterized as a 'heavy burden.'" *In re Brown*, 295 Va. 202, 227 (2018) (citations omitted); *see also* 2 Kenneth S. Broun et al., McCormick on Evidence § 340, at 712 (Robert P. Mosteller ed., 8th ed. 2022) (describing this standard as "a more exacting measure of persuasion"). Thus, the standard is not satisfied when the evidence leaves "competing inferences 'equally probable.'" *Edmonds v. Edmonds*, 290 Va. 10, 22 (2015) (citation omitted). Stated differently, "the persuasive quality of clear-and-convincing evidence must establish that 'the thing to be proved is highly probable or reasonably certain.'" *In re Brown*, 295 Va. at 227 (quoting Black's Law Dictionary 674 (10th ed. 2014)).

46

682, 728 (2014)).  This highly "focused" evidentiary analysis "requires the [g]overnment to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person' — the particular claimant whose sincere exercise of religion is being substantially burdened."  *Burwell*, 573 U.S. at 726 (quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430-31 (2006)).

In this case, the core allegation in Vlaming's complaint is that he was fired as a French teacher for referring to a biologically female student only by the student's preferred name instead of by both the preferred name and government-mandated masculine pronouns.  Vlaming alleges that he could not comply with this compelled-speech mandate because it coerced him into violating his conscience by endorsing an ideology at odds with his sincerely held religious beliefs.  This allegation, when placed in the context of all other supporting facts and supporting inferences in Vlaming's 39-page complaint, asserts a prima facie claim of a statutory violation of Code § 57-2.02(B).

2.

The School Board argues that even if Vlaming's allegations state a prima facie claim, the circuit court was nonetheless correct in dismissing the claim because the VRFRA categorically exempts some government actions from its reach.  In support of this argument, the School Board relies upon Code § 57-2.02(E), which states that "[n]othing in this section shall prevent any governmental institution or facility from maintaining health, safety, security or discipline."  The School Board argued in the circuit court that this provision, as a matter of law, bars Vlaming's VRFRA claim.  *See* J.A. at 111-12.  Although the circuit court did not directly address this issue, the School Board raises it on appeal as a free-standing legal basis for affirming the circuit court's dismissal of Vlaming's complaint.  *See* Appellees' Br. at 42-44.  We reject this argument.

Whatever the meaning of Code § 57-2.02(E), one interpretative baseline is clear:  If

broadly construed, the exemption would apply to nearly all government actions.  Most, if not all,

laws, policies, or actions could plausibly be said to promote "health, safety, security, or

discipline" in some manner.  This is necessarily so because "the police power is essentially the

inherent power of sovereign state governments 'to enact laws "to promote the health, peace,

morals, education, and good order of the people."'"  *Hooked Grp., LLC v. City of Chesapeake*,

298 Va. 663, 668 (2020) (alteration and citation omitted); *see also Bacon v. Walker*, 204 U.S.

311, 317 (1907) (noting that the police power includes "regulations designed to promote the

public health, the public morals, or the public safety").  Such a construction of Code § 57-

2.02(E) would eviscerate the VRFRA.  We cannot adopt an interpretation of the VRFRA that

"would render it a dead letter and defeat its essential purpose."  *Graham v. Community Mgmt.*

*Corp.*, 294 Va. 222, 230 (2017).

Aware of this interpretative risk, the School Board argues that no matter how broadly or

narrowly interpreted, subsection E bars Vlaming's prima facie claim as a matter of law.  *See*

Appellees' Br. at 42.[31]  We need not demark with specificity the conceptual boundaries of Code

---

[31] When a statute "carves an exception" out of its "general scope," we must determine
whether the exception constitutes a "negative element" of the claimant's "prima facie case" or an
affirmative defense upon which the defendant has the burden of production and persuasion.
*Myers v. Commonwealth*, 299 Va. 671, 678-79 (2021) (applying this principle to Code § 18.2-
308); *see also New Dimensions, Inc. v. Tarquini*, 286 Va. 28, 33-34 (2013) (noting that under the
Equal Pay Act, plaintiffs must "make out a prima facie case" by showing a pay differential with
an equally skilled "higher-paid male employee" but that "the burden then shifts to the employer
to prove . . . that the pay differential is justified by . . . one of the four statutory exceptions");
*Vaughan v. Mayo Milling Co.*, 127 Va. 148, 156 (1920) (applying the interpretative canon that
"when the exception or provision is in a subsequent substantive clause, the case contemplated in
the enacting or general clause may be fully stated without negativing the exception or proviso, as
a prima facie case is stated; and it is for the party who relies upon the matter of excuse or defense
furnished by the statute . . . to bring it forward in his defense"); *cf.* 3C Shambie Singer,
Sutherland's Statues and Statutory Construction § 76:3, at 323 (8th ed. 2018) (noting that in
construing civil-rights legislation, "those who claim the benefit of an exception have the burden

48

§ 57-2.02(E) to answer this assertion. According to the complaint, the School Board fired Vlaming because he had referred to a student only by the student's preferred name, avoided the use of any third-person pronouns, and refused to use the government-mandated pronouns. Whatever the outer reaches of Code § 57-2.02(E), we find little difficulty in concluding that the School Board's termination of Vlaming's employment (assuming, as we must, that his allegations are true) does not qualify under subsection E as a wholesale exemption from the VRFRA's reach. The literal text, historical context, and essential purpose of the VRFRA cannot so easily be set aside.[32]

### D.

Vlaming also challenges the circuit court's dismissal of his free-speech claims asserted under Article 1, Section 12 of the Constitution of Virginia. Pruned down to its trunk line, Vlaming's complaint does not allege that the School Board fired him for saying something he should not have said — but for not saying something that his religion and his conscience forbade him from saying. While no liberty is absolute, Vlaming contends that the right to freedom of expression is at its apogee in compelled-speech cases. Fully embracing this premise, we find that it applies to this case and that the circuit court erroneously dismissed Vlaming's free-speech claims.

---

of proving they come within the limited class for whose benefit the exception was established"). Given the carefully prescribed burdens of proof in subsections A and B of Code § 57-2.02, we find it implausible that the General Assembly intended subsection E to constitute a negative element of the claimant's prima facie case.

[32] The dissent concludes that our constitutional analysis "in one fell swoop" renders the VRFRA "suddenly irrelevant." *Post* at 106. We question what is meant by this. Suffice it to say, the presence or absence of statutory rights does not determine the existence and scope of constitutional rights. In a democratic republic, "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Howell*, 292 Va. at 350 (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)).

1.

The First Amendment of the United States Constitution provides with characteristic brevity that "Congress shall make no law . . . abridging the freedom of speech." Article I, Section 12 of the Constitution of Virginia, however, provides an amplified restatement of the right to free speech:

> That the freedoms of speech and of the press are among the great bulwarks of liberty, and can never be restrained except by despotic governments; that any citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right; that the General Assembly shall not pass any law abridging the freedom of speech . . . .

While the First Amendment's prohibition against government restriction speaks solely in the negative — "Congress shall make no law" — the Virginia clause speaks in both negative and affirmative terms — "any citizen may freely speak . . . on all subjects," and "the General Assembly shall not pass any law abridging the freedom of speech." *Compare* U.S. Const. amend. I, *with* Va. Const. art. I, § 12.

As earlier observed, the architecture of judicial power implicit in American federalism gives the United States Supreme Court the last word on the meaning of the First Amendment and gives the Supreme Court of Virginia the last word on the meaning of the Constitution of Virginia. When we interpret the protection given to free speech by the Constitution of Virginia as being "coextensive with the free speech provisions of the federal First Amendment," *Elliott v. Commonwealth*, 267 Va. 464, 473-74 (2004), we are not outsourcing to the federal courts our decision-making power over the Constitution of Virginia. *See Richmond Newspapers, Inc. v. Commonwealth*, 222 Va. 574, 588 (1981). We are merely acknowledging that the then-existing interpretation of the First Amendment by the United States Supreme Court matches our own understanding of Article I, Section 12 of the Constitution of Virginia. The Virginia protection of

free speech coexists (and thus is coextensive) with the federal protection because, as we have understood both in specific cases, the former appeared to be at least as strong as the latter.

To be sure, in some cases, we might find that the Virginia constitutional right of free speech is stronger than the prevailing interpretation of the First Amendment by the United States Supreme Court. In the present case, however, we need not speculate on such hypotheticals. We believe that the extant principles of free speech presently articulated by the United States Supreme Court in its interpretation of the First Amendment equally describe the baseline protection of the right of free expression secured by the Constitution of Virginia. That said, even if our understanding of existing federal precedent is incorrect, we would nonetheless hold fast to our reasoning in the present case as the proper interpretation of the right to free speech protected by Article I, Section 12 of the Constitution of Virginia.

2.

In the vocabulary of First Amendment jurisprudence, Vlaming's principal theory of recovery asserts a "compelled speech" claim. This type of claim challenges an attempt by the government to "compel an individual to create speech [he] does not believe" and to "'utter what is not in [his] mind' about a question of political and religious significance." *303 Creative LLC v. Elenis*, 600 U.S. 570, 578-79, 596 (2023) (citations omitted).

As the complaint frames this factual scenario, the School Board fired Vlaming not because of what he said but because of what he refused to say. He used Doe's preferred name but avoided the use of any third-person pronouns when referring to Doe and "rarely, if ever, used third person pronouns to refer to any students during class or while the student being referred to was present." J.A. at 7. The School Board terminated Vlaming's employment, the complaint

51

alleges, because he refused to use the government-mandated pronouns *in addition to* Doe's preferred name.

(a)

The constitutional right to free speech "includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (citing *West Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 633-34 (1943)). "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Barnette*, 319 U.S. at 642. "A system which secures the right to proselytize religious, political, and ideological causes must also guarantee the concomitant right to decline to foster such concepts." *Wooley*, 430 U.S. at 714.

It is a "cardinal constitutional command" that government coercion, even when indirect, cannot constitutionally compel individuals to "mouth support" for religious, political, or ideological views that they do not believe. *Janus v. American Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018). "[I]n most contexts, any such effort would be universally condemned" because individuals cannot be constitutionally "coerced into betraying their convictions." *Id.* at 2463-64. "Forcing free and independent individuals to endorse ideas they find objectionable is always demeaning, and for this reason, one of our landmark free speech cases said that a law commanding 'involuntary affirmation' of objected-to beliefs would require 'even more immediate and urgent grounds' than a law demanding silence." *Id.* at 2464 (citation omitted).

As the United States Supreme Court recently reaffirmed, the freedom to speak or not speak generally endures "regardless of whether the government considers [the] speech sensible

52

and well intentioned or deeply 'misguided' and likely to cause 'anguish' or 'incalculable grief.'" *303 Creative LLC*, 600 U.S. at 586 (citation omitted). "Nor does it matter whether the government seeks to compel a person to speak its message when he would prefer to remain silent or to force an individual to include other ideas with his own speech that he would prefer not to include." *Id.* Some find these axioms of liberty troubling because they trust "state governments to coerce only 'enlightened' speech. But if that is the calculation, it is a dangerous one indeed." *Id.* at 2320. "[I]f liberty means anything at all, it means the right to tell people what they do not want to hear." *Id.* (citation omitted). All the more, it means the right to disagree without speaking at all.

The constitutional prohibition on government punishing protected speech relies heavily on the idea that "the best test of truth is the power of the thought to get itself accepted in the competition of the market" of free thinking. *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting). "That at any rate is the theory of our Constitution." *Id.* The constitutional prohibition on government *compelling* its citizens to "mouth support" for ideological beliefs, *Janus*, 138 S. Ct. at 2463, takes that idea one step further. Forcing creedal conformity is more pernicious than silencing dissent because the former seeks to monopolize the marketplace of ideas by making everyone in the market say the same thing about the same idea. *See id.* at 2464 ("When speech is compelled, . . . additional damage is done."); *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 641 (1994) (observing that government efforts to "suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion . . . 'rais[e] the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace'" (citation omitted)).

Because of this distinction, the government has a higher burden to justify compelled speech than when it seeks to punish or to censor protected speech. "When a public employer does not simply restrict potentially disruptive speech but commands that its employees mouth a message on its own behalf, the calculus is very different." *Janus*, 138 S. Ct. at 2473. Under this stricter standard, "a law commanding 'involuntary affirmation' of objected-to beliefs would require 'even more immediate and urgent grounds' than a law demanding silence.'" *Id*. at 2464 (quoting *Barnette*, 319 U.S. at 633); *see also Riley v. National Fed'n of the Blind of N.C.*, 487 U.S. 781, 795-97 (1988) (rejecting a "deferential test" for compelled-speech claims). In short, courts apply "rigorous scrutiny" to any effort by government to "compel speakers to utter or distribute speech bearing a particular message." *Turner Broad. Sys., Inc.*, 512 U.S. at 642.

(b)

The need to reinforce these principles "is nowhere more vital than in the community of American schools." *Shelton v. Tucker*, 364 U.S. 479, 487 (1960). Teachers and students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). Students in a public-school classroom, for example, cannot be compelled to salute the flag or recite the pledge of allegiance. *See Barnette*, 319 U.S. at 642. Both the nonverbal flag salute and the verbal pledge of allegiance declare a speaker's ideological belief about our national self-identity — a belief sacred to some but not to others. Requiring a nonbeliever to salute the flag or to recite the pledge would constitute a government "compulsion" on the speaker to "declare a belief." *Id.* at 631.

Constitutional free-speech protections are not limited to students or to university professors. Secondary-school teachers unquestionably enjoy free-speech protections. *See, e.g.*, *Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410, 413 (1979); *City of Madison, Joint Sch.*

54

*Dist. No. 8 v. Wisconsin Emp. Rels. Comm'n*, 429 U.S. 167, 176-77 (1976); *Pickering v. Board of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968); *Shelton*, 364 U.S. at 486-87. The right to be free from compelled speech is among these protections. *See, e.g.*, *Russo v. Central Sch. Dist.*, 469 F.2d 623, 631-33 (2d Cir. 1972); *State v. Lundquist*, 278 A.2d 263, 274 (Md. 1971); *Opinions of the Justices to the Governor*, 363 N.E.2d 251, 254 (Mass. 1977). That does not mean, of course, that secondary-school teachers cannot be expected (and even compelled as a condition of employment) to teach the curricular materials for the classes that they are hired to teach. "The core of the teacher's job is to speak in the classroom on the *subjects* she is expected to teach." *Brown v. Chicago Bd. of Educ.*, 824 F.3d 713, 715 (7th Cir. 2016) (emphasis added). Math teachers must teach math, science teachers must teach science, history teachers must teach history, and so on. But none of them can be compelled into the service of controversial "religious, political, [or] ideological causes," *Wooley*, 430 U.S. at 714.

In this case, Vlaming alleges that the School Board fired him as a French teacher for refusing to use masculine pronouns when referring to Doe, a biologically female student. Vlaming did not insist on referring to Doe with feminine pronouns. Instead, he avoided the use of third-person pronouns altogether either when referring to Doe or to any other students in French class, and he instead used Doe's preferred name. The coerced masculine pronouns had nothing to do with any curricular topic related to the French language. This coercion was instead, Vlaming argues, simply a compelled-speech mandate seeking to use him as "an instrument for fostering public adherence to an ideological point of view he finds unacceptable," *id.* at 715, and to compel him to "speak in ways that align with [the government's] views" in a manner that defies his "conscience about a matter of major significance," *303 Creative LLC*, 600 U.S. at 602-03. Notions of "the need for orderly school administration," *Pickering*, 391 U.S. at

569, may play a role in balancing the government's right to punish or to censor speech — but these concerns play no role as a counterbalance to a teacher's right not to be compelled to give a verbal salute to an ideological view that violates his conscience and has nothing to do with the specific curricular topic being taught.

The concept of "gender identity" is among many "controversial subjects" that are rightly perceived as "sensitive political topics." *Janus*, 138 S. Ct. at 2476. Speech on such matters occupies the "'highest rung of the hierarchy of First Amendment values' and merits 'special protection.'" *Id.* (quoting *Snyder v. Phelps*, 562 U.S. 443, 452 (2011)). The ideological nature of gender-identity-based pronouns involves a palpable "struggle over the social control of language in a crucial debate about the nature and foundation, or indeed real existence, of the sexes." *Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021) (citation omitted). Compelling an educator's "speech or silence" on such a divisive issue would cast "a pall of orthodoxy over the classroom" on a topic that has "produced a passionate political and social debate." *Id.* at 503, 508. Whether at the highest or lowest level, the government has no inherent power to declare by ipse dixit that controversial ideas are now uncontroversial. After all, the "freedom to differ is not limited to things that do not matter much. That would be a mere shadow of freedom. The test of its substance is the right to differ as to things that touch the heart of the existing order." *Barnette*, 319 U.S. at 642.

3.

Our colleagues in dissent take a different view, asserting that our "distinction between free speech and compelled speech is a siren song; it is constitutionally insignificant." *Post* at 132. This insignificance, the dissenters argue, stems from the "[s]imply stated" axiom that "the School Board is the speaker and Vlaming its spokesperson; thus, the School may regulate its own

messages to that effect." *Post* at 129. Under this logic, Vlaming has no right to free speech because he is not the speaker. The School Board is the speaker and Vlaming its mouthpiece. Everything he says is officially compelled, and everything he cannot say is officially censored. This is the thesis underlying the dissenters' belief that Vlaming can be compelled to convey the school's "specific message" on "preferred pronouns" and "be a part of a larger initiative" while trying to teach the French language to high schoolers. *Post* at 122, 128.

This approach closely tracks the School Board's illiberal view of its teachers' right to free speech. The School Board argues that it could constitutionally compel Vlaming to use the government-mandated pronouns, in addition to using students' preferred names, because doing so was among the "official duties" that he owes to the School Board. *See* Appellees' Br. at 48-52. In its broadest sense, however, this argument is circular. If it were true, the government could define away a teacher's right against compelled speech by unilaterally deeming such speech a compulsory official duty. The arguments on brief by the School Board seem to suggest that this is what it attempted to do:

- "Vlaming's speech in the hallways and classrooms of West Point High School was pursuant to his official duties as a public school teacher and therefore is not protected speech. Put more simply, a public school board may dictate the in-classroom speech of a public high school teacher without running afoul of the Virginia Constitution's free speech provisions." Appellees' Br. at 9.

- "Vlaming's on-the-job speech in dereliction of his basic teaching responsibilities thus finds no protection under the Virginia Constitution." *Id.* at 47.

- "Public school teachers like Vlaming are only in a position to address students like Doe because they are hired to do so by government employers. . . . Vlaming's mode of addressing his students constitutes 'speech [he] was expected to deliver in the course of carrying out his job' . . . . The School Board was

57

thus entitled to regulate it without implicating the Virginia Constitution." *Id.* at 48-49 (citation omitted).

At face value, the School Board's assertions suggest that a secondary-school teacher's free-speech rights end at the schoolhouse gate. As long as the teacher is in the schoolhouse halls, classrooms, gymnasium, auditorium, or teachers' lounge, the School Board can require the teacher to say something, or nothing, on any topic virtually without limit. Under this sweeping definition, all aspects of a teacher's "on-the-job speech," *id.* at 47, are categorically off the list of protected constitutional rights. In our opinion, this definition of the "official duties" limitation on free speech sweeps too broadly.

The leading case on the "official duties" limitation, *Garcetti v. Ceballos*, involved a deputy prosecutor who wrote an internal legal memorandum asserting that a search warrant in a pending criminal case had been improperly obtained. 547 U.S. 410, 414 (2006). At the later suppression hearing, the deputy prosecutor took the witness stand on behalf of the accused and testified against the enforceability of the search warrant. *See id.* at 414-15. After the trial court rejected the defendant's motion to suppress, the deputy prosecutor's supervisors removed him from the prosecution team and later demoted him.[33] *See id.* at 415.

The deputy prosecutor sued the district attorney's office claiming that his supervisors had retaliated against him in violation of the First Amendment. The United States Supreme Court rejected the claim. Focusing its analysis on the deputy prosecutor's internal legal memo, the Court concluded that the act of writing the memo was one of the deputy prosecutor's official duties in the district attorney's office. *See id.* at 421. The supervising prosecutors had every

---

[33] The lower court opinions provide a full description of the facts of the case. *See Ceballos v. Garcetti*, 361 F.3d 1168, 1170-72 (9th Cir. 2004); *Ceballos v. Garcetti*, No. CV0011106AHMAJWX, 2002 WL 34098285, at *1-2 (C.D. Cal. Jan. 30, 2002) (unpublished).

right, the Court held, to "take proper corrective action" against the deputy prosecutor for what they perceived to be a misguided (and ultimately unsuccessful) legal analysis of the suppression issue. *Id.* at 423.

For several reasons, we reject the School Board's view that *Garcetti* should govern Vlaming's case. To begin with, *Garcetti* was not a compelled-speech case. *Garcetti* applied the official-duties doctrine to "expressions employees *make* pursuant to their professional duties," *id.* at 426 (emphasis added), not expressions employees *refuse to make*. Punishing a government employee for improper speech may or may not be constitutionally violative, but it is "not easy to imagine a situation in which a public employer has a legitimate need to demand that its employees recite words with which they disagree," *Janus*, 138 S. Ct. at 2473. This distinction undermines the School Board's argument that *Garcetti*'s official-duties doctrine warrants the dismissal of Vlaming's compelled-speech claim. His factual situation is wholly unlike that of the prosecutor in *Garcetti*. Vlaming claims that he was fired for what he would not say — unlike the deputy prosecutor, who was disciplined for what he did say.

Equally important, the punished speech in *Garcetti* was merely a prosecutor's legal opinion on a routine topic in criminal law that was rejected by his superiors and ultimately rejected by the trial court presiding over the criminal proceeding. In contrast, the compelled speech in Vlaming's case involves an ideological topic that has engendered fierce public debate. "From courts to schoolrooms this controversy continues." *Meriwether*, 992 F.3d at 508. Because "the use of gender-specific titles and pronouns has produced a passionate political and social debate," it is obvious that "[p]ronouns can and do convey a powerful message implicating a sensitive topic of public concern." *Id.* "Never before have titles and pronouns been scrutinized

59

as closely as they are today for their power to validate — or invalidate — someone's perceived sex or gender identity." *Id.* at 509.

For these reasons, we find *Garcetti*'s official-duties doctrine inapplicable to the allegations in Vlaming's complaint. Applying our understanding of Article I, Section 12 of the Constitution of Virginia to this case, we hold the view that "where the State's interest is to disseminate an ideology, no matter how acceptable to some, such interest cannot outweigh an individual's First Amendment right to avoid becoming the courier for such message." *Wooley*, 430 U.S. at 717. The School Board cannot avoid this constitutional prohibition by simply declaring it Vlaming's "official duty" to courier the School Board's ideological view of gender identity.

Our conclusion is reinforced by the fact that *Garcetti* anticipated and disavowed any effort to interpret the official-duties doctrine as inflexibly applying to all aspects of "classroom instruction" or "speech related to scholarship or teaching." 547 U.S. at 425.[34] The Supreme Court followed up this qualification with a warning to employers who might in the future create "excessively broad job descriptions" in an effort to make everything said while at work a potential violation of the employee's official duties. *Id.* at 424-25. Both reasons further counsel against applying *Garcetti*'s official-duties doctrine to the facts alleged in Vlaming's complaint.

---

[34] The dissent claims that the "classroom" exception to *Garcetti*'s official-duties doctrine, despite its breadth and unqualified language, applies only to professors in public colleges and universities but not to teachers in high schools. *Post* at 126 note 25. Given our reasoning, we need not engage in this debate in any detail. For purposes of resolving the unique case before us, the *Garcetti* approach does not account for the nuances implicated in Vlaming's case, regardless of whether Vlaming taught at a high school or university level.

4.

Our dissenting colleagues bring to our attention several lower federal court opinions that have developed a curricular-speech application of *Garcetti*'s official-duties doctrine. Having carefully considered all of them, we have not found any that help us resolve Vlaming's case. For example, in *Evans-Marshall v. Board of Education of Tipp City Exempted Village School District*, a high school teacher claimed a First Amendment right "to select books and methods of instruction for use in the classroom without interference from public officials." 624 F.3d 332, 334 (6th Cir. 2010). The Sixth Circuit held that no such right existed. We see no need to contest this conclusion. It is generally true, as one court explained, "that those authorities charged by state law with *curriculum development* [may] require the obedience of subordinate employees, including the classroom teacher." *Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477, 479 (7th Cir. 2007) (alteration in original) (emphasis added).

The concept of a curricular-speech exception is rational and legally sound. It is its application to this case that we contest. Neither *Evans-Marshall* nor *Mayer* involved compelled speech on a highly divisive, ideological issue that violated a teacher's religious faith, and our case does not involve a teacher demanding the right to teach a different curriculum from the one that he was hired to teach.[35] We hold that the curricular-speech exception in compelled-speech

---

[35] The dissent cites *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 271 (1988), as an on-point example of the "school curriculum" limitation on a teacher's free-speech rights. *Post* at 120-21. *Kuhlmeier* analyzed "the First Amendment rights of students," 484 U.S. at 266, not teachers. Nothing in *Kuhlmeier* addressed the curricular-speech limitation on a teacher's free-speech rights. The Fourth Circuit, however, found the *Kuhlmeier* analogy pertinent in a case where the teacher claimed a First Amendment right to unilaterally determine the "makeup of the school curriculum through the selection and production of a play." *Boring v. Buncombe Cnty. Bd. of Educ.*, 136 F.3d 364, 366 (4th Cir. 1998) (en banc). We have no contest with the view that the First Amendment does not authorize a drama teacher to create and produce the curriculum for the school's official "dramatics" program in which plays are "performed in interscholastic drama competitions." *Id.* at 367-68. Again, we need not decide whether the

cases applies only to the specific "subjects" that the teacher "is expected to teach," *Brown*, 824

F.3d at 715.[36]  The exception would eclipse the rule if we held otherwise.

5.

Because the gravamen of Vlaming's free-speech claims involves an allegation of

compelled speech on an ideological subject, we hold that the circuit court erred when it

dismissed Vlaming's free-speech claims.  The factual allegations of Vlaming's complaint,

coupled with the reasonable inferences therefrom, state legally viable claims that he was fired in

violation of Article I, Section 12 of the Constitution of Virginia.[37]

E.

Vlaming's complaint further alleges that the School Board fired him in violation of

Article I, Section 11 of the Constitution of Virginia, which states that "no person shall be

---

result would be the same under Article I, Section 12 because the facts of *Boring* (a teacher demanding the unreviewable right to dictate the school's drama curriculum) are far afield from the facts of Vlaming's case (a teacher refusing on religious grounds to use government-mandated pronouns in a French class).

[36] We offer no opinion, favorable or unfavorable, on the application of the curricular-speech exception outside the context of a compelled-speech context.

[37] Count II of Vlaming's complaint uses the expression "Viewpoint and Content Discrimination," J.A. at 27-29, and Count III alleges "Retaliation" by the School Board, *id.* at 29-31.  These counts add that the School Board fired him not only "for not expressing the Board's views regarding gender identity" (as in Count I) but also for "expressing his views" on why he could not comply with the compelled-speech directive. *See id.* at 27.  Read with the benefit of reasonable inferences, the pertinent allegations in Vlaming's complaint appear to describe private statements that he made to the school administration about his avoidance of third-person pronouns in the classroom and his religious reasons for this decision.  We need not dwell long on this issue.  Courts have soundly rejected "the conclusion that a public employee forfeits his protection against governmental abridgment of freedom of speech if he decides to express his views privately rather than publicly." *Givhan*, 439 U.S. at 414.  As we observed earlier, the concept of "gender identity" is among the many "controversial subjects" that are rightly perceived as "sensitive political topics" occupying the "highest rung of the hierarchy" of free-speech protection. *Supra* at 56 (quoting *Janus*, 138 S. Ct. at 2476).  Assuming Vlaming's factual allegations are true, his complaint states prima facie claims of viewpoint discrimination and retaliation for his expressed statements (in addition to the unexpressed statements that the

deprived of his life, liberty, or property without due process of law."[38]  On several levels, Article

I, Section 11 parallels the procedural due-process protections in the Fifth and Fourteenth

Amendments to the United States Constitution.  While interpreting and applying the former, we

review, as persuasive (but not binding) authority, United States Supreme Court opinions

construing the latter.  In this respect, we hold that the protections of Article I, Section 11 are at

least as strong as the existing understanding of procedural due-process rights secured by the

United States Constitution.

In this case, Vlaming alleges that the School Board based its termination decision upon

two written policies that neither expressly nor implicitly required teachers to use third-person

pronouns, in addition to preferred names, for transgender students.  Dismissing this claim on

demurrer, the circuit court held as a matter of law that any ordinary person would have known

that these policies forbade Vlaming's *nonuse* of pronouns and authorized his termination as the

price of his silence.  We disagree.

1.

Under settled procedural due-process principles, a government requirement "is

unconstitutionally vague if persons of 'common intelligence must necessarily guess at [the]

meaning [of the language] and differ as to its application.'"  *Tanner v. City of Va. Beach*, 277

Va. 432, 439 (2009) (quoting *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926)).  A

---

School Board attempted to compel him to make) in violation of his right of free expression under
Article I, Section 12 of the Constitution of Virginia.

[38] The School Board did not contest below or on appeal that Vlaming has a property
interest in the non-probationary status of his employment agreement.  *See generally Gilbert v.
Homar*, 520 U.S. 924, 928 (1997) ("The protections of the Due Process Clause apply to
government deprivation of those perquisites of government employment in which the employee
has a constitutionally protected 'property' interest."); *Cleveland Bd. of Educ. v. Loudermill*, 470
U.S. 532, 538 (1985) (holding that a person having a property right in continued employment
cannot be deprived of that property interest without due process).

provision without "ascertainable standards" fails to provide "'fair notice' to citizens as required by the Due Process Clause." *Id.* at 440.

This principle is particularly important when "vague language" implicates free-speech concerns because of the risk that individuals will self-censor "based on a fear that they may be violating an unclear law." *Id.* at 439. Vague statutes that touch "'upon sensitive areas of basic First Amendment freedoms' . . . inevitably lead citizens to 'steer far wider of the unlawful zone' . . . 'than if the boundaries of the forbidden areas were clearly marked.'" *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (quoting *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964)). While "[v]ague laws in any area suffer a constitutional infirmity," courts "look even more closely" at vagueness that implicates freedom of expression. *Ashton v. Kentucky*, 384 U.S. 195, 200 (1966); *see also FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012) (recognizing that the "requirement of clarity in regulation is essential to the protections provided by the Due Process Clause" and that "[w]hen speech is involved, rigorous adherence to [due-process] requirements is necessary to ensure that ambiguity does not chill protected speech"). These principles are not limited to penal statutes. Even though "[s]chool disciplinary rules need not be as detailed as a criminal code," *Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 668 (8th Cir. 2023), "a proportionately greater level of scrutiny is required [when] the regulation reaches the exercise of free speech," *id.* (citation omitted).

In this case, Vlaming asserts an "as applied" constitutional challenge. *See, e.g.*, *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 481 (2007); *Stanley v. City of Norfolk*, 218 Va. 504, 506 (1977). Vlaming's as-applied claim asks us to examine the clarity of the School Board's policies not in the abstract, but as they apply to his specific situation — the avoidance of any third-person pronouns when referring to Doe, accompanied by the agreement to use Doe's

64

preferred name. The relevant question, therefore, is whether the School Board's policies clearly informed teachers that they could be fired for not using third-person pronouns in addition to preferred names when referring to transgender students. This focused analysis cannot be satisfied by generalizations alone.

The first policy, "School Board Policy AC," stated in pertinent part that the School Board is "committed to nondiscrimination with regard to . . . gender identity . . . as *defined by law*." J.A. at 71 (emphasis added). As for the defining law on this issue, the policy cited the Education Amendments Act of 1972, 20 U.S.C. §§ 1681-88, more commonly known as Title IX. The second policy, "School Board Policy GBA/JFHA," prohibited, among other things, "harass[ing] a student . . . based on . . . gender identity." J.A. at 73. Such harassment included "name calling, jokes or rumors," "slurs, negative stereotypes and hostile acts," and "physical acts of aggression." *Id.* at 75. Policy GBA/JFHA also listed "gender identity" as a legally protected category under Title IX by attempting to incorporate its provisions by reference.

Neither of the two written School Board policies mentioned the use or nonuse of pronouns. Nor did they mandate the use of only government-approved pronouns for transgender students. The School Board does not claim otherwise. Instead, it points out that both written policies "incorporate" by reference "Title IX standards," Appellees' Br. at 58, and argues that in this and many other contexts, ignorance of the law is no excuse. In other words, the School Board argues, Vlaming should have known that Title IX standards enforced by these policies clearly required him to use pronouns in addition to names when referring to transgender students. We disagree.

Title IX states generally that no person "on the basis of sex" should be "subjected to discrimination" in any federally funded school. 20 U.S.C. § 1681(a). Title IX regulations define

"sexual harassment" as "unwelcome conduct" that is "so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity." 34 C.F.R. § 106.30(a) (restating the standard adopted by *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999)). No appellate court, federal or state, has ever held, in the school context, that referring to a transgender student by preferred name and avoiding the use of any third-person pronouns to refer to the student is a severe, pervasive, and objectively offensive act of harassment under Title IX. To date, the only appellate court opinion directly addressing the issue has held the opposite. *See Meriwether*, 992 F.3d at 511 (concluding that the school's "purported interest in complying with Title IX is not implicated by [the professor's] decision to refer to Doe by name rather than Doe's preferred pronouns").

2.

In support of its argument that discrimination "defined by law," J.A. at 71, 73, clearly applied to Vlaming's avoidance of third-person pronouns, the School Board on brief cites three federal district court opinions — two published, one unpublished. *See Tay v. Dennison*, 457 F. Supp. 3d 657, 682-84 (S.D. Ill. 2020); *Milo v. Cybercore Techs., LLC*, No. SAG-18-3145, 2020 WL 134537, at *7-8 (D. Md. Jan. 13, 2020) (unpublished); *Parker v. Strawser Constr., Inc.*, 307 F. Supp. 3d 744, 748, 756-59 (S.D. Ohio 2018). These cases are unhelpful to our analysis because each case involves different facts and dissimilar statutory schemes.

All three cases address the purposeful use of non-preferred pronouns as opposed to the avoidance of any third-person pronouns. *See Tay*, 457 F. Supp. 3d at 650, 678, 683 n.15; *Milo*, 2020 WL 134537, at *2-3, 6-8; *Parker*, 307 F. Supp. 3d at 748. Two cases involve interpretations of Title VII's provisions protecting "transgender status" in the context of employment discrimination. *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1753 (2020)

66

(disclaiming any intent to signal that its reasoning or holding "will sweep beyond Title VII to other federal or state laws that prohibit sex discrimination"). The third case involves an inmate's claim under 42 U.S.C. § 1983. None of the federal district court opinions mention, much less address, Title IX's provisions governing discrimination "on the basis of sex" in federally funded schools. "Title VII differs from Title IX in important respects," and thus, "it does not follow that principles announced in the Title VII context automatically apply in the Title IX context." *Meriwether*, 992 F.3d at 510 n.4; *see also Adams ex rel. Kasper v. School Bd. of St. Johns Cnty.*, 57 F.4th 791, 811 (11th Cir. 2022).

School officials supported their interpretation of Title IX with a document entitled "Fact Sheet on U.S. Department of Education Policy Letter on Transgender Students." *See* J.A. at 46-49. Prepared by an advocacy group, the "Fact Sheet" omitted an important fact: The "Policy Letter" relied upon by the advocacy group had been rescinded one-and-a-half years earlier by the U.S. Department of Education and the U.S. Department of Justice. *See id.* at 10. In a joint statement issued in February 2017, both Departments stated that the earlier guidance documents did not "contain extensive legal analysis or explain how the position is consistent with the language of Title IX, nor did they undergo any formal public process." Sandra Battle & T.E. Wheeler, II, *Dear Colleague Letter*, U.S. Dep't of Educ. 1-2 (Feb. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201702-title-ix.pdf.

On appeal, the School Board responds by pointing out that the U.S. Department of Education later reversed course again and issued a more protective policy statement in June 2021, two-and-a-half years after Vlaming was fired.[39] We fail to see how this after-the-fact legal

---

[39] *See* Enforcement of Title IX of the Education Amendments of 1972 with Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of *Bostock v. Clayton County*, 86 Fed. Reg. 32,637 (June 22, 2021); *see also* Suzanne B. Goldberg, *Letter to Educators*

pronouncement changes the fair-notice analysis. Whatever persuasive value the 2021 policy

statement may have had at the time it was issued — which is itself debatable[40] — it cannot cure

a *previous* procedural due-process violation. We focus on the clarity of the law at the time of the

alleged due-process deprivation, not some later interpretation or clarification by an

administrative body. As we have explained:

> [T]he requirement of fair notice contained in due process is not satisfied if the public cannot determine what the law prohibits or the standard to which they must conform from either the language of the statute or a properly promulgated regulation or other official guidance provided prior to the statute being enforced, but rather only after the fact from the result of an arbitrary exercise of discretion by the administrative official charged with enforcing the statute.

*Volkswagen of Am., Inc. v. Smit*, 279 Va. 327, 341 (2010); *cf. United States v. Lanier*, 520 U.S.

259, 267 (1997) (stating that due process requires that a "statute, either standing alone or as

construed, made it reasonably clear *at the relevant time* that the defendant's conduct was

criminal" (emphasis added)).

At the time that the School Board fired Vlaming, no clearly established law — whether

constitutional, statutory, or regulatory — put a teacher on notice that not using third-person

pronouns in addition to preferred names constituted an unlawful act of discrimination against

transgender students. If the government truly means to compel speech, the compulsion must be

---

*on Title IX's 49th Anniversary*, U.S. Dep't of Educ. 1-2 (June 23, 2021), https://www2.ed.gov/about/offices/list/ocr/correspondence/stakeholders/educator-202106-tix.pdf; U.S. Dep't of Justice & U.S. Dep't of Educ., *Confronting Anti-LGBTQI+ Harassment in Schools*, U.S. Dep't of Educ. (June 2021), https://www2.ed.gov/about/offices/list/ocr/docs/ocr-factsheet-tix-202106.pdf.

[40] In July 2022, a federal district court enjoined the implementation of the 2021 policy statement in 20 states that had filed the civil action challenging the legality of the administrative agency's policy statements. *See Tennessee v. United States Dep't of Educ.*, No. 3:21-cv-308, 2022 WL 2791450, at *1 n.1, *24 (E.D. Tenn. July 15, 2022), *appeal docketed*, No. 22-5807 (6th Cir. Sept. 13, 2022).

clear and direct. *See, e.g.*, *Parents Defending Educ.*, 83 F.4th at 668-69 (holding that a school transgender policy did "not provide adequate notice of what conduct is prohibited" because of the use of the "capacious concept" of "gender identity"). We offer no opinion on whether this clarity and directness exists today, but we can say with confidence that it did not exist in 2018 when the School Board fired Vlaming.

For these reasons, we hold that the circuit court erred by dismissing on demurrer Vlaming's due-process claim. The allegations in his complaint, coupled with reasonable inferences therefrom, state a legally viable claim under the Due Process Clause of Article I, Section 11 of the Constitution of Virginia.[41]

3.

We acknowledge the contrary view advanced by the dissent. It appears to rest on two related assertions. We find neither one convincing.

The first assertion is that, as a matter of law, Vlaming should have known that the School Board's policies "required him to use Doe's preferred pronouns" as opposed to avoiding the use of third-person pronouns altogether. *Post* at 140. Vlaming's complaint, however, expressly alleges that he did not and could not have known that this is what the policies required. This allegation cannot be swept away on demurrer as intrinsically implausible. We have read the policies beginning to end and find nothing in them about the *mandatory use* of third-person pronouns. Maybe so, the dissent responds, but school officials "informed Vlaming that he *could*

_____

[41] In the circuit court, the School Board argued that Policies AC and GBA/JFHA in 2018 also incorporated by reference the Virginia Human Rights Act, presently codified as Code §§ 2.2-3900 to -3909, and that it, like Title IX, applied to gender-identity discrimination. The School Board, however, has abandoned that argument on appeal. We will not address it other than to observe that "gender identity" did not exist as a protected class in the Virginia Human Rights Act until 2020 (nearly two years after Vlaming was fired) when the General Assembly amended the Act to expressly add it. *See* 2020 Acts chs. 1137, 1140, at 2274-75, 2311.

69

*be* violating federal law" incorporated by reference in the written policies. *Post* at 141 (emphasis added). We find no legal significance in the mere assertion that the enforcing officials "saying it is so makes it so." At that time and even now, it is entirely unclear whether the *nonuse* of third-person pronouns would be or, for that matter, even "could be," *post* at 141, a violation of federal law.

The second assertion is that the policies really did not need to be clear because "the demands of public secondary and elementary school discipline are such that it is inappropriate to expect the same level of precision in drafting school disciplinary policies as is expected of legislative bodies crafting criminal restrictions." *Post* at 139-40 (quoting *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 260 (3d Cir. 2002)) (citing *Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 442 (4th Cir. 2013)). The precedents cited, however, do not support the proposition asserted. The "disciplinary policies" in these cases involved disciplining students for violating school dress codes, not firing a tenured teacher for failing to use third-person pronouns. As we have emphasized, whether "the timing and content of the notice" is constitutionally sufficient "will depend on appropriate accommodation of the competing interests involved." *Fairfax Cnty. Sch. Bd. v. S.C. ex rel. Cole*, 297 Va. 363, 376 (2019) (quoting *Goss v. Lopez*, 419 U.S. 565, 579 (1975)). Vlaming's interest in keeping his tenured job (a constitutionally protected property interest) is qualitatively different than a student's interest in wearing T-shirts that violate school dress codes (as in *Sypniewski* and *Hardwick*).

F.

Finally, Vlaming challenges the circuit court's dismissal of his claim that the School Board breached his employment contract. The complaint alleges that, at the time Vlaming was fired, he had been employed as a teacher for six years, had received "only positive feedback in

70

teacher evaluations" during his service, and had been granted "continuing contract status." *See* J.A. at 5-6, 42. Based upon these allegations, Vlaming claims that his employment relationship with the School Board was governed by a contract terminable only for cause. The School Board, Vlaming contends, did not have good cause to fire him.

With respect to terminations based on a teacher's misconduct, Virginia law distinguishes between teachers who have "achieved continuing contract status" and teachers who have not. *See* Code §§ 22.1-304(A)-(B), -305. *See generally* Wade Anderson, *School Law*, *in* Handbook of Virginia Local Government Law § 18-8.01(b)-(c), at 18-84 to -86 (April Wimberley ed., 2023 ed.). The latter teachers are treated as "probationary" employees with limited job security. Code § 22.1-303(A). The former teachers have a "form of tenure," *Dennis v. County Sch. Bd. of Rappahannock Cnty.*, 582 F. Supp. 536, 538 (W.D. Va. 1984), because these teachers have a contractual right to continued employment "during good behavior and competent service," Code § 22.1-304(B); *see also* Code § 22.1-307 (listing examples of grounds for dismissal).

As previously discussed, Vlaming's complaint alleges that the School Board fired him because he asserted his Virginia constitutional rights to free exercise and free speech, as well as his statutory rights under VRFRA. Because we hold that these claims are legally viable, it necessarily follows that Vlaming has also alleged a valid breach-of-contract claim. By merely asserting his legal rights, Vlaming could not have violated any condition of "good behavior and competent service" statutorily implicit in his employment agreement. *See* Code § 22.1-304(B); *see also* Code § 22.1-295.2(A)-(B) (forbidding discriminatory "employment" actions "on the basis of" a teacher's "religion," including "any outward expression of religious faith"). The circuit court, therefore, erred when it dismissed on demurrer Vlaming's claim that the School Board had breached his employment contract.

III.

One final emotive theme in the dissenting opinion warrants a response. The dissent asserts that Doe is "nearly invisible" in our legal analysis because we have violated the "obligation and duty" of all courts "to demonstrably ensure that parties and those similarly situated know their positions have been heard, understood, and addressed." *Post* at 143. To remedy our purported breach of this obligation and duty, the dissent provides a series of legal and factual arguments in support of Doe's transgender rights.

For example, the dissent relies heavily on a divided panel opinion of the United States Court of Appeals for the Fourth Circuit, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020). That case posed the question whether federal law gives "transgender students" a right to use school bathrooms different from those reserved for the students based upon their "so-called 'biological sex.'" *Id.* at 593. The answer, the majority in *Grimm* exclaimed, was "resoundingly yes." *Id.* In dissent, Judge Niemeyer took a demonstrably different view. We offer no commentary on the majority or dissenting opinions in *Grimm* because we are applying Virginia law, not federal law, and because Doe is not a party to this case.[42]

The dissent also volunteers an extensive factual argument in support of Doe. It adopts the views of various authors and advocates discussing the psychological need for transgender students to be uncritically affirmed in their chosen identities.[43] Whatever their legal relevance or

---

[42] Doe unsuccessfully sought leave to intervene in the circuit court and ultimately withdrew an appeal of the circuit court's order denying intervention. J.A. at 324; R. Add. at 13.

[43] No mention is made, however, of any contrary views in the medical literature, *see, e.g.*, Stephen B. Levine & E. Abbruzzese, *Current Concerns about Gender Affirming Therapy in Adolescents*, 15 Current Sexual Health Reps. 113 (2023); Stephen B. Levine et al., *Reconsidering Informed Consent for Trans-Identified Children, Adolescents, and Young Adults*, 48 J. Sex & Marital Therapy 706 (2022); Jilles Smids & Patrik Vankrunkelsven, *Onzekerheden Rond de Huidige Genderzorg* [*Uncertainties Around the Current Gender Care*], NTvG [Dutch J.

72

probative weight, these factual arguments are inappropriate for our appellate review of the circuit court's order granting the School Board's demurrer and plea in bar. The School Board presented no evidence on Doe's psychological state for the circuit court to consider. Nor did the court's ruling make any factual findings, which was entirely correct not to do when it decided the matter on a demurrer. Granting a demurrer means that no factual findings are legally material because the complaint's allegations of fact, even if true, do not state any prima facie legal claims. *See supra* at 7-8. Because there is no evidentiary record, developed or undeveloped, we respond to the proffer of hypothetical facts in the dissent only to make clear that they are not before us on appeal.

IV.

In sum, the circuit court erred when it dismissed this case based solely on a review of the pleadings. Accepting arguendo that the allegations in the complaint are true, as we must because of the posture of this appeal, Vlaming has asserted legally viable claims under the Constitution of Virginia, the VRFRA, and common-law contract principles. We reverse the circuit court's dismissal order and remand this case for further proceedings consistent with this opinion.[44]

*Reversed and remanded.*

---

Med.] (Nov. 7, 2023) (Neth.), https://www.ntvg.nl/artikelen/onzekerheden-rond-de-huidige-genderzorg (abstract in English available at https://pubmed.ncbi.nlm.nih.gov/37930172/); Kenneth J. Zucker, *Debate: Different Strokes for Different Folks*, 25 Child & Adolescent Mental Health 36 (2020); Kenneth J. Zucker, *Adolescents with Gender Dysphoria: Reflections on Some Contemporary Clinical Research Issues*, 48 Archives Sexual Behav. 1983 (2019); Jennifer Block, *Gender Dysphoria in Young People is Rising — and so is Professional Disagreement*, BMJ (Feb. 23, 2023), https://www.bmj.com/content/380/bmj.p382; Paul W. Hruz, *A Clarion Call for High-Quality Research on Gender Dysphoric Youth*, Acta Paediatrica (July 8, 2023), https://onlinelibrary.wiley.com/doi/full/10.1111/apa.16895, or the conflicting views of popular social commentators, *see, e.g.*, Helen Joyce, Trans: When Ideology Meets Reality (2021).

[44] The dissent includes nearly 11 pages of "appropriate considerations" for the circuit court to apply on remand. *Post* at 108-18; *see also post* at 119 note 23 (describing "appropriate" issues for the circuit court to decide "[o]n remand"). A circuit court on remand, however, must be faithful to "'both the letter and spirit' of an appellate mandate" and not seek to reconsider

JUSTICE POWELL, with whom CHIEF JUSTICE GOODWYN joins, concurring in part.

I write separately to clarify that, in my opinion, the proper test to evaluate a free exercise claim under Article I, Section 16 of the Virginia Constitution is traditional strict scrutiny as expressed in *Sherbert v. Verner*, 374 U.S. 398, 406-09 (1963). I disagree with the majority's conclusion "that 'overt acts against peace and good order,' Code § 57-1, correctly defines the limiting principle for this right [in Article I, Section 16] and establishes the duty of the government to accommodate religious liberties that do not transgress these limits." *Supra* at 18-19. As I read it, the test articulated by the majority may incorporate a limiting principle that has the potential to effectively narrow the state's cognizable compelling governmental interests to only those that regulate peace and good order. *Supra* at 19, 22. I believe that adopting the language of a limiting principle, which was purposefully stated in a statute rather than the Constitution, and declaring it to be a constitutional standard, or a principle of constitutional magnitude, is not supported by the language of our Constitution nor by historical analysis.

It is essential to note that the words "overt acts against peace and good order" do not appear in Article I, Section 16. Rather, the majority extrapolates this limiting principle from a statute, Thomas Jefferson's 1786 Act for Religious Freedom. *Supra* at 17-19. Indeed, a portion of this statute was incorporated verbatim into Article I, Section 16:

> No man shall be compelled to frequent or support any religious
> worship, place, or ministry whatsoever, nor shall be enforced,
> restrained, molested, or burthened in his body or goods, nor shall
> otherwise suffer on account of his religious opinions or belief; but
> all men shall be free to profess and by argument maintain their

---

"issues that 'the mandate laid at rest.'" *Sidya v. World Telecom Exch. Commc'ns, LLC*, 301 Va. 31, 41 (2022) (citation omitted). It is thus fair to observe, as Chief Justice Roberts recently did, that "[a] dissenting opinion is generally not the best source of legal advice on how to comply with the majority opinion." *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 230 (2023).

74

> opinions in matters of religion, and the same shall in no wise
> diminish, enlarge, or affect their civil incapacities.

*Compare* Va. Const. Art. I, sec. 16 *with* Code § 57-1; *see also* Amicus Curiae, Brief for

Professor Alan Taylor in Support of Appellees, at 6 (noting that this portion of Jefferson's statute

"was incorporated into the Virginia Constitution during the 1829 Convention").  The Virginia

Constitution has been revised, amended, and reenacted numerous times since then, and in each

instance, the delegates could have incorporated the peace and good order language into the

Constitution.  They did not.  Va. Const. Art. I, sec. 16.  As admitted by the majority, the

language is a purely legislative creation.  I am aware of no precedent which provides a rationale

for the judicial transformation of a long-standing statutory provision into a constitutional

standard.  *Cf. City of Boerne v. Flores*, 521 U.S. 507, 519 (1997) (noting that Congress does not

have the power to decree or alter the meaning of constitutional rights).  Rather, the fact that a

limiting principle remained in a statute rather than being placed in the Constitution, despite

numerous opportunities to do so, indicates the specific intent *not* to make the statutory language

part of the constitutional provision.  Therefore, I do not believe that it is appropriate for us to

judicially incorporate that specific language from Code § 57-1 into our Constitution when the

drafters of our Constitutions have not seen fit to include it.

Acknowledging the omission of its stated limiting principle from the language of the

Constitution, the majority highlights a historical interpretation by Justice Sandra Day O'Connor

in a dissent, to suggest that the statutory language in Code § 57-1 is a legislative attempt to strike

a balance between "Mason's narrower and Madison's broader notions of the right to religious

freedom."  *Supra* at 16 (citing *City of Boerne*, 521 U.S. at 557 (O'Connor, J., dissenting)).

However, that observation is not a rationale for interpreting the statutory language as an

intentional constitutional standard.  Legislative history is not a basis for the judiciary to recast a

statute, much less a constitutional provision, by supplying a term the drafters left out. *See*

*Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001) (citing *Gulf Oil Corp. v. Copp*

*Paving Co.*, 419 U.S. 186, 202 (1974); *see also* Antonin Scalia & Bryan A. Garner, Reading

Law: The Interpretation of Legal Texts 94 (2012) ("To supply omissions transcends the judicial

function.") (internal quotations and citations omitted).

The significance of the omission of that statutory language from our Constitution is

heightened by the fact that a majority of states during the founding era expressly included a

"peace and good order" carveout in the free exercise provisions of their constitutions.[1]

---

[1] *See* Del. Declaration of Rights §§ 2–3 (1776) ("That all men have a natural and unalienable right to worship Almighty God according to the dictates of their own consciences and understandings . . . That all persons professing the Christian religion ought forever to enjoy equal rights and privileges in this state, unless, under colour of religion, *any man disturb the peace, the happiness or safety of society*.") (emphasis added); Md. Const. Decl. of Rts. art. 33 (1776) ("wherefore no person ought by any law to be molested in his person or estate on account of his religious persuasion or profession, or for his religious practice, unless under colour of religion *any man shall disturb the good order, peace or safety of the state, or shall infringe the laws of morality, or injure others, in their natural, civil or religious rights*") (emphasis added); Mass. Const. Pt. 1, art. II (1780) ("no subject shall be hurt, molested, or restrained, in his person, liberty, or estate, for worshipping God in the manner and season most agreeable to the dictates of his own conscience; or for his religious profession or sentiments; *provided he doth not disturb the public peace, or obstruct others in their religious worship*") (emphasis added); N.H. Const. Pt. 1, art. 5 (1783) ("Every individual has a natural and unalienable right to worship God according to the dictates of his own conscience, and reason; and no subject shall be hurt, molested, or restrained in his person, liberty or estate for worshipping God in the manner and season most agreeable to the dictates of his own conscience; or for his religious profession, sentiments, or persuasion; *provided he doth not disturb the public peace, or disturb others in their religious worship*.") (emphasis added); N.Y. Const., Art. XXXVIII (1777) ("[T]he free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever hereafter be allowed, within this State, to all mankind: *Provided*, That the liberty of conscience, hereby granted, *shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of this State*.") (some emphasis added); Charter of Rhode Island and Providence Plantations (July 15, 1663) ("that no person within the said colony, at any time hereafter, shall be any wise molested, punished, disquieted, or called in question, for any differences in opinion in matters of religion, and *do not actually disturb the civil peace of our said colony*; but that all and every person and persons may, from time to time, and at all times hereafter, freely and fully have and enjoy his and their own judgments and consciences, in matters of religious concernments, throughout the tract of lance

Interestingly, only four of those states have examined the breadth of their free exercise

provisions and none of them rely on the "peace and good order" language to define a limiting

principle today. *See Doe v. Catholic Relief Servs.*, 300 A.3d 116, 131, n.15 (Md. 2023) ("This

Court has treated Article 36 as embodying the protections guaranteed by the Free Exercise

Clause of the First Amendment."); *State v. Mack,* 249 A.3d 423, 441-43 (N.H. 2020) (rejecting

*Employment Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872 (1990) and adopting the

traditional strict scrutiny test); *Catholic Charities of Diocese of Albany v. Serio*, 859 N.E.2d 459,

466-67 (N.Y. 2006) (rejecting both strict scrutiny and *Smith*, and holding "that substantial

deference is due [to] the Legislature, and that the party claiming an exemption bears the burden

of showing that the challenged legislation, as applied to that party, is an unreasonable

interference with religious freedom."); *Attorney General v. Desilets*, 636 N.E.2d 233, 235-36

(Mass. 1994) (adopting traditional strict scrutiny).

The majority also states that *Sherbert* supports the limiting principle applicable to Article

I, Section 16 of the Virginia Constitution. *Supra* at 20-22. However, *Sherbert* does not support

the specific language of the limiting principle stated by the majority. In dicta, the United States

Supreme Court noted that it had previously "rejected challenges under the Free Exercise Clause

to government regulation of certain overt acts prompted by religious beliefs or

principles. . . [where] [t]he conduct or actions so regulated have invariably posed some

---

hereafter mentioned; *they behaving themselves peaceably and quietly, and not using this liberty
to licentiousness and profaneness, nor to the civil injury or outward disturbance of others*")
(archaic spelling modernized; emphasis added); S. C. Const., Art. VIII, § 1 (1790) ("The free
exercise and enjoyment of religious profession find worship, without discrimination or
preference, shall forever hereafter be allowed within this State to all mankind: Provided, that the
liberty of conscience thereby declared shall not be so construed *as to excuse acts of
licentiousness, or justify practices inconsistent with the peace or safety of this State*.") (emphasis
added).

substantial threat to public safety, peace or order." *Sherbert*, 374 U.S. at 403 (collecting cases).

Notably, this is the only instance in which the phrase "peace or order" appears in the opinion.

This passage from *Sherbert* does not suggest that peace and order are the *only* valid compelling

interests the government may advance to justify regulation of conduct that burdens the free

exercise of religion, but rather describes a trend in cases that had come before the Court. *See id*.

Indeed, of the four cases cited, one dealt with a threat to public safety occasioned by a failure to

observe a vaccination mandate, *Jacobson v. Massachusetts*, 197 U.S. 11 (1905); two dealt with a

ban against polygamy, treated as a general offense against society, *Cleveland v. United States*,

329 U.S. 14 (1946); *Reynolds v. United States*, 98 U.S. 145 (1878); and the fourth dealt with

child labor laws, *Prince v. Massachusetts*, 321 U.S. 158 (1944). To the extent that any of these

are easily classified, they sound more like regulations regarding public safety or general order

rather than specific "overt acts against peace and good order."

Respectfully, the majority spends a good deal of time focusing on what it describes as a

limiting principle stated differently at various times as "overt acts against peace and good order"

and at others as "peace and safety" or "conduct or actions . . . [that] posed some substantial threat

to public safety, peace, or order."[2] *Supra* at 19-20. As noted above, these words do not appear

---

[2] The majority does not precisely define the term "overt acts against peace and good order." Rather than "catalogue" the entire "subset of 'overt acts'" that might limit an individual's free exercise rights, *supra* at 22, the majority offers two examples as understood by the Founders: kidnapping for the purpose of proselytizing and trespassing on private property to protest immoral activity. *Supra* at 20 (citing Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1464 (1990) [hereinafter McConnell, *Origins*]).

Noted in the same passage is Madison's view that free exercise does not grant an individual the right to invade the rights of others. McConnell, *Origins*, at 1464. Jefferson espoused a similar view and suggested that "the legitimate powers of government extend to such acts [of religious expression] only as are injurious to others." Thomas Jefferson, Notes on Virginia, *in* 8 The Works of Thomas Jefferson 249, 400 (H.A. Washington ed., 1884). As noted

78

in our Constitution. The majority then concludes that the strict scrutiny analysis in *Sherbert* "frame[s] the nature of the limiting principle." *Supra* at 20. To avoid any confusion, I would clearly state the test in familiar terms as requiring the government to justify any substantial burden on religiously motivated conduct by a compelling state interest and by means narrowly tailored to achieve that interest. *Sherbert*, 374 U.S. at 406-09.

JUSTICE MANN, with whom CHIEF JUSTICE GOODWYN and JUSTICE POWELL join as to Parts II, III, and IV, concurring in part and dissenting in part.

The issues before us today raise the most delicate human questions of religion, liberty, individualism, and the proper conception of these rights in a society which holds divergent views on the meaning of each. Today we have done little to harmonize this divergence. Now, Virginia stands alone among every jurisdiction in this country by imposing a new level of scrutiny; a super scrutiny for religious rights but no others.

As to the majority's opinion, I concur with its judgment that the circuit court erred in dismissing Vlaming's legally viable free-exercise claims under the Virginia Constitution and VRFRA, and common law contract claims. I therefore agree with the majority to reverse the circuit court's dismissal order and remand this case for further proceedings in the circuit court. However, as stated, I dissent from the majority's analysis and interpretation of Article I, Section 16 of the 1971 Constitution of Virginia. The majority's proposed limiting principle for the free exercise provision in the 1971 Constitution of Virginia is not supported by the plain words of our Constitution, its history, our legal precedent, or legislative action of the General Assembly. I

---

in cases cited by the majority, *supra* at 21-22, and as discussed *infra* by Justice Mann, consistent with the views of Madison, Mason, and Jefferson, modern jurisprudence has recognized compelling interests aimed at safeguarding the rights and wellbeing of others. *See infra* at 103-04 (collecting cases). There is no doubt that safeguarding the rights of others underlies the School Board's asserted compelling interest in this case. *See infra* at 112-13.

also dissent with respect to the majority's rulings on Vlaming's free speech and due process claims. Regarding Vlaming's free-exercise claim, the majority establishes a sweeping super scrutiny standard with the potential to shield any person's objection to practically any policy or law by claiming a religious justification for their failure to follow either. Justice Antonin Scalia, writing on behalf of the Supreme Court of the United States, warned that interpreting a free exercise clause so broadly would permit an individual "to become a law unto himself." *Employment Division v. Smith*, 494 U.S. 872, 885 (1990) (quoting *Reynolds v. United States*, 98 U.S. 145, 167 (1842)). Under the majority's analytical framework, all laws and regulations must yield to an individual's invocation of religious freedom unless doing so results in "overt acts against peace and good order." *Supra* at 17-19. I disagree.[1] The majority casts the limiting principle it has crafted as a solution rooted in history. History leads me to a different conclusion. The ambiguity that attends the scope of "overt acts against peace and good order" casts severe doubt on the workability of the majority's test. Contrary to the majority's analysis, as explained below, I believe the correct interpretation of Article 1, Section 16, as has been historically interpreted by this Court, permits legislation to incidentally burden religious practice so long as it does not target religious belief and is applied "to protect all persons" for a secular purpose. *See Rich v. Commonwealth*, 198 Va. 445, 449 (1956).

Where a claimant alleges that the government was hostile towards his religious free exercise or that the government did not neutrally apply the law, the reviewing court should apply strict scrutiny to determine whether the government's enforcement was narrowly tailored to

---

[1] The separate concurrence authored by Justice Powell echoes this sentiment. Despite coming to different conclusions, the concern about "peace and good order" remains. *See supra* at 74-79. This concept has no defined scope and is absent from our Constitution, no matter which concurrence you read.

achieve a compelling state interest. The majority believes that there is no distinction between its super scrutiny standard and the compelling state interest standard, claiming that peace and good order is the historical underpinning of a state's compelling interest. This is simply not so. Virginia's interests cannot be cabined to what our Founders believed to be peace and good order—as times change, so do a state's compelling interests.

As for Vlaming's free speech and due process claims, the facts speak for themselves. Under well-established federal precedent, Vlaming's allegations as pleaded establish that Vlaming was (1) a public employee engaged in curricular speech pursuant to his official job duties, (2) not speaking as a private citizen on a matter of public concern; and (3) had ample notice that his refusal to use Doe's preferred pronouns was a violation of the School Board's policies, and the School Board provided him an opportunity to be heard on his discipline. Thus, Vlaming failed to plead a cognizable free speech or due process claim under the Virginia Constitution.

In our diverse society, it is imperative "not only to guard the society against the oppression of its rulers, but to guard one part of the society against the injustice of the other part." *The Federalist*, No. 51 (James Madison). Today, our gates open, unguarded.

I. CONSTITUTIONAL FREE EXERCISE OF RELIGION

Virginia's Article I, Section 16 imposes a neutrality analysis, requiring courts to determine whether a generally applicable law is neutral as to religion, and if not, imposing strict scrutiny review. This test can be distilled from the plain language of Article I, Section 16 which does not suggest a religious exemption from generally applicable laws. This reading is bolstered when considering that our Commonwealth's Constitution was ratified in 1971, thereby baking in this Court's precedent that Article I, Section 16 did not include religious exemptions. Finally,

81

the history of Article I, Section 16, supports my position that a religious exemption does not lie in our Constitution.

A fundamental principle of Virginia constitutional analysis that this Court has always recognized is the plain meaning of the Constitution. "We are not permitted to speculate on what the framers of [a] section [of the Virginia Constitution] might have meant to say, but are, of necessity, controlled by what they did say." *Harrison v. Day*, 200 Va. 439, 448 (1959). "If there are 'no doubtful or ambiguous terms used, we are limited to the language of the section itself and are not at liberty to search for meaning, intent or purpose beyond the instrument.'" *Blount v. Clarke*, 291 Va. 198, 205 (2016) (quoting *Harrison*, 200 Va. at 448).

Our Court has historically embraced "a general rule that the words of a Constitution are to be understood in the sense in which they are popularly employed, unless the context or the very nature of the subject indicates otherwise." *Id.* The majority's opinion departs from this fundamental principle and crosses the threshold into a world of academic speculation in search of a limiting principle not included in the Constitution.[2]

---

[2] The majority supports its interpretive divergence by extensively citing Chairman Harrison's advisory statements on how to interpret the draft version of the 1971 Virginia Constitution. *See supra* at 39-40. With all due respect to Justice Harrison, his comments carry no judicial weight, and his hypothesis that the General Assembly "did not initiate this Commission with the idea of giving Virginia *a new constitution*" is incorrect. That is precisely what the General Assembly did, as the General Assembly's words and this Court's precedent amply provide. *See* Acts of Assembly 1970, c. 763 (proposing that Virginia voters decide whether to "strike" the entire Constitution and "insert" a new constitution); *Staples v. Gilmer*, 183 Va. 613, 630 (1945) ("The vote was favorable, and Virginia had a new constitution."); *Elliot v. Ashby*, 104 Va. 716, 718 (1905) ("More than that, since that time a *new Constitution has been adopted*, *which has retained*, so far as it affects this case, *the language of the preceding Constitution*[.]") (emphasis added); *see also* Brent Tarter, Constitutional History of Virginia 281 (2023).

A.  ARTICLE I, SECTION 16 OF VIRGINIA'S 1971 CONSTITUTION

The language of Article I, Section 16 is plain, despite its length.  *See Pirkey Bros. v. Commonwealth*, 134 Va. 713, 718 (1922) ("The scope of the act of religious freedom may be gathered from its preamble and from the interpretation thereof in judicial decisions.").  Article I, Section 16 states generally that "all men are equally entitled to the free exercise of religion, according to the dictates of conscience."  Then, in pertinent part, it provides that:

> No man shall be compelled to frequent or support any religious worship, place, or ministry whatsoever, nor shall be enforced, restrained, molested, or burthened in his body or goods, nor shall otherwise suffer on account of his religious opinions or belief; but all men shall be free to profess and by argument to maintain their opinions in matters of religion, and the same shall in nowise diminish, enlarge, or affect their civil capacities.

Va. Const. art. I, § 16.[3]  The clause Vlaming asserts his challenge under is the last one (the Civil Capacities Clause), which limits the State's authority to "diminish, enlarge, or affect their civil capacities" on account of "their opinions in matters of religion."  *Id.*

The majority's grammatical analysis of the Civil Capacities Clause makes an error that skews its reading of the text.  The Civil Capacities Clause reads: ". . . and *the same* shall in nowise diminish, enlarge, or affect their civil capacities."  Under the rule of the last antecedent, "all qualifying words and phrases, where no contrary intention appears, apply only to the last antecedent."  *Scott v. Commonwealth*, 292 Va. 380, 383 (2016).  Thus, the only way to read the

---

[3] Vlaming has limited his argument to the portion of Article I, Section 16 quoted here, and so I do the same in my analysis.  *See* Pet. for Appeal at 19; Appellant's Br. at 21; *Clifford v. Commonwealth*, 274 Va. 23, 25 (2007) (holding that arguments not made in the petition for appeal "are not to be considered on appeal" and that "an appellate court may not 'recast' an argument made in a lower court into a different argument upon which to base its decision").  Vlaming argues that the School Board violated Article I, Section 16 by diminishing his civil capacities because of his religious beliefs.  My analysis must therefore be constrained to answering that question, rather than reformulating his argument as a natural-rights defense of a hybrid right to religiously inspired doctrinal speech.  *See supra* at 30.

Civil Capacities Clause is to understand "the same" to refer to "their opinions in matters of religion," which is the last antecedent preceding the Civil Capacities Clause.

Another misapprehension in the majority's opinion is its position that I believe that religious liberty is only protected in the event "civil capacities" are diminished. *See supra* at 28. I have neither articulated this position nor do I believe it to be so. What I do believe is that, in this case, Vlaming has only asserted a free-exercise cause of action based on his diminished civil capacity as a public-school teacher. I am limited to the claims and arguments presented by the parties. *Clifford v. Commonwealth*, 274 Va. 23, 25 (2007). I offer no opinion as to how the analysis might change under different facts or legal claims.

The Constitutional directive to the State is clear: no one should suffer at the hands of the state on account of his or her religious beliefs, and their civil capacities—those which derive from the State—should not be affected on account of a person's religious beliefs. There is no question as to what the text of our Constitution says regarding freedom of religious expression. The issue is not what the text of our Constitution says, but rather what it does not say. Our Constitution contains no express statement exempting religiously motivated activities from generally applicable laws. Like the United States Constitution, the Virginia Constitution of 1971 does not state a limiting principle regarding the right to exercise religious freedom.

1. Significance of the 1971 Constitution

The majority rightfully recognizes that there must be some limiting principle applied to the right Article I, Section 16 establishes. *Supra* at 16. The majority considers the history of the text of Article I, Section 16 from its inception and looks to similar analyses conducted by federal courts concerning the right to free exercise of religion. Considering those factors is proper; my disagreement with the majority concerns its failure to recognize the significance of the relevant

Constitution having been adopted in 1971 as well as the conclusions it draws from its consideration of history.

The majority vigorously defends its proposition that Virginia voters did not adopt a new constitution in 1971. *See supra* at 38-41. This Court has previously held, however, that Virginians adopt a new constitution when they ratify a general amendment to the constitution by public referendum. *See Elliott v. Ashby*, 104 Va. 716, 718 (1905). When a constitutional provision is construed by a court prior to a readoption of that constitutional provision using identical language, the prior judicial construction of the provision "must be taken as having been approved by the adoption of the identical language in the Code and the Constitution."[4] *Id.* at 718.

Every time the majority emphasizes that the wording of Section 16 has remained unchanged since its initial adoption in 1776, they concede my point, because it is precisely the adoption of a new constitution *with unaltered language* that informs us that Virginians incorporated prior judicial interpretations into the 1971 Constitution. By readopting identical language into the new constitution, existing judicial interpretations were incorporated into the

---

[4] The majority points to *Howell v. McAuliffe*, 292 Va. 320 (2016), to support its assertion that "[w]hen a constitutional provision has remained unchanged throughout Virginia constitutional history, we apply the original meaning of the provision when first adopted." *See supra* at 13. As an initial matter, this directly contradicts our Court's holding in *Ashby*, which states that readoption of identical language of a constitutional provision is evidence of acquiescence by the electorate to all judicial interpretations issued prior to adoption. *See Ashby*, 104 Va. at 718. Further, the majority overlooks the fact that, in *Howell*, we made an express finding that the constitutional provision cited as authority by the Governor was ambiguous before turning to the legislative history of Article I, Section 7 of the Constitution of Virginia. *See Howell*, 292 Va. at 343. Regardless of the justification in *Howell*, the majority makes no parallel finding of ambiguity in this case, and Article I, Section 16 was rewritten against a backdrop of judicial interpretation, rendering the legislative history from 1776 informative, rather than declarative, of the original public meaning of Article I, Section 16 of the 1971 Constitution.

85

original public meaning of the 1971 Constitution, in the same way that the General Assembly incorporates appellate interpretations of statutory language when it recodifies the same language subsequent to a judicial interpretation.

"As with the constitutional revision of 1928, the General Assembly proposed the new constitution to the voters in November 1970 in the form known in parliamentary practice as an amendment in the form of a substitute." Brent Tarter, Constitutional History of Virginia 281 (2023). "The question on the ballot asked voters whether to delete the entire old constitution . . . and in its place, insert the new." *Id.*; *see* Acts of Assembly 1970, c. 763 (proposing that Virginia voters decide whether to "strike" the old constitution and "insert" the new constitution). We have held that ratification by Virginia voters of a general amendment of the constitution results in a new constitution. *Staples v. Gilmer*, 183 Va. 613, 630 (1945) ("The vote was favorable, and Virginia had a new constitution."); *Elliott v. Ashby*, 104 Va. at 718. Jefferson exhorts us, as recounted by the majority, to "carry ourselves back to the time when the Constitution was adopted." *See supra* at 44. In this instance, Jefferson points us to 1971.

## 2. Historical Framework

I agree with the majority that we must evaluate the historical context of Section 16's enactment to glean its meaning, so that is where I begin. But it is only a beginning, not an end to itself. We need not, and should not, resort to originalism to complete the analysis. *See infra* at 110-11 (noting Thomas Jefferson's observation that "laws and institutions must go hand in hand with the progress of the human mind").

Taking the original public meaning of 1776 to be informative to my analysis, the majority misconstrues this, too. Interpreting Article I, Section 16 in its historical context shows that it was not intended to exempt citizens from neutral laws, but to combat the religious intolerance

and establishment that pervaded Colonial Virginia. Viewing the Mason and Madison debates and eventual compromise against this same historical backdrop reveals the central purpose of Article I, Section 16, and contextualizes Jefferson's Act for Religious Freedom. It is helpful to review the history and context behind the 1776 adoption of Article I, Section 16 of the Constitution of Virginia to understand the meaning and scope of the language in addressing the concerns raised by the majority. *See Everson v. Bd. of Educ. of Ewing Tp.*, 330 U.S. 1, 14-15 (1947) (interpreting the First Amendment "in light of its history and the evils it was designed forever to suppress"). The majority's historical recitation does not fully consider the evils our framers attempted to suppress. Ultimately, the inquiry is formulated thusly: "what is the religious freedom which has been guaranteed[?]" *Reynolds v. United States*, 98 U.S. 145, 162 (1878). The answer is not one of religious exemptions to neutral laws. Rather, the framers of Article I, Section 16 intended to combat the religious intolerance and establishment that pervaded Colonial Virginia.[5]

---

[5] The majority points out that *Everson* involved questions of establishment, not freedom of religion, and as such bears no relation to Article 1, Section 16. *Supra* at 32-33. However, evident from the text of Article I, Section 16 is the message that freedom of conscience can only flourish in the absence of state-imposed religious coercion. This is not "conflation" but recognition that the two concepts belong to the same natural rights philosophical and historical line, where our Founders first addressed specific injustices imposed by the established church before doing away with it completely. Article I, Section 16's chosen means of achieving religious freedom was to disentangle tithes from taxes, chipping away at the state religion's reliance on state funds. Jefferson's Bill for Establishing Religious Freedom was penned only a year later and passed in a piecemeal fashion until the crowning Statute came into law ten years after. *See* Thomas E. Buckley, S.J., *The Political Theology of Thomas Jefferson*, in The Virginia Statute for Religious Freedom: Its Evolution and Consequences in American History 83-86 (Merrill D. Peterson & Robert C. Vaughan eds. 1988). "[Jefferson and Madison] were one in their conviction that freedom of religious belief and worship is a natural right that should be guaranteed in Virginia's fundamental law and that the privileged position of a state church maintained by public taxation violated that natural right." *Id*. at 83. In other words, there are no "separate histories and purposes." *Supra* at 33.

The eventual adoption of Madison's free exercise provision was a result of political compromise, not the legitimization of a constitutional right to religious exemptions to neutral laws. *See generally,* Amicus Curiae, Brief for Professor Alan Taylor in Support of Appellees, at 10-12. At the time the General Assembly enacted Jefferson's Act, the debate was not over the scope of the free exercise provision but, rather, the disestablishment of the Anglican Church. *See* 1 A.E. Dick Howard, Commentaries on the Constitution of Virginia 291 (1974) ("[T]here remained an established church, and the General Assembly received many petitions calling for statutory action to give further protection for religious liberty."); *see also* Amicus Curiae, Brief for Professor Alan Taylor in Support of Appellees, at 7 (noting that the Anglican Church had significant involvement in state affairs which "dictated many aspects of official civil life").

Virginia's deep entrenchment with the Anglican Church during the colonial era is well-documented. *See e.g., Everson*, 330 U.S. at 11 (referring to "Virginia, where the established church had achieved a dominant influence in political affairs"); *McGowan v. Maryland.*, 366 U.S. 420, 438 (1961) ("Madison had sought also to have the Declaration expressly condemn the existing Virginia establishment."); *Engel v. Vitale*, 370 U.S. 421, 428 n.10 (1962) (noting that the Church of England was the established church in Virginia). Because of this entrenchment, the pre-Revolutionary war period in Virginia was fraught with religious intolerance, discrimination, and hostility. Religious dissenters "faced an array of civil disabilities." *Lee v. Weisman*, 505 U.S. 577, 640-41 (1992) (Scalia, J., dissenting). For example, only Anglican clergyman could legitimize marriages, "leaving children of those married by dissenting ministers subject to claims of bastardy, with resulting legal incapacities." John A. Ragosta, Wellspring of Liberty: How Virginia's Religious Dissenters Helped Win the American Revolution and Secured Religious Liberty 16-17 (2010) [Hereinafter Ragosta, *Wellspring*].

Moreover, the Church and the state were inextricably linked. "[M]inisters were required by law to conform to the doctrine and rites of the Church of England; and all persons were required to attend church and observe the Sabbath, were tithed for the public support of Anglican ministers, and were taxed for the costs of building and repairing churches." *Lee*, 505 U.S. at 640 (Scalia, J., dissenting). "The vestry assessment – taxation without representation for religious dissenters – was usually the highest tax paid by eighteenth century Virginians." Ragosta, *Wellspring*, *supra*, at 16. Anglican leaders often selectively enforced laws against religious dissenters, and they had the authority, among other things, to process land boundaries within their parishes and assist the government in collecting levies. *See id*. at 16-17, 28. The religious intolerance and hostility even escalated against some dissenters to physical abuse, intimidation, and incarceration. *Id*. at 28; *see also Reynolds*, 98 U.S. at 162-63 (noting that some colonies prescribed punishments "for a failure to attend upon public worship, and sometimes for entertaining heretical opinions"). Persecution of dissenters in the years leading up to the war increased the call for toleration. Ragosta, *Wellspring*, *supra*, at 39. It is against this historical backdrop – the call for greater toleration – that Mason and Madison's proposals were introduced. *Id.* Religious, social, sexual and racial persecutory intolerance of marginalized groups existed then and continues along an unbroken line to this moment.

The contemplation of increased toleration through the free exercise provision was not accompanied by a call for a right of religious exemption to neutral laws. This contention is supported by an analysis of the views of both Thomas Jefferson and James Madison.[6] Jefferson

[6] Jefferson and Madison played key roles in the development of Virginia's free exercise provisions. *See Reynolds*, 98 U.S. at 162-63. It is no secret that they also played an integral role "in the drafting and adoption" of the Religion Clauses of the First Amendment of the federal constitution. *Everson*, 330 U.S. at 13. The provisions of the First Amendment "had the same objective and were intended to provide the same protection[s]" as were secured in Virginia. *Id.*

supported a distinction between belief and conduct, contending that the former be protected against government control and the latter not. Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1451 (1990). In a letter he wrote to the Danbury Baptist Association, he proclaimed that "'the legislative powers of government reach actions only, and not opinions . . . . [M]an . . . has no natural right in opposition to his social duties.'" *Id.* The United States Supreme Court, in *Reynolds*, relied on Jefferson's sentiments to conclude "that there can be no free exercise right to exemption from a generally applicable law when such laws are directed at actions and not opinions." *Id.*; *see also Reynolds*, 98 U.S. at 164.

The prevailing understanding in eighteenth century America regarding the meaning of "free exercise," does not support the notion that the government should grant absolute exemptions based on religion. Religious exemptions to neutral laws were "not even an issue in serious contention." *Id.* at 948; Walter Berns, The First Amendment and the Future of American Democracy 36 (1976); Richard E. Morgan, The Supreme Court and Religion 23 (1972); David Little, *Thomas Jefferson's Religious Views and Their Influence on the Supreme Court's Interpretation of the First Amendment*, 26 Cath. U. L. Rev. 62-64 (1976)). Rather, "the free exercise of religion meant the freedom to choose and practice one's religion (or no religion) without being subjected to intentional, direct government coercion or influence." Ellis West, *The Case Against a Right to Religion-Based Exemptions*, 4 Notre Dame J.L. Ethics & Pub. Pol'y 591, 624 (1990).[7] As understood by the framers, the guarantees secured by the right to religious

---

Accordingly, any discussion regarding the purpose and understanding of the First Amendment's free exercise clause is also beneficial to the analysis of Article I, Section 16 of the Constitution of Virginia.

[7] "[H]owever it may be mistaken, the end of law is not to abolish or restrain, but to preserve and enlarge freedom: for in all the states of created beings capable of laws, where there

freedom were two-fold: religious freedom mandated disestablishment and the equal treatment of religion under the law.[8] Philip A. Hamburger, *A Constitutional Right of Religious Exemption: An Historical Perspective*, 60 Geo. Wash. L. Rev. 915, 948 (1992) [hereinafter Hamburger, *Historical Perspective*] (explaining that dissenters "frequently agitated for equal civil rights and the absence of laws respecting religion").

Analyzing Thomas Jefferson's 1786 Statute for Religious Freedom within the context of the "evils" it sought to suppress exemplifies our framer's understanding of religious freedom's twin guarantees. Jefferson's statute was enacted in the wake of opposition to the introduction of the 1784 Assessment Bill. *Everson*, 330 U.S. at 36 (Rutledge, J., dissenting). This bill "was nothing more nor less than a taxing measure for the support of religion, designed to revive the payment of tithes suspended since 1777." *Id.* Incensed at the idea that the government would levy a tax expressly for religious support, Madison penned his essay titled "Memorial and Remonstrance against Religious Assessments," in which he declared "that in matters of Religion, no man[']s right is abridged by the institution of Civil Society and that Religion is wholly exempt from its cognizance." Memorial and Remonstrance against Religious Assessments, *in* 8 The Papers of James Madison, Congressional Series 295, 299. He further argued:

---

is no law, there is no freedom: for liberty is, to be free from restraint and violence from others; which cannot be, where there is no law: but freedom is not as we are told a liberty for every man to do what he lists: . . . but a liberty to disposes, and order as he lists, . . . within allowance of those laws under which he is, and therein not to be subject to the arbitrary will of another, but freely follow his own." John Locke, Second Treatise of Government 32 (C.B. Macpherson ed. 1980) (1st ed. 1690).

[8] "Americans during the revolutionary period engaged in extensive discussion and applied their theory that the state had no power in religious matters. In the majority of states they decided that freedom of religion applied not only to the exercise of religion, but also to its support . . . Opponents of state support for religion regarded such support as an establishment, but *they opposed it primarily as a violation of the free exercise of religion*." West, *supra* at 628 (quoting Thomas Curry, The First Freedoms: Church and State in America to the Passage of the First Amendment (1986)).

> that a true religion did not need the support of law; that no person,
> either believer or non-believer, should be taxed to support a
> religious institution of any kind; that the best interest of a society
> required that the minds of men always be wholly free; and that
> cruel persecutions were the inevitable result of government-
> established religions.

*Everson*, 330 U.S. at 12.

"The opposition galvanized by Madison's Remonstrance not only scuttled the Assessment Bill; it [also] spurred Virginia's Assembly to enact" the Statute for Religious Freedom. *Espinoza* v. *Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2285 (2020) (Breyer, J. dissenting). That statute, as did the Memorial and Remonstrance, "emphasized the risk to religious liberty that state-supported religious indoctrination threatened." *Id*. at 2286. Following this enactment, Virginia began to dismantle laws that allowed for the established church. Ragosta, *Wellspring*, *supra*, at 134. Thus, the Statute for Religious Freedom was aimed at disestablishment and does not provide a resolution to questions regarding the proper scope of Section 16.

Viewed "in light of its history and the evils it was designed forever to suppress," it is evident that the framers sought to address the unequal treatment between religions and the establishment of religion. *See Everson*, 330 U.S. at 14-15. There is nothing in the text of Article I, Section 16 which grants an exemption from neutral laws. From this historical standpoint, the better-reasoned view is that Article I, Section 16 of the Constitution of Virginia does not support a right to religious exemptions from neutral laws.

Between 1776 and 1971, not a single decision of this Court recognized a religious exemption from general laws, and the majority's "overt acts" test does not appear anywhere in the Virginia reports. On several occasions, to the contrary, our Court has unequivocally recognized that civil capacities may be diminished by the State in connection with preconditions

92

that are necessary to the performance of the capacity in question. In 1971, Virginians adopted this utter rejection of a regime of religious exemptions from general laws into the Constitution of Virginia (1971) as the original understanding of Article I, Section 16 thereof.

### 3. Controlling Precedent Interpreting Article I, Section 16

Our precedent interpreting Article I, Section 16 vindicates this historical analysis. As a preliminary note, the majority accuses me of advocating for the *Smith* standard without mentioning the case explicitly. *Supra* at 13, 25 & n.12, 41. I advocate for a *Virginia* standard which supports strict scrutiny of non-neutral laws. I do not expressly endorse *Smith* because I do not need to.[9] As explained below, the standard I develop finds its roots in Virginia's case law, history, and actions by our General Assembly.

In *Perry v. Commonwealth*, this Court interpreted Article I, Section 16 to prohibit government institutions from considering the mere holding of a religious opinion to be a legal incapacity, where such belief does not naturally disqualify a person from satisfying the capacity. 44 Va. (3 Gratt.) at 643-44.[10] When there is a secular purpose for the disqualification,

---

[9] The majority notes that *Smith*'s shelf life remains uncertain. *Supra* at 13. *Smith* has been criticized since it became law in 1990. However, it does not make *Smith* "bad law" or any less instructive. *Smith* relied in part on prior Sunday-closing law cases, similar to those in Virginia. *See* 494 U.S. at 880 (citing *Braunfeld v. Brown*, 366 U.S. 599 (1961)).

[10] The majority misinterprets *Perry*. Our Court repeatedly emphasized in *Perry* that the witness had been disqualified because of his religious opinions, and that this rendered his disqualification an unconstitutional civil incapacity. *Id.* The term "natural-law rights," does not appear in *Perry*. What does appear in the holding of that opinion is the distinction between a "natural incapacity" and a "civil incapacity," and that is the distinction I am after. *Id.* The former, because it does not justify the incapacity using the disqualified party's religious opinion, may form the basis of a civil incapacity. The latter may not, because it is a disqualification that does not speak to the person's fitness for the capacity, but rather, places the person in a state of civil incapacity based on their religious opinions. *Id.* In *Perry*, our Court conducted no "overt-acts" analysis. We asked one question: was the decision to disqualify the witness predicated on a "natural incapacity" or a religiously motivated "civil incapacity" with respect to the inherent occupational qualifications of a witness who wishes to testify in court. No distinction is to be drawn here between natural rights and civil capacities.

however—when the law is neutral as to religion—Article I, Section 16 is not violated. For the first time, this Court held that, when a law is neutral as to religion, Article I, Section 16 is not violated.[11] The protections contained in Article I, Section 16 extend to all Virginians, because "so long as they keep within [the] pale" of the law, all are free to exercise their religion in this Commonwealth. *Id.* at 642. This Court relied on an interpretation of Virginia's Constitution that placed "all religions on a footing of perfect equality; protecting all; imposing neither burdens nor civil incapacities upon any; conferring privileges upon none." *Id.* at 641.

An indirect burden on a person's free exercise does not violate the Virginia Constitution when it does not target religious belief. *Cf. Braunfeld v. Brown*, 366 U.S. 599, 605 (1961) (holding that, where a Sunday law only inconvenienced members of the Orthodox Jewish faith who believed it necessary to work on Sunday, "the statute at bar does not make unlawful any religious practices of appellants; the Sunday law simply regulates a secular activity and, as applied to appellants, operates so as to make the practice of their religious beliefs more expensive. . . . And even these are not faced with as serious a choice as forsaking their religious practices or subjecting themselves to criminal prosecution."). "A law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny. . . a law restrictive of religious practice must advance '"interests of the highest order"' and must be narrowly tailored in pursuit of those interests." *McDaniel v. Paty,* 435 U.S. 618, 628 (1978) (quoting *Wisconsin v. Yoder,* 406 U.S. 205, 215 (1972))).

---

[11] This judicial interpretation finds echoes in the writing of John Locke, relied upon by Jefferson and invoked by the majority. *See, e.g.,* John Locke, A Letter Concerning Toleration 18, available at https://thefederalistpapers.org/wp-content/uploads/2012/12/John-Locke-Concerning-Toleration.pdf (last accessed May 9, 2023) [hereinafter Letter Concerning Toleration].

We stated our position more directly in *Remington v. Commonwealth*, 262 Va. 333 (2001). The question presented to our Court in *Remington* was whether, as a matter of law, the jurors had been removed from the venire because of their religious beliefs. The circuit court questioned the jurors, "[d]o you have any religious, philosophical, or moral beliefs which would prevent or substantially impair your ability to convict a person of a crime which potentially carried a death penalty?" The jurors answered that they did. This Court found the jurors' removal did not violate Article I, Section 16 because "their responses demonstrated that their personal objections to the death penalty would have substantially impaired or prevented them from performing their duties as jurors." *Id.* at 349. This Court did not draw a distinction between whether this impairment stemmed from religious, moral, or political convictions. Because the record showed that the incapacity did not derive from the religious beliefs as beliefs, but rather from the fact that the beliefs manifested into an unwillingness to perform their duties as jurors, it did not violate the Constitution. *Id.* We reached the same conclusion in *Schmitt*, where a prospective juror advised the court that she had "moral, religious, or conscientious objections to voting for the death penalty." *Schmitt v. Commonwealth,* 262 Va. 127, 141 (2001). Again, this Court made no distinction between whether this incapacity was derived from ordinary or religious convictions. This is what we held in *Perry* to be a "natural incapacity," because the religious belief in question stood as a natural impediment to the proper execution of the civil capacity in question. *See id.*

This Court has also interpreted Article I, Section 16 in our line of Sunday-law cases, where we "expresse[d] fully [our] views on the questions of Sunday observance, religious liberty, a Christian state, [as well as] the constitutionality and construction of the [Sunday] statute." *Crook v. Commonwealth*, 147 Va. 593, 596-97 (1927) (citing *Pirkey Bros.*, 134 Va. at

95

722).  The Sunday laws were upheld under Article I, Section 16 because "[w]hile the provision of the statute, therefore, cannot be enforced as a religious observance, the great moral force that is back of it will make itself felt in its enforcement in conformity with the views of that force." *Id.*

Article I, Section 16 has been historically interpreted by this Court to permit incidental burdens on the religious practice of individuals so long as religious belief was not the target of the legislation and it was applied "to protect all persons" for a secular purpose.  *See Rich v. Commonwealth*, 198 Va. 445, 449 (1956) ("Judge Burks, citing many authorities, pointed out that the statute cannot be enforced as a religious observance; but that it is enforceable as a valid exercise of the police power of the State, its purpose being to protect all persons from the physical and moral debasement which comes from uninterrupted labor.").

4.  The General Assembly's Legislative Interpretations

In addition to focusing on the original-public-meaning analysis of the 1971 Constitution of Virginia and controlling precedent, the General Assembly's legislative interpretations of Article I, Section 16 also prove informative.  "While not controlling, legislative interpretation of [a] constitutional provision . . . is entitled to great weight."  *City of Roanoke v. James W. Michael's Bakery Corp.*, 180 Va. 132, 151 (1942).  "When the General Assembly acts in an area in which one of its appellate courts already has spoken, it is presumed to know the law as the court has stated it and to acquiesce therein."  *Weathers v. Commonwealth*, 262 Va. 803, 805 (2001).  "[I]f the legislature intends to countermand such appellate decision it must do so explicitly."  *Id.*  "Legislative construction of a constitutional provision is entitled to consideration, and if the construction be contemporaneous with adoption of the constitutional provision, it is entitled to great weight."  *Dean v. Paolicelli*, 194 Va. 219, 227 (1952).  As such,

"[l]ong acquiescence in such an announced construction so strengthens it that it should not be changed unless plainly wrong." *Id.*

In 2016, when the General Assembly reaffirmed Jefferson's Act, it did so without any explicit countermand of any appellate decision that had been rendered on religious free exercise in Virginia. *See* Code § 57-2. This served as legislative acquiescence to this Court's jurisprudence, described above, which has for centuries interpreted Article I, Section 16 to mean that the State can moderate a person's civil capacities where their religious convictions would "substantially impair or prevent them" from performing their duties, and that "conscientious religious belief" is "no excuse for an illegal act made criminal by the law of the land." *See Remington*, 262 Va. at 349; *Kirk v. Commonwealth*, 186 Va. 839, 845 (1947).

The General Assembly is also presumed to have knowledge of the Court of Appeals' decisions on free exercise under Article I, Section 16 rendered prior to 2016. *See Barson v. Commonwealth*, 284 Va. 67, 74 (2012); *Weathers*, 262 Va. at 805. The Court of Appeals applied rational-basis review to religiously neutral laws challenged under Article I, Section 16 well before the reaffirmation of Jefferson's Act. *See Roberts v. Roberts*, 41 Va. App. 513, 523 (2003) ("That statute is religiously neutral, does not substantially burden the free exercise of religion, and rationally advances the legitimate state interest of protecting children."); *Horen v. Commonwealth*, 23 Va. App. 735, 743 (1997).

Our jurisprudence forbids this Court from overruling constitutional interpretations long acquiesced in by the General Assembly unless they are plainly wrong.[12] Neutral laws have

---

[12] Legislative acquiescence in these decisions, which previously interpreted Article I, Section 16 to be less protective of free exercise of religion than VRFRA, is informative. VRFRA says explicitly that:

always been presumed constitutional under Article I, Section 16. If a claimant alleges and proves that the government was hostile towards his religious free exercise or did not apply the law neutrally to the claimant, the reviewing court should apply strict scrutiny. This test is consistent with this Court's prior precedent and has proved workable in Article I, Section 16 claims for hundreds of years. It should continue to be applied.

### B. APPLICATION OF ARTICLE I, SECTION 16

The School Board essentially argues that Vlaming's religious beliefs, to the extent that they would not allow him to follow the anti-discrimination policy as enunciated by the School Board and relied upon by Doe and Doe's parents, substantially impaired his ability to perform his duties as a French teacher. Under *Remington* and *Perry*, this policy is a valid use of the state's police power. Vlaming contends, however, that the School Board did not treat him or his beliefs in a neutral manner.

Consistent with Article I, Section 16's demand that the State remain neutral toward religious opinion, "the government, if it is to respect the Constitution's guarantee of free exercise, cannot impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018). A law or policy with no intent to discriminate based on religion

---

> Nothing in this section shall be construed to . . . affect, interpret or in any way address those portions of Article I, Section 16 of the Constitution of Virginia, the Virginia Act for Religious Freedom (§ 57-1 et seq.), and the First Amendment to the United States Constitution that prohibit laws respecting the establishment of religion.

Code § 57-2.02(C)(ii). Therefore, I will not consider the text of VRFRA in this analysis of legislative interpretations of Article I, Section 16.

but with the sole objective of protecting minors from harassment is neutral. *See Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 533 (1993). Neutrality is rooted in the objective of a law. *Id.* Factors relevant to a neutrality analysis include the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decision-making body." *Id.* at 540.

In the present case, the School Board's policies on their face—as written and as interpreted and communicated by the School Board—do not target employees based on religious opinions. Any school employee, regardless of faith, is required to avoid discriminatory behavior or harassment and is required to refer to transgender students using their preferred pronouns; it does not matter whether the employee has a religious or secular objection to them. Enforcement of the policy does not require an individualized assessment into an employee's religion.

1. "Overt Acts" is Not an Appropriate Limiting Principle

The test the majority employs in evaluating Vlaming's free exercise claim is an anomaly in our Constitution's constellation of fundamental rights. This Court applies strict scrutiny to every other question involving constitutional rights. The limiting principle created by the majority relates only to "overt acts against peace and good order," and, in the process, creates more ambiguity than clarity. It is a legal outlier.

There has been significant debate among jurists and legal scholars as to the true meaning of the phrase, with some going so far as to argue that "overt acts against peace and good order" encompasses all violations of the law. *See City of Boerne v. Flores*, 521 U.S. 507, 539 (1997) (Scalia, J., concurring in part) (noting that "peace" and "order" appear to have historically meant "obeying the laws"); Hamburger, Historical Perspective, *supra*, at, 918 (noting that many

99

eighteenth century lawyers believed that "every breach of law is against the peace" (quoting R v. Lane, 6 Mod. 128, 87 Eng. Rep. 884 (Q.B. 1704))). The majority insists that this is not the approach it is taking, but nevertheless, refuses to define the scope of "overt acts against peace and good order" in Virginia.

The majority's opinion seems to suggest that if this Court uses the term "compelling state interest" repeatedly, Virginia adopts a strict scrutiny standard. While conjuring *Sherbert* is alluring, *Sherbert* applies strict scrutiny and nothing more, despite the majority's careful selection of quotes from the case. *Supra* at 20-22. Justice Alito's concurrence in *Fulton v. City of Philadelphia*, 141 S. Ct. at 1890, succinctly observes that "the test distilled from *Sherbert* [is] that a law that imposes a substantial burden on the exercise of religion must be narrowly tailored to serve a compelling interest." *See also* Stephen A. Siegel, *The Origin of the Compelling State Interest Test & Strict Scrutiny*, 48 Am. J. Legal Hist. 355, 380 (2006) ("*Sherbert* was the first clear, succinct, and complete statement of what constitutional lawyers have come to mean by the phrase 'strict scrutiny.'"); Richard H. Fallon, Jr., *Strict Judicial Scrutiny*, 54 UCLA L. Rev. 1267, 1281 (2007). Rather than applying *Sherbert*, however, the majority reviews Vlaming's claims by asking whether his "overt acts" "invariably posed some substantial threat to public safety, peace or order," and whether the government could not defuse the threat or avoid the contest altogether by "less restrictive means." *Supra* at 23. This is not the analysis that *Sherbert* requires. The majority's test replaces the Commonwealth's "compelling state interest" with a new requirement that the plaintiff's actions pose an invariable, substantial threat to public safety, peace, or good order. Even if "overt acts" was the ember from which a strict scrutiny flame originated, the majority sees the two standards as one and the same. These concepts are not synonymous.

The majority elects to *not* define its limiting principle. Assuaging concerns that their limiting principle might create ambiguity, the majority assures us that legal historians provide a cohesive and workable interpretation. *See supra* at 19. The majority decrees that that phrase encompasses "only a distinct subcategory of unlawful behavior," although it declines to elaborate. *Supra* at 19. Here, the public safety, peace, or order standard remains as nebulous as compelling state interests are understood. It is also doubtful that the standard is compatible with other areas of our modern constitutional jurisprudence.[13]

---

[13] Sir William Blackstone's Commentaries on the Laws of England were accepted by the Founders "as the most satisfactory exposition of the common law of England." *Schick v. United States*, 195 U.S. 65, 69 (1904). English common law was incorporated, in part, into our body of law at the time of the 1776 Constitutional Convention. 1 St. George Tucker, Blackstone's Commentaries, Editor's App. Note E at 432 (1803). Thus, Blackstone's Commentaries offer guidance in defining common law terms that the majority does not. According to Blackstone, thirteen offenses constituted a violation against the public peace: (1) riotous assemblies of 12 or more persons; (2) poaching; (3) anonymous threats; (4) damage or destruction of public locks, sluices, or floodgates on a navigable river; (5) public brawling; (6) riots or unlawful assemblies of 3 or more persons; (7) tumultuous petitioning; (8) forcible entry or detainer; (9) carrying dangerous weapons; (10) spreading false news to provoke public disorder; (11) spreading false prophecies; (12) incitements to breach of the peace; and (13) libel. Michael W. McConnell, *Freedom from Persecution or Protection of the Rights of Conscience?: A Critique of Justice Scalia's Historical Arguments in City of Boerne v. Flores*, 39 Wm. & Mary L. Rev. 819, 834-37 (1998).

Not only are some of the offenses listed by Blackstone irrelevant to the free exercise of religion, but some directly contradict our modern understanding of constitutional freedoms. Taking for example "spreading false news to provoke public disorder," the Supreme Court of the United States has expressly held that false speech is constitutionally protected, *United States v. Alvarez*, 567 U.S. 709 (2012), and prosecutions for incitement are difficult to maintain under today's First Amendment jurisprudence, see *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (holding that states may not forbid advocacy of disorder "except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action").

Similarly, the majority notes that "trespass on private property" may be considered a breach of public peace and safety because it interferes with the private rights of others. *Supra* at 20. However, Justice Brandeis' concurrence in *Whitney v. California*, 274 U.S. 357, 377 (1927), commented it would be "hardly conceivable" that the danger of trespass could ever be substantial enough to justify the suppression of First Amendment rights. *See also Marsh v. State of Ala.*, 326 U.S. 501, 509 (1946) ("When we balance the Constitutional rights of owners of property

Until today, this Court used strict scrutiny to evaluate the most precious individual rights guaranteed by our Commonwealth's Constitution. For any fundamental right or suspect classification, our precedent holds that the burden rests on the government to show its actions are narrowly tailored to achieve a compelling interest. *Mahan v. Nat'l Conservative Political Action Comm.*, 227 Va. 330, 336 (1984). Article I, Section 12, which ensures freedom of speech, press, petition, and assembly, mandates strict scrutiny review. *Elliott v. Commonwealth*, 267 Va. 464, 473-74 (2004); *Adams Outdoor Advert. V. City of Newport News*, 236 Va. 370, 381-82 (1988). Article I, Section 11 mandates strict scrutiny review to protect Virginians from state actions that draw impermissible classifications based on race, sex, or religion. *Wilkins v. West*, 264 Va. 447, 468 (2002). Strict scrutiny applies if a government action affects a parent's fundamental right to maintain a relationship with their child. F.E. v. G.F.M., 35 Va. App. 648, 664 (2001). And strict scrutiny applies if a statute infringes on the right to a jury trial, the only right which our Constitution calls "sacred." *Willis v. Mullett*, 263 Va. 653, 658 (2002); Va. Const. art. I, § 11.

In fact, the only other time this Court used something close to the majority's peace and good order standard in modern jurisprudence was during the Civil Rights Era. This "peace, good order and the rights of others" limiting principle shares a troubling history, too. This Court has used the phrase twice. Both cases involved a locality's restriction on free assembly and speech during civil rights protests. *See Thomas v. City of Danville*, 207 Va. 656 (1967); *York v. City of Danville*, 207 Va. 665 (1967). While this Court held that some aspects of an injunctive order preventing civil rights demonstrations were unconstitutional, it emphasized that the First Amendment rights of its citizens in both instances were required to be "exercised in

---

against those of the people to enjoy freedom of press and religion, as we must here, we remain mindful of the fact that the latter occupy a preferred position.").

subordination to the general comfort and convenience" of the rights of others. *Thomas*, 207 Va. at 661 (quoting *York*, 207 Va. at 669). This precedent suggests that the test actually provides weaker protection than the standard applied to our constitutional rights to today.

To see overt acts against peace and good order as the *only* compelling interests the Commonwealth possesses ignores the interests of this Commonwealth that have been protected by this Court, enacted by the General Assembly, and requested by its citizens. This Court unanimously held two years ago that "there is little doubt that relevant circumstances, conditions, and public policies have changed since 1890." *Taylor v. Northam,* 300 Va. 230, 256 (2021). Certainly, we can recognize that circumstances, conditions, and public policies in which the Commonwealth has an interest have changed since Virginia's founding.

In applying strict scrutiny, the Supreme Court of the United States has recognized that states may have compelling interests in areas beyond public safety, peace, and order. For instance, states have compelling interests in protecting the psychological wellbeing of minors and in maintaining labor laws that protect the most vulnerable, even if those labor laws incidentally burden religious expression. *See Sable Communications of California, Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989); *Prince v. Massachusetts*, 321 U.S. 158 (1944). Perhaps most relevant here, the government has not just a compelling but a "*fundamental, overriding interest*" in eradicating discrimination in education. *Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983). Until now, it was indisputable that the psychological wellbeing of children, basic labor standards, and eliminating discrimination were interests of paramount importance for our government. What is unclear now is whether these recognized interests, none of which directly implicate public safety, can ever survive a "substantially burdening public safety, peace, or

order" test, even when the means provide "the most exact connection" to the government objective. *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003).

The majority's new test puts Vlaming's right to free exercise in a class by itself. The practical effect is to presumably elevate Vlaming's rights above all other rights in our Constitution. Vlaming's right to be free from policies that allegedly burden his religious exercise would be protected to a higher standard than his right to speak his mind about secular matters, to be free from racial or gender discrimination, to see his children, or to receive due process in our courts. This result cannot be what our Founders intended.

A particularly disturbing consequence of the majority's super scrutiny standard is that it imposes a different degree of scrutiny for state policies that affect religious expression than for those which burden the expression of ordinary ideas not rooted in religious belief. If Vlaming professed no religion, and his objections to Doe's gender identity stemmed from his understanding of biology, there would be no question that this Court would use strict scrutiny to evaluate whether Vlaming could speak his views. Because Vlaming's justifications are rooted in religion, however, the majority presumably gives his beliefs greater deference in the eyes of the law.

This result couldn't be further from the intention of our Founders. In creating a hierarchy of legal protections for ideas and expression, wholly dependent on their epistemological source, the majority tears at the very values that underpin Article I, Section 16. Jefferson and Madison both believed in a liberty of conscience that placed religious and secular thought on equal ground in the eyes of the state. In Madison's own words, "equality" in belief ought to be the basis for every law in Virginia. Memorial and Remonstrance against Religious Assessments, in 8 The Papers of James Madison, Congressional Series 295, 299. And "[w]hilst we assert for ourselves

a freedom to embrace, to profess and to observe the Religion which we believe to be of divine origin, we cannot deny an equal freedom to those whose minds have not yet yielded to the evidence which has convinced us." *Id.* Jefferson was even more skeptical of a state-imposed pyramid of thought. To prevent governmental and clerical abuse, Jefferson argued it necessary that "reason and free enquiry" live side-by-side with religious teachings as total intellectual peers, and the interaction between the two would in turn drive scientific and spiritual progress in the Commonwealth. *See* Thomas Jefferson, Notes on the State of Virginia, 164-70 (Lilly and Wait ed. 1832).

Even more telling is the fact that at the time this country was founded, a majority of states had free exercise provisions that included a similar "peace and good order" carveout.[14] Of these states, none of them have gone as far as the majority in substituting "compelling state interest" for "disturb the good order, peace or safety." Three of these states, Delaware, Rhode Island, and South Carolina, never assigned independent meaning to the "peace and good order" carveouts in their original constitutions. However, Maryland, Massachusetts, New Hampshire, and New York have fully examined the breadth of their respective free exercise provisions and none of them have found the carveouts to expand such protections to the extent that our majority does.[15] Virginia now stands alone in adopting super scrutiny.

---

[14] *See* Del. Declaration of Rights §§ 2-3 (1776); Md. Const. Decl. of Rts. art. 33 (1776); Mass. Const. Pt. 1, art. II (1780); N.H. Const. Pt. 1, art. 5 (1783); N.Y. Const., Art. XXXVIII (1777); Charter of Rhode Island and Providence Plantations (July 15, 1663); S. C. Const., Art. VIII, § 1 (1790). Justice Powell's concurrence provides further explanation of this point. *See supra* at 76-77 n.1.

[15] Maryland holds that the free exercise rights guaranteed by its state constitution are coextensive with those guaranteed by the First Amendment and has expressly adopted the United States Supreme Court's reasoning in *Smith*. *Doe v. Catholic Relief Services*, 300 A.3d 116, 131 n.15 (Md. 2023) ("This Court has treated Article 36 as embodying the protections guaranteed by the Free Exercise Clause of the First Amendment."). New York takes a similar approach,

Finally, the majority's super scrutiny effectively renders VRFRA a dead letter. VRFRA, even if stronger in its language and evidentiary standard, largely mirrors its federal counterpart in mandating *Sherbert*'s strict scrutiny analysis. Like *Sherbert*, VRFRA tasks our courts with evaluating whether a burden to free exercise is the least restrictive means of furthering a compelling state interest. Code § 57-2.02(B). Notable here is the General Assembly's wholesale endorsement of "compelling interests" as understood by our courts in 2007 when the statute was effectuated, accepting without objection those well-recognized compelling interests, articulated above, which may not directly implicate concerns of public safety, peace, and order. See *Weathers*, 262 Va. at 805. Now, in one fell swoop, the majority's super scrutiny subsumes the General Assembly's directives, rendering VRFRA suddenly irrelevant before this Court even had a chance to interpret it.

### 2. Applying *Sherbert-Yoder*

While my concurrence endorses Virginia's neutrality standard as the basis for my analysis, the result would still be the same when evaluating this case using *Sherbert v. Verner* and *Wisconsin v. Yoder*. In *Sherbert*, the Supreme Court of the United States applied strict scrutiny in determining whether government regulations are permissible in the face of free exercise challenges. Under this approach, courts ask (1) whether the law imposed a burden on the ability to freely exercise religion; and (2) if so, whether the government has a compelling

---

holding that *Smith*'s neutral, generally applicable law approach provides the starting point for analyzing free exercise claims under its state constitution, while, at the same time, recognizing that exceptions to this approach exist where it is shown that the law unreasonably interferes with an individual's right to practice their religion. *Catholic Charities of Diocese of Albany v. Serio*, 859 N.E.2d 459, 467 (2006). Massachusetts and New Hampshire, on the other hand, have expressly rejected the reasoning of *Smith*, choosing instead to adopt the compelling state interest balancing test the United States Supreme Court described in *Sherbert v. Verner*, 374 U.S. 398 (1963).

interest in the enforcement of its law that is narrowly tailored enough to justify the burden on free exercise rights. 374 U.S. at 403, 406.

Less than a decade later, (and after the adoption of Virginia's 1971 Constitution) in *Wisconsin v. Yoder*, 406 U.S. 205 (1972),[16] the Supreme Court built on *Sherbert*'s test, providing that a "regulation neutral on its face may, in its application, nonetheless offend the constitutional requirement for government neutrality if it unduly burdens the free exercise of religion." *Id.* at 220. The *Yoder* test required a court to ask whether "there is a state interest of sufficient magnitude to override the interest claiming protection under the Free Exercise Clause." *Id.* at 214. In doing so, the Supreme Court emphasized the importance of "preserving doctrinal flexibility and recognizing the need for a sensible and realistic application of the Religion Clauses." *Id.* at 220-21.

When applying *Sherbert-Yoder* to the facts of this case, the result is the same as under Virginia's neutrality-oriented analysis. In analyzing the appropriate considerations under Article I, Section 16, using both Virginia's neutrality principle and the *Sherbert-Yoder* paradigm, Vlaming has sufficiently plead a cause of action to survive demurrer. An important component of this analysis is who the regulation seeks to protect. Here, the regulations do not seek to protect Vlaming, but Doe. Accordingly, I feel it necessary to review appropriate considerations for a court under my interpretation of Article I, Section 16.

---

[16] The issue before the Supreme Court was whether Wisconsin's compulsory school attendance law, which required a child to attend school until the age of 16, violated Amish religious beliefs that high school attendance was contrary to their religion and way of life. *Id.* at 209. The Supreme Court held that the free exercise clause prohibited Wisconsin from compelling Amish children to attend high school until the age of 16. *Id.* at 234.

107

C.  APPROPRIATE CONSIDERATIONS UNDER ARTICLE I, SECTION 16[17]

My analysis above shows that the test articulated by the majority defies both the plain meaning and original public meaning of Article I, Section 16 of the 1971 Constitution of Virginia.  The threshold inquiry in any as-applied Section 16 claim should be whether the law in question has been neutrally applied.

In this case, I accept that Vlaming alleged facts sufficient for his claim that the School Board transgressed the as-applied neutrality standard by proceeding "in a manner intolerant of religious beliefs . . . because of their religious nature." *Fulton*, 141 S. Ct. at 1878.  However, I do not have to accept the legal conclusion that Vlaming reaches in alleging that the School Board acted in a non-neutral manner.  Assuming that Vlaming could prove his claim that the policy was not religiously neutral, the School Board's "actions [must be] examined under the strictest scrutiny." *See id.* at 1881.  In such an instance, "[t]he question, then, is not whether the [School Board] has a compelling interest in enforcing its non-discrimination policies generally, but whether it has such an interest in denying an exception to [Vlaming]." *Id.*  And while "[a] government policy can survive strict scrutiny only if it advances 'interests of the highest order' and is narrowly tailored to achieve those interests[,]" the analysis "inevitably call[s] for a

---

[17] The majority in footnote 44 states, in part: "The dissent includes 11 pages of "appropriate considerations" for the circuit court to apply on remand."  The majority correctly notes that a dissent should not attempt to guide the trial court on remand.  So, the complaint confuses me as no such suggestion has been made.  Like any dissent, I simply point out what I believe the appropriate analysis should have been and then I follow that analysis to its conclusion.  By doing this the object of a dissent is accomplished: to record my disagreement with the majority's analysis and findings and to preserve for posterity the argument for future consideration.

delicate balancing of important but conflicting interests." *Id.*; *Yoder*, 406 U.S. at 237 (White, J., concurring).[18]

A proper analysis of the nature and scope of the School Board's interests in this case must necessarily consider the nature and scope of the rights of Doe because it is his underlying interests that, at bottom, the School Board is entrusted to serve and for whose protection the anti-discrimination policy was adopted. The potential for religious liberty to clash with other rights has been recognized for centuries. *See, e.g., Watson v. Jones*, 80 U.S. 679, 728 (1871) ("In this country the full and free right to entertain any religious belief . . . which *does not infringe personal rights*, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect.") (emphasis added); *see generally* United States Commission on Civil Rights, *Peaceful Coexistence: Reconciling Nondiscrimination Principles with Civil Liberties* 29 (2016) ("Religious liberty was never intended to give one religion dominion over other religions, or a veto power over the civil rights and civil liberties of others."). Free exercise challenges must yield to the application of neutral principles of law protecting non-religious rights with the religious rights of others.

By considering the rights of Doe as an integral part of its analysis of the nature and scope of the School Board's interest in enforcing its anti-discrimination policy, the analysis paints the most accurate picture of the factors the School Board must consider when making enforcement

---

[18] This balancing is especially important when considering the historical use of religious invocations to seek exemptions from other anti-discrimination laws and to oppose the enactment of such laws. *See, e.g., Bob Jones Univ.*, 461 U.S. at 583 (noting the university's "racially discriminatory admissions policy based upon its interpretation of the Bible"); *Dole v. Shenandoah Baptist Church*, 899 F.2d 1389, 1397-99 (4th Cir. 1990) (holding employer's free exercise rights did not exempt it from complying with the Fair Labor Standards Act's equal pay requirement).

decisions. But this analysis cannot be limited to the conception of rights as they were understood

two centuries ago.

In *Loving v. Virginia*, 206 Va. 924 (1966) (*Loving I*), this very Court upheld the

convictions of a white man and black woman for the crime of marrying each other and then

residing within Virginia. The trial judge expressed the following opinion in support of the

convictions:

> Almighty God created the races . . . and he placed them on separate
> continents. And but for the interference with his arrangement there
> would be no cause for such marriages. The fact that he separated
> the races shows that he did not intend for the races to mix.

*Loving v. Virginia*, 388 U.S. 1, 3 (1967) (*Loving II*) (quoting the trial judge's opinion).

This Court in *Loving I* found "no sound judicial reason" to overturn its previous decision

upholding miscegenation statutes, refusing to consider "a number of texts dealing with the

sociological, biological and anthropological aspects of the question of interracial marriages"

because to do so "would be judicial legislation in the rawest sense of that term." *Loving I*, 206

Va. at 929. The Supreme Court of the United States ultimately corrected this Court's mistake,

but the damage was done.

As uncomfortable as it is to relive this repugnant history, it is necessary to emphasize in

the sharpest terms the importance of viewing religious rights with the rights of others in mind.

Our Founders, though failing in their time to recognize the rights of marginalized or enslaved

people, still had the foresight to understand the ever-evolving nature of humankind. As Jefferson

wrote:

> [L]aws and institutions must go hand in hand with the progress of
> the human mind. As that becomes more developed, more
> enlightened, as new discoveries are made, new truths disclosed,
> and manners and opinions change with the change of

110

circumstances, institutions must advance also, and keep pace with
the times.

2 Howard, *supra* at 1165 (quoting *Writings of Thomas Jefferson* (Ford ed.), X, 4243).  It is with the guidance of progress in mind that women, persons of color, and persons of non-heterosexual orientation were given the very same rights as our Founders.  In line with Jefferson's entreaty to modernity, our General Assembly amended the Virginia Human Rights Act in 2020, affirmatively stating that "[i]t is the policy of this Commonwealth to [s]afeguard all individuals within the Commonwealth from unlawful discrimination because of . . . gender identity."  *See* Code § 2.2-3900.  This legislation was created to . . . "[p]reserve the public safety, health, and general welfare . . . and to further the interests, rights and privileges of individuals within the Commonwealth."  Therefore, to properly analyze the School Board's compelling interest in enforcing its anti-discrimination policy, the rights of Doe are indispensable.

1. The School Board's Interests in its Anti-Discrimination and Anti-Harassment Policies

The School Board argues that it has a compelling interest in enforcing its anti-discrimination and anti-harassment policies for the protection of transgender students.  This Court has recognized that "the protection of children from harm, whether moral, emotional, mental, or physical, is a valid and compelling state interest."  *Knox v. Lynchburg Div. of Soc. Serv.*, 223 Va. 213, 223 (1982) (citing *Stanley v. Illinois*, 405 U.S. 645, 652 (1972)).  "It is evident beyond the need for elaboration that a State's interest in 'safeguarding the physical and psychological well-being of a minor' is 'compelling.'"  *New York v. Ferber*, 458 U.S. 747, 756-57 (1982) (quoting *Globe Newspaper Co. v. Superior Ct.*, 457 U.S. 595, 607 (1982)); *see also Yoder*, 406 U.S. at 230 (recognizing the relevance of the child's interests when noting that it was not a case "in which any harm to the physical or mental health of the child or to the public safety, peace, order, or welfare has been demonstrated or may be properly inferred").  "A

democratic society rests, for its continuance, upon the healthy, well-rounded- growth of young people into full maturity as citizens." *Ferber*, 458 U.S. at 757. "Accordingly, we have sustained legislation aimed at protecting the physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights." *Id.*

In addition to their "compelling interest in protecting the physical and psychological well-being of minors," school districts can have a "compelling state interest in protecting transgender students from discrimination." *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 528-29 (3d Cir. 2018). "When transgender students face discrimination in schools, the risk to their wellbeing cannot be overstated." *Id.* at 529.[19]

To promote this interest, the School Board enacted anti-discrimination and anti-harassment regulations. Anti-discrimination policies "serve[] compelling state interests of the highest order," as they ensure "society the benefits of wide participation in political, economic, and cultural life." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 624-25 (1984). The School Board enacted and interpreted its policies to comply with federal anti-discrimination laws such as Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX"), which prohibit discrimination on the basis of sex. *See Kluge v. Brownsburg Cmty. Sch. Corp.*, 548 F. Supp. 3d 814, 846 (S.D. Ind. 2021) (*Kluge II*) ("continuing to allow [a teacher] an accommodation that resulted in complaints that transgender students felt targeted and dehumanized could potentially have subjected [the school] to a Title IX discrimination lawsuit brought by a transgender student"); *Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of*

---

[19] "[T]here is no doubt that transgender individuals historically have been subjected to discrimination on the basis of their gender identity, including high rates of violence and discrimination in education, employment, housing, and healthcare access." *Grimm v. Gloucester Cnty. Sch. Bd.*, 302 F. Supp. 3d 730, 749 (E.D. Va. 2018) ("*Grimm I*") (collecting cases).

*Educ.*, 208 F. Supp. 3d 850, 870-71 (S.D. Ohio 2016) (concluding a transgender student "forced to use a separate bathroom and otherwise not [be] treated as a girl" was likely to succeed under Title IX); *but see Meriwether v. Hartop*, 992 F.3d 492, 511 (6th Cir. 2021) (concluding in the university context that a professor's refusal to use a transgender person's pronouns did not implicate the university's interest in complying with Title IX).[20]

Moreover, the School Board, by and through the powers granted to it by the General Assembly, has an interest in complying with its constitutional obligation "to ensure that an educational program of high quality is established and continually maintained." Va. Const. art. VIII, § 1. "[E]ducation is perhaps the most important function of state and local governments . . . [and] is the very foundation of good citizenship." *Brown v. Bd. of Educ. of Topeka, Shawnee Cnty., Kan.*, 347 U.S. 483, 493 (1954). "[I]t is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education." *Id.* Accordingly, children of school age in Virginia are constitutionally compelled to attend secondary school. *See* Va. Const. art. VIII, § 3; Code § 22.1254. Public school teachers play an integral role in their development as "role models" who impart "essential lessons of civil, mature conduct." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 683 (1986). It is without question that a School Board's ability to provide a high-quality education, and a student's ability to receive one, are hampered when that student faces discrimination and harassment perpetuated or sanctioned by the school or its agents.

---

[20] In *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1741 (2020), the U.S. Supreme Court held that under Title VII discrimination against a person for being transgender is discrimination "based on sex." Though *Bostock's* applicability to Title IX is contested, it has been used by courts to guide "evaluation of claims under Title IX." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020) (*Grimm II*).

113

## 2. Doe's Personal Identity and Educational Interests

The majority appears indifferent to whether Vlaming's actions in this case caused harm to Doe, seemingly viewing the question as either irrelevant to the legal analysis or so inconsequential as to not warrant a rigorous examination. Like surplusage. The potential harm caused by Vlaming's actions, however, is central to Vlaming's free exercise claim and thus it is necessary to articulate what that harm could be.

Doe's personhood and educational interests are relevant to the application of strict scrutiny because they form the object of the School Board's compelling interest in enforcing its anti-discrimination policy. Doe unquestionably has an interest in his own individual liberty and self-determination. *See* Va. Const. art I, § 1 ("That all men are by nature equally free and independent and have certain inherent rights . . . ; namely, the enjoyment of life and liberty, with the means of acquiring and possessing property, and pursuing and obtaining happiness and safety."); *see also Obergefell v. Hodges*, 576 U.S. 644, 663 (2015) (citing *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972), and *Griswold v. Connecticut*, 381 U.S. 479, 484-86 (1965)) ("[T]hese liberties extend to certain personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs.").[21] Within the public school setting,

_____

[21] In *Grimm II*, 972 F.3d at 609-10, a case which involved the assignment of in-school bathroom usage to a transgender student's biological sex, the United States Court of Appeals for the Fourth Circuit described how the student's gender identity was inseverable from his conception of himself as a person:

> Second, the Board contends that even if the policy necessarily involves sex-based discrimination, it cannot violate equal protection because Grimm is not similarly situated to cisgender boys. Instead, it asks us to compare Grimm's treatment under the policy to the treatment of students it would consider to be "biological" girls, because Grimm's "choice of gender identity did not cause biological changes in his body, and Grimm remain[ed] biologically female." But embedded in the Board's framing is its

114

eradicating discrimination and harassment ensures that public school systems foster environments conducive to such individual self-realization.

Furthermore, the School Board had legitimate reason to believe that its pronoun policy was necessary to protect the students in its care. In a study conducted in 2015, "77% of respondents who were known or perceived as transgender in their K-12 schools reported harassment by students, teachers, or staff." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 597 (4th Cir. 2020) ("*Grimm II*") (referencing Br. of Amici Curiae Sch. Adm'rs from Twenty-Nine States & D.C. in Supp. of Pl. Appellee 6 [hereinafter "Br. of School Administrator Amici"]). Similarly, a 2020 survey conducted by the Centers for Disease Control revealed that 27 percent of transgender students surveyed felt unsafe at school and about 35 percent of transgender students were bullied at school, and 35 percent had attempted suicide in the past 12 months. Michelle M. Johns et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students--19 States and Large Urban School Districts*, Morbidity and Mortality Weekly Rep. 67,

---

own bias: it believes that Grimm's gender identity is a choice, and it privileges sex-assigned-at-birth over Grimm's medically confirmed, persistent and consistent gender identity. The policy itself "recognizes that some students question their gender identities," and states that such students have "gender identity issues." Grimm, however, did not question his gender identity at all; he knew he was a boy. The overwhelming thrust of everything in the record—from Grimm's declaration, to his treatment letter, to the amicus briefs—is that Grimm was similarly situated to other boys, but was excluded from using the boys restroom facilities based on his sex-assigned-at-birth. Adopting the Board's framing of Grimm's equal protection claim here would only vindicate the Board's own misconceptions, which themselves reflect "stereotypic notions."

(Internal citations omitted) (alteration in original).

69-70 (Jan. 25, 2019). This harassment has detrimental educational consequences, as "students who experienced greater harassment had significantly lower grade point averages." *Grimm II*, 972 F.3d at 597 (referencing Br. of School Administrator Amici 11).

Pronoun usage is connected to this harm, as "[f]ailure to use a student's chosen name and pronouns can increase self-scrutiny, which can cause students to internalize the homophobia or transphobia targeted at them." Caitlin Ring Carlson, Emma Hansen, *Pronoun Policies in Public Schools: The Case Against First Amendment Exceptions for K-12 Teachers*, 32 Geo. Mason U. C.R.L.J. 261, 295 (2022) (citing Lauren Munro, Robb Travers & Michael R. Woodford, *Overlooked and Invisible: Everyday Experiences of Microaggressions for LGBTQ Adolescents*, 66 J. of Homosexuality 1439, 1446 (2019)). However, "teachers addressing students by their preferred name led to students' improved mental health, including less depression and decreased suicidal thoughts or behavior." *Id.* (citing Amanda M. Pollitt, Salvatore Loverno & Stephen T. Russell, *Predictors and Mental Health Benefits of Chosen Name Use Among Transgender Youth,* 53 Youth & Soc'y 320, 330-36 (2019)); *Grimm II*, 972 F.3d at 597 (noting that "transgender students have better mental health outcomes when their gender identity is affirmed"); *Boyertown*, 897 F.3d at 523 (noting that "[s]ocial gender transition can help alleviate gender dysphoria").

In the recently decided case of *Kluge v. Brownsburg Community School Corp.*, 64 F.4th 861 (7th Cir. 2023) (*Kluge III*), the Seventh Circuit considered whether a teacher's use of students' last names only to avoid using transgender students' names was a reasonable accommodation under Title VII that the school was required to accept. The answer was an emphatic no. *Id.* at 891. Under the standard articulated by that court, "[a] practice that indisputably cause[s] emotional harm to students and disruptions to the learning environment is an undue hardship to a school as a matter of law." *Id.* at 886. The school received various

116

"reports and complaints about the harms caused by Kluge's last names-only practice," with one student reporting "that the practice made the transgender students stand out, and that he and others in the school felt bad for the transgender students." *Id.* at 885. In light of this evidence, the Seventh Circuit held that the proposed accommodation imposed an undue hardship on the school, reasoning that "no reasonable jury could conclude that a practice that emotionally harms students and disrupts the learning environment is only a slight burden to a school." *Id.* at 891.[22]

Though *Kluge III* concerns claims under Title VII, which Vlaming has not asserted here, its facts provide a demonstrative example of how a teacher's refusal to use transgender students' preferred pronouns can cause emotional harm to students and disrupt the learning environment. Indeed, "Kluge himself conceded that the school had a legitimate interest in the mental health of its students, even though learning is the primary purpose for the existence of the school." *Id.* at 889. Further, other courts have observed that the stigma resulting from differential treatment because of an individual's transgender identity can result in harm. *See Grimm II*, 972 F.3d at 61718 (concluding that the stigmatization of a transgender student being forced to use a separate restroom, which results in emotional and dignitary harm, is cognizable under Title IX); *see also*

---

[22] The court in *Kluge III* applied the meaning of "undue hardship" as it had previously been interpreted by many courts analyzing religious accommodation claims under Title VII, which was that an employer was not required "to bear more than a *de minimis* cost" in accommodating an employee's religious practice. *Id.* at 881 (quoting *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977) (emphasis in original)). However, in *Groff v. DeJoy*, 600 U.S. ___, slip op. at 4 (2023), the U.S. Supreme Court clarified the contours of the *Hardison* decision from which the "de minimis" language originated. It provided that *Hardison* could not "be reduced to that one phrase," noting that "*Hardison* referred repeatedly to 'substantial' burdens." *Id.* at 15. It therefore understood "*Hardison* to mean that 'undue hardship' is shown when a burden is substantial in the overall context of an employer's business," describing the inquiry as "fact-specific." *Id.* at 15-16. Irrespective of whether the "de minimis" or "substantial" standard is applied in *Kluge III*, the analogous facts of the case help inform the nature of the inquiry in Vlaming's case.

*Boyertown*, 897 F.3d at 530 (stating that requiring transgender students to use individual bathrooms "would very publicly brand all transgender students with a scarlet 'T'").

In Vlaming's case, in recognition of Virginia's fundamental commitment to high quality education and child development, an inquiry into the potential harm caused to Doe and the disruption to the learning environment is unmistakably relevant. Vlaming's Complaint acknowledges that Doe withdrew from the class in response to Vlaming's conduct. This indicates that Doe's educational performance was inhibited by Vlaming's behavior, but the facts as they exist before us are insufficient to properly weigh the harm to Doe without the benefit of a developed record. Accordingly, I must concur with the majority that Vlaming, with the barest of records, has alleged sufficient facts to survive demurrer. However, I come to this conclusion after deploying a strict scrutiny test, and not a form of super scrutiny that would constrict the School Board's interests and fail to take Doe's rights into account.

## II. VIRGINIA'S RELIGIOUS FREEDOM RESTORATION ACT

Unlike Article I, Section 16, which we have interpreted many times over the centuries, VRFRA has never been interpreted by an appellate court in Virginia.

The majority's dicta regarding the "essentiality" requirement in VRFRA—and the heightened "clear and convincing" standard of proof—may or may not be true with respect to VRFRA's federal counterpart, but they are unnecessary to resolve Vlaming's VRFRA claim as it stands before us. This is because the only element of Vlaming's VRFRA claim disputed in this litigation is whether the anti-discrimination policy was the "least restrictive means" by which the School Board could further its compelling interests in nondiscrimination and a safe educational environment.

Vlaming's complaint alleges that his religious free exercise was substantially burdened by the anti-discrimination policy as the anti-discrimination policy forced him "to choose between fidelity to religious belief and employment." *See Ballweg v. Crowder Contracting Co.*, 247 Va. 205, 213 (1994) (internal quotation marks omitted). Accepting as true the well-pleaded allegations in the Complaint, as we must at the demurrer stage, I concur with the majority that Vlaming has made a prima facie free-exercise claim under VRFRA. Vlaming alleges that the School Board forced him to choose between employment and fidelity to his religious beliefs.[23]

## III. FREEDOM OF SPEECH

Vlaming failed to state a cause of action for his free speech claims. This is not, as the majority frames it, a case about compelling adherence to a particular "ideology." It is about a public school teacher refusing to follow the rules applicable to all of the educators in the school. The School Board enacted reasonable directives as an expression of its will that students would be treated with dignity and respect by school employees. The majority's characterization of Vlaming's on-the-job speech is not sensible. The manner in which Vlaming addressed Doe was both curricular and part of Vlaming's official duties as a French teacher. Even if this were not

---

[23] Mere opinions must be distinguished from "beliefs rooted in religion," and making this determination "is more often than not a difficult and delicate task." *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.,* 450 U.S. 707, 713-14 (1981). Courts here serve a "narrow function" which requires them to determine whether the belief is the result of "an honest conviction." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 725 (2014) (quoting *Thomas*, 450 U.S. at 716). The sincerity of Vlaming's religious belief "is a question of fact that is generally not appropriate for a court to determine at summary judgment." *Kluge II*, 548 F. Supp. 3d 841. The substantiality of the burden, on the other hand, is a matter of law. *See Burwell*, 573 U.S. at 760 (Ginsburg, J. dissenting) (noting the importance of "the distinction between the sincerity of a challenger's religious belief and the substantiality of the burden" imposed). Accordingly, I provide no opinion on the sincerity of Vlaming's belief, and my conclusion that Vlaming has stated a cause of action is limited to the face of the Complaint. On remand, it will be appropriate for the circuit court to take evidence on the nature of Vlaming's religious beliefs, as it is relevant to determining the degree to which they were burdened by the School Board's enforcement of its anti-discrimination and anti-harassment policies.

the case, Vlaming's speech has a strong enough nexus to Vlaming's duties as a public school teacher to ensure that he was not speaking as a private citizen on a matter of public concern, putting his speech squarely within the purview of speech the School Board could legally regulate. Therefore, I respectfully dissent from Part II.C of the majority's opinion.

We have never construed Article I, Section 12 of the Constitution of Virginia more broadly than the First Amendment and have unambiguously stated that it "is coextensive with the free speech provisions of the federal First Amendment." *Elliott*, 267 Va. at 473-74. Accordingly, federal precedent guides my analysis of Vlaming's free speech claims.

## A. VLAMING WAS ENGAGED IN CURRICULAR SPEECH

The nature of the speech at issue is dispositive in this case. The speech here is not a matter of public concern because it is curricular, and, even if it were not curricular, the result is the same. Whether speech is curricular "is a question of law for the court." *Lee v. York Cnty. Sch. Div.*, 484 F.3d 687, 697 (4th Cir. 2007). When a teacher's speech is curricular, it does not constitute speech on a matter of public concern, and it is not protected by the First Amendment. *See Boring v. Buncombe Cnty. Bd. of Educ.*, 136 F.3d 364, 368 (4th Cir. 1998). The majority takes an overly restrictive view of the matter, concluding that speech is only curricular if it relates directly to the specific subject being taught. *Supra* at 55-56. First Amendment jurisprudence indicates that curricular speech is broader in scope and "encompasses a wide range of types of communication." *See Lee*, 484 F.3d at 692 (internal quotation omitted). Curricular speech touches upon "school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271 (1988); *see also Boring*, 136 F.3d at 368 (applying *Kuhlmeier* to determine whether speech is

120

curricular, reasoning that if speech is curricular in nature, it does not constitute speech on a matter of public concern). Classroom speech can impart particular knowledge if its purpose is to convey a specific message or information to students; speech does not need to relate to instruction in a particular subject in order to be considered curricular speech, as information on social or moral values to which the teacher believes the students should learn or be exposed is also curricular speech. *Lee*, 484 F.3d at 699.

While I agree with the majority that constitutional free speech protections are not limited to students or to university professors, the law treats the curricular speech of college and university faculty differently from that of primary and secondary school teachers. *See Grutter v. Bollinger*, 539 U.S. 306, 329 (2003). While "[t]he Supreme Court [of the United States] has long recognized that 'universities occupy a special niche in our constitutional tradition,'" public primary and secondary school teachers, by contrast, are hired to teach the curriculum developed by the politically accountable branches of state and local government. *See id.*; *Sweezy v. New Hampshire*, 354 U.S. 234, 249-55 (1957); *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967) (recognizing that a university "classroom is peculiarly the 'marketplace of ideas'").

Primary and secondary school teachers are not given the freedom to teach whatever they personally believe. Unlike university students, primary and secondary school pupils are captive audiences who generally lack the intellectual sophistication necessary to engage with and scrutinize the views of their instructors. *Mayer v. Monroe Cnty. Comm. Sch. Corp.*, 474 F.3d 477, 479-80 (7th Cir. 2007). When disagreements about what should be taught in public school classrooms arise, they generally are better resolved by politically accountable officials whose views can be debated openly. *See Evans-Marshall*, 624 F.3d at 341; *Mayer*, 474 F.3d at 479-80

121

("[I]f indoctrination is likely, the power should be reposed in someone the people can vote out of office, rather than tenured teachers."). In fact, those federal circuits that have considered whether public primary or secondary school teachers enjoy freedom similar to that of college professors to determine what they will teach found that the First Amendment does not protect their curricular speech to the same degree. *See Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 966-70 (9th Cir. 2011); *Evans-Marshall*, 624 F.3d at 342; *Mayer*, 474 F.3d at 479-80; *cf. Lee*, 484 F.3d at 694 n. 11, 700 (declining to apply *Garcetti* but concluding under *Pickering-Connick* that a teacher's speech was not protected by the First Amendment).

Contrary to the majority's position, the test for whether the speech at issue here is curricular is not based on whether Vlaming's use of masculine or feminine pronouns has anything to do with a "curricular topic related to the French language," *supra* at 55; rather, the test is whether students, parents or members of the public could reasonably perceive Vlaming's use of masculine or feminine pronouns in class as bearing the imprimatur of the school or communicating a specific message to students. *See, e.g., Lee*, 484 F.3d at 699. Vlaming fails this test. The School Board's policies governing communication with students by using their preferred pronouns bears the imprimatur of the school's message they want communicated to students. There is no question that the speech at issue occurred in and around the classroom during school hours and as part of classroom instruction. Therefore, in my opinion, the speech at issue here is clearly curricular.

With curricular speech, it is the School Board, as the entity that determines the content of the education it provides, that is speaking. The School Board can therefore choose to regulate the content of what is or is not expressed. *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 833 (1995) ("When the University determines the content of the education it

provides, it is the University speaking, and we have permitted the government to regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message."). Moreover, "[i]t cannot be doubted that in order to pursue its legitimate goals effectively, [a school board] must retain the ability to control the manner in which its employees discharge their duties and to direct its employees to undertake the responsibilities of their positions in a specified way." *Urofsky v. Gilmore*, 216 F.3d 401, 409 (4th Cir. 2000). Viewed through this prism, the present case is less about compelled speech and more about an employer (the School Board) controlling how its employees (teachers) interact with its most valuable—and vulnerable—clients (students).[24] Accordingly, I would hold that Article 1, Section 12 does not protect the curricular speech of primary and secondary teachers.

Once it is established that Vlaming was engaged in curricular speech, the logic of the Sixth Circuit is persuasive, and the outcome of this case is strongly guided by the decision in *Evans-Marshall v. Board of Education of Tipp City Exempted Village School District*, 624 F.3d 332 (6th Cir. 2010). Rather than addressing *Evans-Marshall*, the majority relies instead on another Sixth Circuit case, *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021), to support its conclusion. Like the present case, *Meriwether* involved disciplinary action that resulted from a teacher's failure to use students' preferred pronouns based on a religious objection. *Id.* at 498-503. *Meriwether*, however, involved a college professor, not a high school teacher. This fact alone was sufficient for the Sixth Circuit to explicitly distinguish *Meriwether* from *Evans-*

---

[24] Under the majority's formulation, a school board could never mandate how teachers interact with students short of stating that such interactions must be legal. Any lesser mandate would be functionally unenforceable, as a teacher could simply raise the specter of compelled speech and have the mandate invalidated. Indeed, under the majority's approach, it is questionable if a school board could even punish a teacher for comments made in the school setting unless those comments directly related to the subject.

*Marshall*. *Id*. at 505, n.1 (explaining that in *Evans-Marshall* "[w]e distinguished college and university professors and made clear that our holding was limited to schoolteachers"). It is also worth noting that even in *Meriwether*, the court recognized that the use of students' preferred pronouns is an important matter related to curricular speech. *Id.* at 507. Like the present case, *Evans-Marshall* addressed the speech of a high school teacher and is therefore more informative and far more persuasive. *Id.* at 334. After analyzing the contours of public employees' free speech rights, the Sixth Circuit concluded that the curricular speech of high school teachers is not constitutionally protected speech. *Id.* at 340-41. Because "[e]xpression is a teacher's stock in trade, the commodity [he] sells to [his] employer in exchange for a salary," it necessarily follows that, when a school board offers a curriculum or instructional policy to a teacher, it is not repressing his speech. *See id.* at 340 (citing *Mayer*, 474 F.3d at 479).

Therefore, as Vlaming's speech was curricular in nature, his free speech claim fails as a matter of law. However, assuming that the speech was not curricular, Vlaming's free speech claim fails as a matter of law under both *Garcetti* and the first step of the analysis outlined in *Pickering v. Board of Education of Township High School District 205, Will County, Illinois*, 391 U.S. 563 (1968), as set out below.

### B. VLAMING'S SPEECH WAS PURSUANT TO HIS OFFICIAL DUTIES

Even if Vlaming's speech was not curricular, his free speech claims fail as a matter of law because his speech was made pursuant to his official duties as a public employee. When a public employee speaks pursuant to their official duties, the employee is not speaking as private citizen and therefore, the First Amendment does not protect the employee's speech from discipline. *Garcetti v. Ceballos*, 547 U.S. 410, 424 (2006). *Garcetti* acknowledged that "when public employees make statements pursuant to their official duties . . . the Constitution does not

124

insulate their communications from employer discipline." *Id.* at 421. "When [public employees] speak out, they can express views that contravene governmental policies or impair the proper performance of governmental functions." *Id.* at 419. Accordingly, "[s]upervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission." *Id.* at 422-23. There is no question that school boards retain this power. *See, e.g., Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995) ("[W]hen the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes.").

While I agree with the majority that public employees do not forfeit their constitutional rights by virtue of their employment by the government, *see Garcetti*, 547 U.S. at 417, the Supreme Court of the United States has recognized that "many of the most fundamental maxims of our First Amendment jurisprudence cannot reasonably be applied to speech by government employees." *Waters v. Churchill*, 511 U.S. 661, 672 (1994). Thus, public employees are subject to some restrictions on core First Amendment activities, like political campaigning. *See, e.g.*, *U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 564 (1973).

Our jurisprudence accepts that government employees will have to at some point, through their speech or silence, carry out the government's objectives through their work duties. *See, e.g., Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 140 S. Ct. 2082, 2090 (2020) (Thomas, J., concurring) ("[T]he Constitution itself impos[es] affirmative ideological commitments prerequisite to assisting in the government's work.") (internal citations omitted). It is inevitable that certain government entities "will adopt and pursue programs and policies . . . contrary to the profound beliefs and sincere convictions of some of its citizens . . . [and] funds raised by the government will be spent for speech and other expression

125

to advocate and defend its own policies." *Bd. of Regents of Univ. of Wisconsin Sys. v. Southworth*, 529 U.S. 217, 229 (2000). For this reason, "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Id.*

The majority is correct that the First Amendment "includes both the right to speak freely and the right to refrain from speaking at all." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018). While Vlaming asserts that the School Board's requirement to call students by their preferred pronouns constitutes compelled speech, speech may be compelled by a public employer if the speech in question is part of an employee's official duty and not private citizen speech on a matter of public concern. *See Garcetti*, 547 U.S. at 421.[25]

Public schools may compel speech and regulate its delivery because they have an interest in shaping and pursuing their educational goals. *See Lane v. Franks*, 573 U.S. 228, 237 (2014); *Garcetti*, 547 U.S. at 418. When a public institution compels a teacher to speak on matters pertaining to the school's curriculum and policies, such speech falls within the teacher's official duties. *See Janus*, 138 S. Ct. at 2474 (explaining that in public institutions, "[t]he employee is effectively the employer's spokesperson."). The majority's classification of a teacher's requirement to communicate with students using their preferred pronouns as speech not within a

---

[25] Additionally, it is worth noting that in his dissent, Justice Souter raised concerns about its applicability to "academic freedom in public colleges and universities." *Garcetti*, 547 U.S. at 438 (Souter, J., dissenting) (emphasis added). The *Garcetti* majority responded by stating "[w]e need not, and for that reason do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching." *Id.* at 425. This is a far cry from disavowing "any effort to interpret the official-duties doctrine as inflexibly applying to all aspects of 'classroom instruction' or 'speech related to scholarship or teaching'" as the majority now claims. *Supra* at 60 (quoting *Garcetti*, 547 U.S. at 425). To the contrary, the plain language of the *Garcetti* majority indicates that it simply did not need to decide that issue at that time.

teacher's official duties is erroneous. *See, e.g., Janus*, 138 S. Ct. at 2474 ("[I]n general when public employees are performing their job duties, their speech may be controlled by their employer."). Communicating with students is expected of teachers as a part of their ordinary job duties. *Janus*, 138 S. Ct. at 2474; *Howell v. Town of Ball*, 827 F.3d 515, 524 (5th Cir. 2016); *Johnson-Kurek*, 423 F.3d at 595. Thus, by all accounts, adhering to the anti-discrimination policy falls into two unprotected categories: ministerial speech relating to school and course administration, *Meriwether*, 992 F.3d at 507, and educational speech relating to school policies and values, *Chiras v. Miller*, 432 F.3d 606, 613 (5th Cir. 2005), both of which may be permissibly compelled in the furtherance of the school's educational objectives. *Id.*

The majority notes that *Garcetti* was not a compelled speech case and *Garcetti* applied the official-duties doctrine to "expressions employees *make* pursuant to their professional duties, not expressions employees *refuse to make*." *Supra* at 59. I am unpersuaded. The distinction the majority attempts to draw between expressions made pursuant to professional duties and expressions employees refuse to make is without support or significance. First, *Garcetti* itself does not draw that distinction. There is nothing in *Garcetti's* reasoning to suggest that the prosecutor would have fared differently if instead of writing the defiant memorandum, he had simply refused to prosecute the case against his employer's wishes. Second, I find no meaningful difference between Vlaming calling Doe by his last name alone or by his masculine chosen French name and Vlaming refusing to call Doe by his preferred pronoun. The end result is the same.

Additionally, the majority tells us it is a constitutional command that government coercion, even when indirect, cannot compel individuals to "mouth support" for religious, political, or ideological views that they do not believe. However, Vlaming is not excluded from

127

exercising a contrary view when not actively engaged in his government employment. *See Agency for Int'l. Dev. v. All. for Open Soc'y Int'l*, 570 U.S. 205, 213 (2013) (holding it unconstitutional for the government to regulate speech outside of a federally funded program, even if that speech voices a contrary viewpoint to the government's message). Vlaming retained the right to espouse his own views in contrast to the school's values. He may do so in public discussions, panels, or other engagements of his choosing outside of his official job duties. *See, e.g., Loudoun Cnty. Sch. Bd. v. Cross*, No. 210584, slip op. at 1 (Aug. 30, 2021) (unpublished order). But the school is entitled to require its employees to cultivate a safe, inclusive, and respectful environment while in the classroom.

School boards have "the discretion to promote policies and values of its own choosing free from forum analysis or the viewpoint-neutrality requirement," and "retain[] this discretion even where it chooses to employ private speakers to transmit its message." *Chiras*, 432 F.3d at 613. Indeed, the Supreme Court of the United States has held that nothing in the First Amendment prevents the government from speaking for itself when espousing a policy, taking a position, or selecting a view it wants to express. *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 208 (2015); *Pleasant Grove City v. Summum*, 555 U.S. 460, 467-68 (2009). Such is not a restriction on private speech, but the way the government carries out its duties to reflect the will of the electorate every day. *Walker*, 576 U.S. at 208. If this were not the case, "it is not easy to imagine how government [could] function." *Id*. The School Board may require Vlaming to be a part of a larger initiative during his instructional time without infringing on his private speech because the School Board has designated certain communications as official duty speech. *See, e.g., Rumsfeld v. F. for Acad. and Institutional Rts., Inc.*, 547 U.S. 47, 66-67 (2006). Requiring Vlaming to implement the School's anti-discrimination policy is not

compulsion, but a requirement that he completes his job duties in the manner assigned. Simply stated, the School Board is the speaker and Vlaming its spokesperson; thus, the School may regulate its own messages to that effect. Even if Vlaming fundamentally disagreed with these communication requests, he could not refuse to comply and, instead, assert his own personal views.[26]

Even assuming that Vlaming's speech was not made pursuant to his "official duties," it was not protected under the Article 1, Section 12 of the Constitution of Virginia under the *Pickering-Connick* framework.

C.  THE APPLICABILITY OF THE *PICKERING* FRAMEWORK TO NON-CURRICULAR SPEECH

Individuals do not abandon their constitutional rights "by virtue of accepting public employment," but "the state, as an employer, undoubtedly possesses greater authority to restrict the speech of its employees than it has as sovereign to restrict the speech of the citizenry as a whole." *Urofsky*, 216 F.3d at 406. When a public school teacher's speech is at issue, the objective is to "arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. The United States Court of Appeals for the Fourth Circuit has described this inquiry as a three-prong test in which courts consider "(1) whether the public employee was speaking as a citizen upon a matter of public concern or as an employee about a matter of

---

[26] "Were the Free Speech Clause interpreted otherwise, government would not work. How could a city government create a successful recycling program if officials, when writing householders asking them to recycle cans and bottles, had to include in the letter a long plea from the local trash disposal enterprise demanding the contrary? How could a state government effectively develop programs designed to encourage and provide vaccinations, if officials also had to voice the perspective of those who oppose this type of immunization?" *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207-08 (2015).

129

personal interest; (2) whether the employee's interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public; and (3) whether the employee's speech was a substantial factor in the employee's adverse employment decision." *Kashdan v. George Mason Univ.*, No. 201509, slip op. at 4 (4th Cir. June 13, 2023) (quoting *Adams v. Trs. of Univ. of N.C.–Wilmington*, 640 F.3d 550, 56061 (4th Cir. 2011)) (hereinafter "*Pickering-Connick* framework"). This framework is derived from the Supreme Court of the United States' decisions in *Pickering* and *Connick v. Myers*, 461 U.S. 138 (1983).

Rather than applying the *Pickering-Connick* framework, the majority effectively prescribes a categorical rule which gives an employee an absolute right to refrain from speaking if "the State's interest is to disseminate an ideology." *Supra* at 60 (quoting *Wooley v. Maynard*, 430 U.S. 705, 717 (1977)). The School Board, however, vehemently denies that it has any ideological interest. It merely requires teachers to follow the wishes of a child regarding their preferred pronouns. It asserts that "Vlaming subverted the School Board's efforts to promote a learning environment free from discrimination based on gender identity in compliance with federal and state law." In light of the majority's summary conclusion that the School Board's interest in this case is to "disseminate an ideology," is the trial court on remand expected to ignore the School Board's arguments and evidence presented in favor of its asserted interests? Under the applicable analytical framework, the answer should be no, but the majority opinion appears to suggest otherwise.

The majority remarks that pronouns have never "been scrutinized as closely as they are today for their power to validate—or invalidate—someone's perceived sex or gender identity." *Supra* at 59-60 (quoting *Meriwether*, 992 F.3d at 509). While the majority deploys this in

130

support of its position that Vlaming was speaking on a matter of public concern, this public scrutiny only heightens the compelling need for the School Board to shield its students from potentially hostile classroom environments.

The majority relies in significant part on *Wooley* to validate its analytical structure. *Wooley*, however, is factually distinguishable from this case. In *Wooley*, a New Hampshire law required noncommercial motor vehicles to use license plates with the state's motto, "Live Free or Die," and made it a criminal offense to conceal the motto. *Id.* at 707. The U.S. Supreme Court held that the state could not constitutionally compel a man and his wife, who held religious objections to the motto, to display it. *Id.* at 717. The statute was unconstitutional not merely because it compelled an individual to convey an ideological message, but because it "in effect require[d] that appellees use their private property as a 'mobile billboard' for the State's ideological message or suffer a penalty." *Id.* at 715. The requirement to "publicly advertise" the motto distinguished it from other government compelled messages.[27]

A state mandated message, visible "to hundreds of people each day," on an individual's personal vehicle is categorically different from a public school teacher's on the job communications with a student as dictated by School Board employment regulations. *Id.* at 715. Thus *Wooley*, as a case dealing with the free speech rights of citizens in their private and personal capacities, is inapposite to this case, which requires an examination of Vlaming's role as a public employee.

---

[27] As an example to highlight this distinction, the U.S. Supreme Court referenced the motto, "In God We Trust," contained on United States currency. *Wooley*, 430 U.S. at 717, n.15. This motto, unlike the license plate motto, "passed from hand to hand" and "need not be displayed to the public." *Id.* at 717, n.15.

131

Moreover, the majority's distinction between free speech and compelled speech is a siren song; it is constitutionally insignificant. *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796-97 (1988) ("There is certainly some difference between compelled speech and compelled silence, but in the context of protected speech, the difference is without constitutional significance, for the First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what *not* to say.") (emphasis in original); *Wooley*, 430 U.S. at 714 (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943)) (noting that "[t]he right to speak and the right to refrain from speaking are complementary components of the broader concept of 'individual freedom of mind'").

The Supreme Court of the United States' holding in *Janus,* 138 S. Ct. 2448 (2018), does not compel a different conclusion. The challenger in *Janus* was a public employee and nonunion member who was required to pay a percentage of the union's fees. *Id.* at 2461. The U.S. Supreme Court held that the "compelled subsidization of private speech" was unconstitutional, reasoning in part that, "[w]hen a large number of employees speak through their union, the category of speech that is of public concern is greatly enlarged, and the category of speech that is of only private concern is substantially shrunk." *Id.* at 2464, 2473. It thus held that *Pickering* did not apply because it "was developed for use in a very different context—in cases that involve 'one employee's speech and its impact on that employee's public responsibilities.'" *Id.* at 2472 (quoting *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 467 (1995)). It further noted that, "[o]f course, if the speech in question is part of an employee's official duties, the employer may insist that the employee deliver any lawful message." *Id.* at 2473 (citing *Garcetti*, 547 U.S. at 421-22, 425-26). The Supreme Court in *Janus* postulated that *Pickering* would

"require adjustment" in a compelled speech case, but it declined to decide whether it applied to such cases and further declined to articulate what that "adjustment" would look like. *Id.*

Here, the policies at issue apply to all employees, but the speech in question only concerns the interpersonal communications between one teacher, Vlaming, and one student, Doe. The School Board's policies did not require Vlaming to endorse the articulated political positions of an entire union; they merely tasked Vlaming to address Doe with his preferred pronoun. The purpose of union membership is to allow workers to advocate and collectively bargain for their employment interests, which inherently involves taking positions on matters of public concern and public employment. Requiring a nonunion employee to contribute to a union is distinguishable from requiring a teacher to use the pronouns preferred by a student.

Therefore, to the extent the communication here was not curricular, application of the *Pickering-Connick* framework is appropriate. *See, e.g., Adams*, 640 F.3d at 564-65; *Lee*, 484 F.3d at 694, n.11. Previous cases which have addressed the precise issue presented here—whether a teacher has a free speech right to refuse to use a transgender student's preferred pronouns—have applied some version of the *Pickering-Connick* framework. *See, e.g., Meriwether*, 992 F.3d at 507; *Kluge v. Brownsburg Cmty. Sch. Corp.*, 432 F. Supp. 3d 823, 838 (S.D. Ind. 2020) (*Kluge I*). Most importantly, the Fourth Circuit has consistently applied this framework to free speech claims made by teachers. *See, e.g., Kashdan*, 4th Cir. No. 20-1509, slip op. at 4; *Adams*, 640 F.3d at 564; *Lee*, 484 F.3d at 694; *Urofsky*, 216 F.3d at 406; *Boring*, 136 F.3d at 368-69.

Vlaming alleges that he was compelled to speak on a matter of public concern. Our standard of review upon the sustaining of a demurrer requires us to accept as true all factual allegations, but "we do not accept the veracity of conclusions of law camouflaged as factual

133

allegations or inferences." *AGCS Marine Ins. Co. v. Arlington Cnty.*, 293 Va. 469, 473 (2017). Rather, "we review all conclusions of law de novo." *Id.* Therefore, I am not required to accept Vlaming's legal conclusion that he was speaking on a matter of public concern and evaluate this claim accordingly.

Public employee speech, when not made pursuant to official duties, receives protection if the employee speaks as a private citizen addressing a matter of public concern. To determine if speech touches upon matters of public concern, courts look to "the content, form, and context of a given statement, as revealed by the whole record," to evaluate if it involves a "matter of political, social, or other concern to the community." *Connick,* 461 U.S. at 146-48.

While the national debate around "gender identity" may be classified as a "sensitive political topic[] . . . of profound 'value and concern to the public.'" *Janus*, 138 S. Ct. at 2476 (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)), the School Board's antidiscrimination policy did not require Vlaming to pay lip service to any particular political position, just to refer to a child in the way that child wished to be addressed. *See PruneYard Shopping Center v. Robins*, 447 U.S. 74, 87 (1980) (finding no First Amendment violation in part when "no specific message is dictated by the State.").

Second, I consider "whether the speech is 'made primarily in the [employee's] role as citizen or primarily in his role as employee.'" *Urofsky*, 216 F.3d at 407. Courts recognize "the basic truth that speech by public employees undertaken in the course of their job duties will frequently involve matters of vital concern to the public, without giving those employees a First Amendment right to dictate to the state how they will do their jobs." *Id.* (quoting *Terrell v. Univ. of Tex. Sys. Police*, 792 F.2d 1360, 1362 (5th Cir. 1986)) (alteration in original). Only when the employment is "tangentially and insubstantially involved in the subject matter of the public

134

communication made by [the employee], . . . it is necessary to regard the [employee] as the member of the general public he seeks to be.'" *Id*. (quoting *Pickering*, 391 U.S. at 574) (alterations in original).

This is where Vlaming's cause of action fails under the *Pickering-Connick* framework. The majority's argument that Vlaming's speech is unrelated to his position as a public school teacher because it does not directly pertain to a curricular matter fails to sufficiently consider the context in this case. Even assuming that Vlaming were to successfully argue that the matter was of public concern, he undoubtedly fails the *Pickering-Connick* test because he was a public employee speaking in his function as a public school teacher.

The manner in which a teacher communicates with his students in the classroom, during class time, fits squarely within his function as a public school teacher. "[H]ow faculty members relate to students *is* part of their jobs" and the manner in which a teacher runs his classroom is a "core academic dut[y]." *Wozniak v. Adesida*, 932 F.3d 1008, 1010 (7th Cir. 2019) (emphasis in original). Indeed, "it is difficult to imagine how a teacher could perform his teaching duties on any subject without a method by which to address individual students." *Kluge I*, 432 F. Supp. 3d at 839.[28]

In this case, Vlaming and Doe's communications with one another stemmed entirely from their teacher-student relationship. But for his position as a public school teacher, Vlaming would have no need to *ever* communicate with Doe. The majority cannot escape this connection by repeatedly framing the issue as one of compelled ideological conformity.

---

[28] The incident in which Vlaming used the wrong pronoun in class to refer to Doe illustrates the inseparability of basic forms of communication from Vlaming's teaching duties.

*Kluge I*, a factually analogous case, highlights how the majority's analysis goes astray. In *Kluge I*, 432 F. Supp. 3d at 833-36, a high school teacher asserted free speech and free exercise claims against the school's policies requiring him to use transgender students' preferred names and pronouns. The court held that he failed to state a free speech claim in part because he was not "disciplined for criticizing or opposing the Policy, but . . . for refusing to follow it in his classroom by refusing to call students by the first names listed." *Id.* at 839. The court acknowledged the public importance of the topic of gender identity but rejected the argument that all speech related to it is constitutionally protected, stating that "the act of referring to a particular student by a particular name does not contribute to the broader public debate on transgender issues." *Id*; *see also Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trustees*, 2023 WL 4297186 (D. Wyo. June 30, 2023). Additionally, while informative but not precedential, a three-Justice panel of this Court has previously recognized the distinction between speech occurring within the classroom and speech made for the express purpose of expressing a view on a topic.[29]

In this case, Vlaming was not attempting to influence the political, cultural, or social debate around this topic. He was not expressing opposition to the policies at a school board meeting, was not speaking to his friends about his personal views on the topic of gender identity

---

[29] In *Loudoun Cnty. Sch. Bd. v. Cross*, Record No. 210584, slip op. at 1 (Aug. 30, 2021) (unpublished order), upon a petition for review, the panel affirmed the lower court's grant of a temporary injunction in favor of an elementary school teacher, after he was placed on administrative leave for comments he made at a public school board meeting criticizing a proposed policy which would require school staff to use the preferred pronouns of transgender students. *Id.* at 1. The three Justice panel reasoned that the facts before it were on a different footing than those in *Kluge I*, because there the teacher was "not asserting that he was disciplined for criticizing or opposing the" school board's policy. *Id.* at 13-14 (quoting *Kluge I*, 432 F. Supp. 3d at 839). Such a distinction makes sense when considering that the core concern in free speech claims made by public employees "is to maintain for the government employee[s] the same right enjoyed by [their] privately employed counterpart[s]." *Urofsky*, 216 F.3d at 407.

136

and was not in any other way speaking in his capacity as a private citizen. He, while teaching, was communicating with a student in his class who was transgender. It is poor reasoning to say that a public school teacher is contributing to the marketplace of ideas by refusing to address a student in the manner requested by the student, and required by the School Board in the course of his employment. [30]

This accords with the general recognition that "the public schools possess the right to regulate speech that occurs within a compulsory classroom setting, and that a school board's ability in this regard exceeds permissible regulation of speech in other governmental workplaces or forums." *See Lee,* 484 F.3d at 695. The majority's holding usurps the School Board's authority, as "it is not a court's obligation to determine which messages of social or moral values are appropriate in the classroom." *Id.* at 700.

Therefore, I would hold that Vlaming has failed to state a cause of action for his free speech claims. Because I conclude that Vlaming was not speaking on a matter of public concern, I do not reach the second or third prongs of the balancing framework. My conclusion is the same under Vlaming's "Compelled Speech," "Viewpoint and Content Discrimination," and "Retaliation" claims. Vlaming makes a conclusory allegation that he was fired "for expressing

---

[30] Given these fundamental differences, Vlaming's case is categorically distinguishable from *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023), in which the U.S. Supreme Court held that an individual who ran a private business designing websites in Colorado had a First Amendment right to refuse to create websites for same-sex couples, as required by Colorado's public accommodations law. In that case, the parties stipulated that the websites were created "to communicate ideas" and, accordingly, the speech qualified as "pure speech." *Id.* at 579. Under that framework, the U.S. Supreme Court reasoned that Colorado unconstitutionally interfered with the website designer's right to participate in the "marketplace of ideas" by requiring her to produce a message with which she disagreed. *Id.* at 585 (quoting *McCullen v. Coakley*, 573 U. S. 464, 476 (2014) (internal quotation marks omitted)). As previously examined, Vlaming's role as a public school teacher is a central, not tangential, part of the analysis, as it requires the consideration of factors which, simply put, do not exist in *303 Creative*.

his views regarding gender identity," but his factual allegations do not, as the majority infers, establish a prima facie cause of action for those claims. To the contrary, the allegations establish that he was fired for repeatedly refusing to use Doe's preferred pronouns *to refer to* Doe in Doe's presence, and in the presence of other students and colleagues. His employment termination was based off his treatment of a student and not his personal expressions on the topic of gender identity or the wisdom of the School Board's policies.

For the same reason, I reject any insinuation that equates my conclusion to the endorsement of an absolute right for the School Board to regulate any and all speech so long as it occurs within the school building. It is the specific treatment of a student, arising solely out of the teacher's position as a public school employee, that compels my conclusion.

IV. DUE PROCESS OF LAW

Regarding Vlaming's due process claims, I would hold that he has failed to state a claim as a matter of law, and respectfully dissent from Part II.D. of the majority's opinion. This Court has made clear in multiple contexts that the "due process protections afforded under the Constitution of Virginia are co-extensive with those of the federal Constitution" and so this Court may look to federal due process jurisprudence for guidance. *Shivaee v. Commonwealth*, 270 Va. 112, 119 (2005); *Morrisette v. Commonwealth*, 264 Va. 386, 394 (2002); *Willis v. Mullett*, 263 Va. 653, 657 (2002).

The thrust of Vlaming's due process argument is that the School Board's policies are unconstitutionally vague as applied. "The constitutional prohibition against vagueness" serves to protect "citizens from the arbitrary and discriminatory enforcement of laws." *Tanner v. City of Va. Beach*, 277 Va. 432, 439 (2009). A statute or ordinance must "be sufficiently precise and

138

definite to give fair warning to an actor that contemplated conduct is criminal."[31] *Id.* "Due process protects 'the opportunity to be heard' by requiring, at a minimum, '*some* kind of notice' and '*some* kind of hearing.'" *Fairfax Cnty. Sch. Bd. v. S.C. by Cole*, 297 Va. 363, 376 (2019) (quoting *Goss v. Lopez*, 419 U.S. 565, 579 (1975) (emphasis in original) (citation omitted)). Whether "the timing and content of the notice" is constitutionally sufficient "will depend on appropriate accommodation of the competing interests involved." *Id.* (quoting *Goss*, 419 U.S. at 579). "Even where First Amendment values are at stake, 'employment standards "are not void for vagueness as long as ordinary persons using ordinary common sense would be notified that certain conduct will put them at risk"' of discipline." *Meriwether*, 992 F.3d at 518 (quoting *Dade v. Baldwin*, 802 Fed. Appx. 878, 885 (6th Cir. 2020)).

In the context of public schools, my inquiry requires a heightened level of caution. "Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint . . . . By and large, public education in our Nation is committed to the control of state and local authorities." *Fairfax Cnty. Sch. Bd.*, 297 Va. at 375 (quoting *Goss*, 419 U.S. at 565). Accordingly, school officials "have greater leeway when crafting school policy than legislatures do in adopting criminal statutes because of the need of school officials to respond to 'a wide range of unanticipated conduct disruptive of the educational process.'" *Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 442 (4th Cir. 2013) (quoting *Fraser*, 478 U.S. at 686). However, "the demands of public secondary and elementary school discipline are such that it is inappropriate to expect the same level of precision in drafting school disciplinary

---

[31] Though *Tanner* is a criminal case, the principles underlying the constitutional prohibition against vagueness correlate with the civil context to ensure that public employees such as school staff are not subject to arbitrary and discriminatory enforcement of employment policies.

policies as is expected of legislative bodies crafting criminal restrictions." *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 260 (3d Cir. 2002).

In this case, Policy AC provides that the "School Board is committed to non-discrimination" on the basis of "gender identity." It cites to Title IX and other federal anti-discrimination laws, among other legal authority, and cross-references Policy GBA/JFHA. Policy GBA/JFHA states that "[i]t is a violation of this policy for any . . . school personnel to harass a student . . . based on . . . gender identity" and further prohibits "[d]emeaning or otherwise harmful actions[,] . . . particularly if directed at personal characteristics including . . . gender identity." This provision recognizes the flexibility needed in the school setting, providing that "[b]ehavior that is not unlawful may nevertheless be unacceptable for the educational environment or the workplace." In other words, sanctionable conduct is not limited to a violation of a criminal statute. Vlaming's conduct represents such a scenario.

Accordingly, the policy makes clear that "[w]hether a particular action or incident constitutes a violation of this policy requires a case-by-case determination based on all of the facts and circumstances revealed after a complete and thorough investigation." Policy GBA/JFHA cites to Title IX and other federal antidiscrimination laws, among other legal authority, and cross-references Policy AC. Policy GBCB requires all staff members "to be aware of and abide by all laws, School Board policies and administrative regulations which affect their work in the West Point school division."

It is apparent from Vlaming's Complaint and attached exhibits that the policies as applied to him were constitutionally unambiguous. Vlaming's own allegations establish that he was clearly informed on multiple occasions that (1) the School Board's policies required him to use Doe's preferred pronouns and (2) his continued refusal to comply with such directive would

140

result in his termination.[32]  On October 24, 2018, Assistant Principal Suzanne Aunspach informed Vlaming that he could be violating federal law and School Board policy by not using Doe's preferred pronouns.[33]

Vlaming responded that it was against his religious beliefs to do so.  On October 30, 2018, Principal Jonathan Hochman informed Vlaming that a refusal to use Doe's preferred pronouns could lead to his employment termination.  Vlaming reiterated that he would not comply due to his religious beliefs.  The next day, Hochman informed Vlaming that he would be receiving a formal letter of reprimand for refusing to comply with School Board policy.  Then, after the in-class incident in which Vlaming misgendered Doe, Vlaming was placed on administrative leave while the School Board investigated his actions.  On November 5, 2018, Hochman sent Vlaming a final warning letter informing him that his refusal to use Doe's preferred pronouns violated Policies GBA/JFHA and GBCB.  The letter made clear that Vlaming's "use of male pronouns should be consistent with how you address other male students."  Vlaming also received a written directive from Superintendent Laura Abel informing

_____

[32] *See Meriwether,* 992 F.3d at 518 (holding that a professor could not challenge the university's policy for vagueness in part because the university administrators "ultimately told him [that] he had to use Doe's preferred pronouns" and he was thus "clearly on notice that the policy applied to his conduct"); *Kluge I*, 432 F. Supp. 3d at 844 (stating "that Mr. Kluge's allegations demonstrate his own understanding and awareness of the Policy and its requirements long before his resignation, as he had several conversations with school administrators concerning his assertions that the Policy conflicted with his religious beliefs and addressing his desire not to follow the Policy"); *Hardwick*, 711 F.3d at 442 (holding that a student's due process rights were not violated in part because she was informed by school officials "on multiple occasions" that her shirts violated the school's dress code).

[33] This contradicts Vlaming's assertion that the School Board, rather than following its own interpretation of School Board policy, was merely following the parents' wishes that Doe be referred to by masculine pronouns.

him that refusal to comply with the directives "will be considered insubordination and will result in termination of your employment."

On November 8, Abel provided written notice to Vlaming that he was being recommended for dismissal. This notice informed him that he had a right to a public hearing before the School Board. Vlaming invoked this right and a hearing was conducted on December 6, 2018, with both sides represented by counsel. At the conclusion of the hearing and upon consideration of the evidence, the School Board unanimously voted to accept Abel's recommendation of dismissal, concluding that Vlaming had violated Policies AC and GBA/JFHA after he was informed no fewer than six times that his refusal to use Doe's preferred pronouns violated such policies.

In sum, the School Board clearly and unambiguously informed Vlaming that his conduct was prohibited, undertook a lengthy investigative process, and conducted a public hearing in which Vlaming was represented by counsel and had the opportunity to fully advocate in favor of his position. For these reasons, I would hold that Vlaming has failed to plead a cause of action regarding his due process claims.

## V. BREACH OF CONTRACT

Finally, Vlaming argues that the School Board breached its employment contract with him when it fired him for exercising his constitutional and statutory rights. Code § 22.1-307 authorizes the School Board to dismiss teachers for "noncompliance with school laws and regulations." As a teacher who had been granted continuing contract status, Vlaming had a contractual right to employment "during good behavior and competent service." Code § 22.1-304(B).

142

Because I would find that Vlaming has stated a cause of action for his free exercise claims, it necessarily follows that he has stated a cause of action for breach of contract. I agree with the majority that this claim may go forward, but only on the basis of Vlaming's constitutional and statutory free exercise rights.

While I conclude that this case cannot be dispensed with at the demurrer stage on Vlaming's free exercise and breach of contract claims, I cannot endorse the test the majority *creates* for addressing free exercise claims. Further, I disagree with the majority's opinion as to Vlaming's free speech and due process claims. Therefore, I respectfully concur in part and dissent in part.

In this building we should dabble in neither the political nor ideological issues of the day. Nor are we to decide cases guided solely by either the practical or logistical consequences of our decisions. Yet like all jurists, part of our obligation and duty is to demonstrably ensure that parties and those similarly situated know their positions have been heard, understood, and addressed.

No doubt Doe will read or hear about the majority opinion and hopefully this partial concurrence and dissent as well. He may observe that, except for the background section of the majority's opinion, he is nearly invisible. But Doe cannot be left out of the equation, as his rights play a vital part in the correct analytical framework. That is as it should be.